IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ANN RYLEE MCLEOD,                      )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )     CIVIL ACTION NO. 20-00595-JB-MU
                                       )
UNITED STATES OF AMERICA, et al.,      )
                                       )
            Defendants.                )

**ORDER**

This action is before the Court on Defendant Scott Fondren's Motions for Summary Judgment (Docs. 233 and 363) and supporting briefs (Docs. 239 and 329), Plaintiff's Responses (Doc. 356 and 376), and Fondren's reply (Doc. 375). A hearing was held on March 11, 2024, and the Court has reviewed the motions, supporting briefs and the various exhibits filed in support of the motions. For the reasons discussed below, Fondren's Motion for Summary Judgment (Docs. 233) is **GRANTED** and his second motion for summary judgment (Doc. 363) is **MOOT**.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**[1]

The facts which resulted in this lawsuit are, for the most part, undisputed by the parties. In most instances, such a situation might streamline the Court's factual predicate to ruling on a dispositive motion. However, in this case, given the number of Defendants, their employment and roles with different state and federal organizations, and the relevant inquires that must be

---

[1] This factual summary repeats, in large part, the factual and procedural backgrounds set forth in this Court's other Orders ruling on the motions for summary judgment filed by the other Defendants.

made with respect to the numerous claims, the Court finds the least complicated path, is to start at the beginning.

On December 11, 2020, Plaintiff filed her Complaint against six defendants, alleging twenty causes of action which can be described as follows: in Counts I-VI, Plaintiff asserts claims pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) for violation of her Fourth Amendment rights (hereinafter "*Bivens*" claims); in Counts VII-X, Plaintiff asserts claims under the Fourth Amendment and 42 U.S.C. § 1983 for use of excessive and deadly force, unlawful entry, and failure to knock and announce (hereinafter "§ 1983" ); in Counts XI-XIV, Plaintiff asserts claims brought pursuant to the Federal Tort Claims Act; 28 U.S.C. §1346(b) ("FTCA"); and in Counts XV-XX Plaintiff asserts claims brought pursuant to Alabama State Law.  (Doc. 1).  Plaintiff later amended her Complaint several times and the operative complaint is the Third Amended Complaint filed on January 12, 2022.  (Doc. 122). Counts I-VI remain *Bivens* claims; *C*ounts VII-XVI are § 1983 claims; Counts XVII-XX are claims brought pursuant to the Federal Tort Claims Act; 28 U.S.C. § 1346(b) for assault and battery, negligence, wantonness, and false imprisonment; and Counts XXI-XXVI are claims brought pursuant to Alabama State Law for assault and battery, intentional infliction of emotional distress, negligence, wantonness, invasion of privacy, and false imprisonment. (*Id*.)

The relevant counts are pled against the various Defendants as follows:

**Count I** (*Bivens* claim) Use of Deadly Force – against Austin Wade Welch ("Welch"), John Gregory Skipper("Skipper"), and Scott Ray Fondren ("Fondren");
**Count II** (*Bivens* claim) Use of Deadly Force – against Beau Bartel ("Bartel");
**Count III** (*Bivens* claim) Unlawful Entry – against Welch, Skipper, and Fondren;
**Count IV** (*Bivens* claim) Unlawful Entry – against Bartel;
**Count V** (*Bivens* claim) Failure to Knock and Announce - against Welch, Skipper, and Fondren;
**Count VI** (*Bivens* claim) Failure to Knock and Announce – against Bartel;

**Count VII** (1983 claim) Use of Excessive and Deadly Force - against Welch, Skipper, Rebecca P. Miller ("Miller"), and David Smith ("Smith");

**Count VIII** (1983 claim) Use of Excessive and Deadly Force – against Fondren;

**Count IX** (1983 claim) Use of Excessive and Deadly Force – against Bartel;

**Count X** (1983 claim) Unlawful Entry- against Welch, Skipper, Miller, and Smith;

**Count XI** (1983 claim) Unlawful Entry- against Fondren;

**Count XII** (1983 claim) Unlawful Entry- against Bartel;

**Count XIII** (1983 claim) Unlawful Entry- against Raylene Busby ("Busby");

**Count XIV** (1983 claim) Failure to Knock and Announce against Welch, Skipper, Miller, and Smith;

**Count XV** (1983 claim) Failure to Knock and Announce against Fondren;

**Count XVI** (1983 claim) Failure to Knock and Announce against Bartel;

**Count XVII** (FTCA claim) Assault and Battery against the United States of America ("USA);

**Count XVIII** (FTCA claim) Negligence against USA;

**Count XIX** (FTCA claim) Wantonness against USA;

**Count XX** (FTCA claim) False Imprisonment against USA;

**Count XXI** (state law claim) Assault and Battery against Skipper, Welch, Busby, Miller, and Smith;

**Count XXII** (state law claim) Intentional Infliction of Emotional Distress against Skipper, Welch, Busby, Miller, and Smith;

**Count XXIII** (state law claim) negligence against Skipper, Welch, Busby, Miller, and Smith;

**Count XXIV** (state law claim) wantonness against Skipper, Welch, Busby, Miller, and Smith;

**Count XXV** (state law claim) invasion of privacy against Skipper, Welch, Busby, Miller, and Smith;

**Count XXVI** (state law claim) false imprisonment against Skipper, Welch, Busby, Miller, and Smith.

Although Plaintiff's Complaint categorizes the relevant individual Defendants as acting

under color of both state and federal authority, the Defendants are employed as follows:

Bartel is a Deputy U.S. Marshal stationed in the Southern District of Alabama.
Busby is a Mobile County Deputy Sheriff.
Welch is a Baldwin County Deputy Sheriff.
Skipper is an Alabama Department of Corrections Sergeant/Training Instructor.
Fondren is a Department of Homeland Security HSI agent.

(Doc. 122 at 4-6).  Relevant to the instant motion is Counts I, III, V, VIII, XI, XV[2] all of which are made pursuant to § 1983 or *Bivens* and asserted against Fondren.  A consideration of the relevant claims against Fondren requires a consideration of the facts relating to Nicholas McLeod, Operation Grinch, and the events of December 19, 2019.

### A.    Operation The Grinch

The Mobile County Sheriff's Office ("MCSO") narcotics and vice unit (NVU) conducts twice yearly arrest round-ups of drug suspects in cases accumulated during the year.  (Doc. 353 at 10).  In late October/early November 2019, the MCSO began planning a December 2019 round-up of completed drug cases.  (*Id*.).  The round-up was referred to as "Operation the Grinch."   (*Id*.).  Nicholas McLeod was identified as one of the subjects to be arrested along with fifty-four other individuals.  (*Id*. at 11, 14).

Round-up operations commander Lt. Patrick White ("White") instructed operations leader Sgt. David Smith ("Smith") ". . . to organize personnel for the teams, divide the teams, and assign them to certain areas and collect the intel packets when they were done, and also prepare the briefing, the ops plan."  (*Id*. at 15).  White told Smith the MCSO narcotics investigators (Deputies Busby, Alan O'Shea and Clint Law) would "take care of the rest." (*Id*.)

Early in the round-up planning, White invited Homeland Security Investigations (HSI) personnel to assist via Philip Lavoie ("Lavoie").  (*Id*.).  Additionally, Smith called U.S. Marshal Beau Bartel ("Bartel"), who was in charge of the Regional Fugitive Task Force's ("RFTF") Mobile Office

---

[2] The Court notes that in December 2023 the parties filed a "Stipulation for Dismissal" pursuant to Fed. R. Civ. P. (a)[1](A)(ii) to dismiss, among other claims, Counts V and XV against Fondren (Doc. 349) and the parties assume those claims have been dismissed.  Nevertheless, the notice did not comply with Fed. R. Civ. P. 41 as it attempted to dismiss some, but not all, claims against Fondren. *See Perry v. Schumacher Grp. of La.*, 891 F.3d 954, 958 (11th Cir. 2018). Regardless, because the Court finds that all claims pursuant to § 1983 and *Bivens* are due to be dismissed for the reasons set forth herein, Counts V and XV are due to be and are hereby dismissed.

and invited the RFTF to participate.  (*Id*. at 8, 15).  According to Smith, generally the RFTF's role was to assist with the round-up.  According to Bartel, the role of the RFTF was to provide a "tactical response" to assist in the arrests.  (*Id*. at 15).   Both Lavoie for HSI, and Bartel for the RFTF, agreed to participate. (*Id*.).

Bartel knew when he agreed to RFTF participation that he would not learn the round-up targets' names, charges, or the personnel assigned to his arrest team.  (*Id*. at 15-16).  Instead RFTF personnel were to show up at the 5 a.m. pre-operational briefing and then help make the arrests.  (*Id*. at 16).  Bartel did not prepare an operational plan and only skimmed over the MCSO operational plan.  (*Id*.).

HSI's role in this operation was to assist the MCSO and the U.S. Marshal Service ("USMS") by helping secure the perimeter of the locations where the arrest warrants were to be executed. (Doc. 239 at 2).   If, while executing the warrants, MCSO/USMS personnel discovered evidence of subsequent drug-related violations which met the federal threshold, HSI personnel would seize and catalog the evidence in a federal evidence database and initiate a federal prosecution based on the newly discovered federal violation. (*Id*.).

Marine Interdiction Agent James Mark Spruill ("Spruill") a Task Force Officer on HIS's Border Enforcement Security Task Force ("BEST") acted as BEST Team Leader for the operation for HSI.  (*Id*. at 3; Doc. 353 at 16).  As Team Leader, Spruill was responsible for preparing the paperwork for HSI's involvement in the operation, including the HSI Enforcement Operation Plan. (Doc. 239 at 3).  He was also responsible for assigning HSI Special Agents, one of whom was Special Agent Fondren ("Fondren") to participate in the operation.  (*Id*.).  Prior to the operation, Smith provided Spruill with the names and personally identifiable information for each subject,

which Spruill then forwarded to an HSI Intelligence Research Specialist who ran each individual through the federal SAFETNet database for deconfliction with other federal agencies. (*Id*.) Upon completion of the HSI Ops Plan, Spruill submitted the plan for approval which was subsequently approved by Lavoie on December 17, 2019.  (*Id*.).

A week before to the round-up Smith prepared the MCSO round-up Ops Plan, which called for four arrest teams.  (Doc. 353 at 21).  The plan's "Operational Assignments" designated Bartel a team leader and Busby was assigned to Bartel's team as narcotics investigator (*Id*. at 21-22).  The Ops plan did not discuss tactics or identify the suspects or their charges.  (*Id*.).  According to Smith, team leaders were to make tactical decisions. (*Id*. at 22).  Bartel did not know who assigned him as team leader, and Busby did not know Bartel was going to be on a team until Bartel arrived to the round-up.  (*Id*.).

### B.    Nicholas McLeod

Nicholas Mcleod ("McLeod") was put on the radar of Officer Busby, a Mobile County Deputy Sheriff, on June 27, 2019 following a drug "reverse" investigation which resulted in McCleod being detained.  (Doc. 353 at 8).  Busby questioned McLeod, but allowed him to leave without arrest.  (*Id*. at 8, 11).  On July 1, 2019, Busby printed Nicholas McLeod's arrest history from the Sheriff's Jail Management System (JMS) which indicated McLeod's residence address as 1377 McCullough Road, Atmore, Alabama.  (*Id*.) The JMS history also indicated that the Mobile Circuit Court issued an alias warrant for McLeod's arrest on June 25, 2019, in a MCSO NVU case. (*Id*. at 11-12). McLeod was ultimately arrested on July 9, 2019, on alias warrants in the state law criminal case. (*Id*.)

Following his arrest, McLeod remained continuously in the Mobile County Sheriff's custody without bond, from July 9, 2019 through January 18, 2020.  During that time, Judge Brooks, a state court judge, ordered the Sheriff to transport McLeod from the jail to a drug rehab facility to complete a 90-day in-patient drug rehab program then transport him back to the Metro jail upon completion pending a status hearing.  (*Id*. at 12-13).  The Mobile Metro Jail staff notified Judge Brooks on December 16, 2019, that McLeod would finish the rehab program on December 18, 2019.  (*Id*. at 13).

On December 17, 2019, Busby signed criminal complaints initiating criminal cases against suspects she planned to include in the round-up (Operation the Grinch), including Nicholas McLeod.  (*Id*.).  Each of the complaints alleged violations of Alabama law.  (*Id*.).  A Mobile County Magistrate issued corresponding arrest warrants.  (*Id*.).  All of the warrants were delivered to the MCSO Warrants Division at about noon on December 18, 2019.  (*Id*.).

MCSO Transportation Officer Cleve Hudson collected Nicholas McLeod at the Mission of Hope on December 18, 2019 and returned him to Metro Jail as the judge ordered. (*Id*.). Back in jail, McLeod was then arrested at 3:36 p.m. on the warrants stemming from the "reverse." (*Id*.). Nicholas McLeod was re-booked into the Metro Jail on the warrants under his biographical information including his Atmore residence address.  (*Id*.).

MCSO Warrants Division clerk Deirdra Greene ("Greene") updated the JMS at 4:34 p.m. to show McLeod's arrest on the Busby warrants as an "added charge" and that he was in the Metro Jail.  (*Id*. at 14).  She followed this entry up at 4:55 p.m. by flagging the JMS entry with "RWA'd" (return without action) and noting "801 Round Up 12/19/2019" to caution that the McLeod warrants had been "included in the [next day's] round-up […]."  (*Id*.)

### C.      December 19, 2019

At approximately 5:00 a.m. on the morning of December 19, 2019, Fondren attended a ten-minute pre-operation briefing which was conducted by both MCSO and USMS personnel. (Doc. 239 at 4; Doc. 353 at 22).  MCSO and USMS team leaders were provided with intel packets for the subject of each arrest.  (Doc. 239 at 4). These packets were not provided to Fondren or his fellow HSI agents.  (*Id*.).  During the briefing, the final team assignments for MCSO, USMS, and HSI personnel were determined, and respective team members grouped together before departing for the various locations identified by MCSO to execute each warrant.  (*Id*.).  Individual suspects, locations to be hit, and tactical matters were not discussed at the briefing.  (Doc. 353 at 22).  However, at the close of the briefing, White "may have said in concluding the briefing be safe, make sure warrants are valid, all that good stuff." (*Id*. at 23). Additionally, according to Bartel, either White or Smith "[. . .] said all of these cases were verified. They're all good to go. [. . .]." (Doc. 333 at 11; Doc. 388-1 at 33.)

Once the arrest teams were identified, Bartel told the RFTF members "this is not our operation. We're not doing our – we are going to get to the house.  We're going to secure the house perimeter. We're going to knock and announce. We're not breaching. We're not making entry. We're going to call everybody out of the house.  If their target is there, we will place them under arrest."  (Doc. 353 at 28-29).

HSI special agents, including Fondren accompanied the MCSO/USMS officers to the address identified within the intel packets/listed on each warrant.  (Doc. 239 at 4).  These intel packets were prepared, and the warrants were obtained by MCSO Narcotics Unit personnel before being provided to MCSO/USMS team leaders responsible for executing the arrest

warrants.  (*Id*.). The location where each warrant was to be executed was shared with HSI personnel prior to the team's departure to the various subjects' suspected locations. (*Id*.). Nicholas McLeod was the second subject on the list as provided by the MCSO.  (*Id*.).

At 6:30 a.m. on December 19, 2019, seven vehicles approached 11223 Old Moffett Road (the "Property").  (Doc. 353 at 4, 31).  Fondren, carrying a M4 rifle and went immediately through the neighbor's yard and into the side and back yard of the Property while checking the windows in order create a perimeter before the RFTF officers knocked on the door.  (*Id*.).  Bartel and Busby approached two men in the front yard, later identified as Chris McLeod ("Chris") and Matthew Sullivan ("Sullivan").  (*Id*. at 32).

Although not known to Fondren, Bartel and Busby learned the identity of the two males (Chris and Sullivan) and were informed that McLeod did not live at the home.  (Doc. 353 at 32). They were additionally told by Chris and Sullivan that McLeod was thought to be in jail.  (*Id*.). Finally, the officers were told that Plaintiff was inside the home and there were guns in the home.

Since Bartel was with Busby at the street, Welch began to walk towards the carport door without Bartel.  (*Id*. at 35).  On his way, Welch heard Chris tell Busby and Bartel that his "wife or girlfriend" was in the house and that Nicholas McLeod was not there.  (*Id*.).  Welch continued towards the house to the carport door followed by Skipper.  (*Id*.). Meanwhile, Fondren was positioned at the southeast corner at the back of the house. (*Id*. at 36).  Believing that there were enough agents in the back yard, and curious to know what was going on in the front of the house and why it was taking so long, Fondren moved up closer to the carport.  (*Id*.).  Fondren saw a conversation taking place at the street among agents and the two men but could not hear what was said.  (*Id*.).

Fondren observed two officers (Welch and Skipper) walking to the carport door and then "stacking up" on the door, which he interpreted as meaning they were going to either knock on and announce to interview someone or they have probable cause that someone else is in the home and they are going to open the door. (*Id*.). Fondren determined he needed to either assist or get out of the way. (*Id*. at 37). He went to join the stack but did not reach it before the door opened. (*Id*.; Doc. 239 at 6). According to Fondren, no one knocked on the door. (*Id*.). Based on his observations, training, and experience, Fondren believed the individual(s) inside the house appeared to be "breaching" their own door, which is a tactical maneuver intended to obtain an advantageous position on anyone outside the door. (Doc. 239 at 6).

According to Plaintiff, she was in bed when she saw a beam of light in the side yard. (Doc. 353 at 1). Believing a prowler was outside, she got out of bed, picked up her pistol, and walked through the house towards the kitchen to ensure the door was locked. (*Id*.). As she reached for the lock, the kitchen door flew open towards her and all she saw were bright lights. (*Id*. at 2). According to Plaintiff, when the door flew open, she was holding a gun aimed at the floor. The officers yelled "Whoa, Whoa gun, gun" and Welch, Skipper, and Fondren all opened fire. (Doc. 353 at 3-4, 42). The officers collectively fired sixteen to eighteen bullets into the house, hitting Plaintiff five times.[3] (*Id*. at 3).

According to Fondren[4], when the door opened, he observed a handgun being presented by a female later identified as Plaintiff from inside the doorway. (Doc. 239 at 6-7). Almost immediately, the gun was pointed directly at/in line with Welch, Skipper, and himself. (*Id*.).

---

[3] It is now undisputed that none of the shots fired by Fondren struck Plaintiff.
[4] Fondren's version of events is disputed by Plaintiff.

Welch and Skipper both immediately commanded Plaintiff drop the gun.  (*Id*.). While Welch and Skipper engaged Plaintiff, Fondren moved away from the door and towards the far corner of the carport to exit Plaintiff's line of fire.  (*Id*.).

As Fondren took his new position, Welch and Skipper continued to identify themselves as officers and commanded Plaintiff to drop her gun, but she refused.  (*Id*.). From Fondren's perspective, Welch and the Plaintiff were so close to one another they appeared muzzle-to-muzzle.  (*Id*.).  According to Fondren, Plaintiff refused to drop the gun and grew hostile in her actions and mannerisms.  (*Id*. at 7-8).  Fondren then observed and heard the first of several gunshots.  (*Id*. at 8).  Unsure of who fired first, Fondren immediately fired two (possibly three) rounds at Plaintiff in an attempt to neutralize any threat to the officers.  (*Id*.).  When he fired, Fondren observed the carport door close and glass fall outward which he believed was an effort by Plaintiff or another unidentified individual's attempt to engage the officers by pushing through or shooting out the glass.  (*Id*.).  At that time, Fondren again moved away from the carport and fired two or three rounds high into/through the glass before ultimately taking position behind a nearby SUV.

Following the shooting, Plaintiff was ordered to exit the house, but informed the officers she had been shot and could not move.  (*Id*. at 8-9).  A team of officers ultimately cleared the house of threats and gave medical aide to Plaintiff.  (*Id*.).  Plaintiff was then transported to a hospital.  (*Id*.).

### D.    Post shooting

Several relevant facts are undisputed post-shooting.  The address listed on the warrant was not the last known address for McLeod or the address listed when he was previously

arrested.  None of the officers present at the Property on December 19, 2019, investigated McLeod's address.  Although not directly relevant to this motion, the totality of the record indicates that Busby gave an investigative file to the Mobile County District Attorney's office where it was reviewed and later sent to the County Magistrate's office. (Doc. 331 at 5).[5]  The Magistrates' office then prepared and issued the warrants, including the address. (*Id*. at 5-6).  The record also reflects that prior to December 19, 2019, Busby sent Rebecca Miller ("Miller") (a civilian MCSO employee who is no longer a defendant) a list of round-up suspects.  (Doc. 353 at 17).  Smith then instructed Miller to run a search on the warrant subjects, that included three reports with identifying information, including addresses.  (*Id*.; Doc. 331).  Miller placed the reports in folders and gave them to Smith, but neither Miller nor Smith reviewed, researched, or investigated further.  (*Id*. at 17-18; Doc. 331 at 7-8).[6]  Additionally, on December 18, 2019.  Miller re-ran all the warrant subjects through JMS (Jail Management Systems), DOC (Dept. of Corrections), and BOP (Bureau of Prisons) between 2p.m. and 2:50 p.m. and then notified Smith that five of the subjects (but not McLeod) had recently been arrested.  (Doc. 331 at 9).  There is no dispute that the address provided on the warrant was Plaintiff's residence.  (Doc. 353 at 4).  Moreover, the McLeod warrants were not active on December 19, 2019, because on that morning, McLeod was incarcerated.

---

[5] Because of the number of officers and organizations involved, there are multiple motions for summary judgment pending in this action simultaneously.  Although these facts were not included in the factual summary specific to Fondren, they do not appear to be disputed by the parties.

[6] Collectively it appears that Smith thought Miller was responsible for determining the last known address for the subjects and Miller believed she was simply running reports that Smith would use to determine last known addresses.  The result is that neither Smith nor Miller determined last known addresses. Also, there is no dispute that the reports on McLeod contained more than one address, including Plaintiff's residence address and the more recent address listed from McLeod's last arrest.

## II.   SUMMARY JUDGMENT STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Anderson*, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson*, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 524 (11th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial." *Vega v. Invsco Group, Ltd.*, 432 F. App'x 867, 870 (11th Cir. June 24, 2011). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

## III.   DISCUSSION

### A.   42 U.S.C. § 1983

Plaintiff alleges that Fondren, while acting under color of state law, violated her Fourth and Fourteenth Amendment rights due to his use of deadly and excessive force (Count VIII) and

unlawful entry (Count XI) into her home and seeks redress under 42 U.S.C. § 1983 ("§ 1983") (*See* Doc. 122).

Fondren contends that because he was acting within the scope and course of his employment as a special federal agent, Plaintiff's § 1983 claims are due to be dismissed. (Doc. 239 at 10-13).  For support, Fondren relies on the fact that (1) Fondren was ordered by his federal superior to assist with the operation, (2) Fondren's directive was to secure the perimeter and provide assistance as needed by the MCSO/USMS officers, (3) Fondren was not directed to execute any warrants, and (4) if the officers executing the arrest found evidence of federal violations, Fondren was to seize evidence and catalog it so that a federal investigation would be initiated.  (*Id*. at 11).  Moreover, Fondren has submitted a Scope of Employment Certification, wherein the United States Department of Justice has certified Fondren was acting within the scope of his employment as a federal agent at all relevant times.  (*See* Doc. 239-2).  Finally, in his supplemental brief, Fondren asserts that he participated in the operation through his federal investigative authority under 19 U.S.C § 1589a(4).  (Doc. 329 at 11-13).

Plaintiff concedes that at the time of the incident, Fondren was an employee of the Federal Government under the Federal Tort Claims Act ("FTCA").  (Doc. 356 at 41).  Plaintiff additionally makes no argument in response to Fondren's position that his authority to participate in the operation derived from 19 U.S.C § 1589a(4).  However, Plaintiff maintains that "the unique nature of the facts of this case" show that Fondren's Constitutional violations were done pursuant to color of state law and are therefore, addressable under § 1983.  (*Id*.).  More specifically, Plaintiff argues Fondren acted under color of state law by virtue of being on the task force controlled by and in concert with state actors to execute state arrest warrant for state

violations.  To determine whether Fondren was acting under color of state law, Plaintiff urges

this Court to consider "the totality of the circumstances" (*see Burton v. Wilmington Parking Auth.*,

365 U.S. 715, 722 (1961)) and apply the test set forth in *Lugar v. Edmonson Oil Co*. 457 U.S. 922,

937 (1982) as "some circuits" and "a number of district courts" have done.  (Doc. 356 at 43).

Relying on *Lugar*, Plaintiff argues that a consideration of the totality of the circumstances

warrants a determination that Fondren was acting under color of state law.  Specifically, Plaintiff

asserts that (1) Fondren "was serving state warrants as a part of the MSCO 'roundup'," (2) "Welch

was a Baldwin County Deputy," (3) "Skipper was an Alabama State employee," (4) "the crimes

charged to [Nicholas] McLeod were petty state offenses," and (5) there is no interstate nexus.

(Doc. 356 at 44).  In sum, Plaintiff contends that these facts show that Plaintiff's constitutional

deprivations can only be traceable to authority conferred on Fondren by Alabama state law.  *Id.*

The Fourteenth Amendment of the Constitution provides in part:

> "No State shall make or enforce any law which shall abridge the privileges
> or immunities of citizens of the United States; nor shall any State deprive
> any person of life, liberty, or property, without due process of law; nor
> deny to any person within its jurisdiction the equal protection of the laws.
> Because the Amendment is directed at the States, it can be violated only
> by conduct that may be fairly characterized as 'state action.'"

*Lugar*, 457 U.S. at 923-24.

"Section 1983 creates no substantive rights; it merely provides a remedy for deprivations

of federal statutory and constitutional rights."  *Almand v. DeKalb County*, 103 f.3d 1510, 1512

(11th Cir. 1997) (citations omitted).  No claim lies under § 1983, for actions taken under color of

federal law. *District of Columbia v. Carter*, 409 U.S. 418, 424-25, 93 S.Ct. 602, 34 L.Ed.2d 613

(1973).  As such, "[a] successful section 1983 action requires that the plaintiff show she was

deprived of a federal right by a person acting under color of state law."  *Almand,* at 1513 citing

*Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992) (citing *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 155–56, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978)).  "A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state." *Id*. (citing *Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir. 1995) (citing *West v. Atkins*, 487 U.S. 42, 48–50, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988)).

Whether conduct constitutes state action is no simple question of fact. *See Blum v. Yaretsky*, 457 U.S. 991, 996–98, 102 S.Ct. 2777, 2782, 73 L.Ed.2d 534 (1982) (describing the question of whether there is state action as question of law); *Cuyler v. Sullivan*, 446 U.S. 335, 342 n. 6, 100 S.Ct. 1708, 1715 n. 6, 64 L.Ed.2d 333 (1980) (determining if state action exists is resolution of question of law); *see also Duke v. Smith*, 13 F.3d 388, 392 (11th Cir. 1994) (reviewing *de novo*, as a mixed question of law and fact, district court's determination that private actor was not sufficiently intertwined with government entity to be engaged in state action).  *Id*. at 1513-14.

Pursuant to *Lugar,* Plaintiff must establish that the deprivation of constitutional rights alleged in her complaint "has resulted from the exercise of a right or privilege having its source in state authority," and that the officers, including Fondren, "may be appropriately characterized as 'state actors' " under the facts of this case.  *Lugar*, 457 U.S. at 939, 102 S.Ct. 2744.

As an initial mater, it is worth noting that none of the cases relied on by Plaintiff to support Fondren was acting under color of state law are from the Eleventh Circuit, or district courts within the Eleventh Circuit.[7]  Moreover, this Court's review of those cases cited by Plaintiff confirm the

---

[7] *See* Doc. 356 at n. 41 and 42 (citing to *Couden v. Duffy*, 446 F.3d 483, 499 (3d Cir. 2006); *Askew v. Bloemker*, 548 F.2d 673, 677 (7th Cir. 1976); *Johnson v. Orr*, 780 F.2d 386, 393 (3d Cir. 1986); *Pettiford v. City of Greensboro*, 556

existence of numerous factual distinctions.  Regardless, even applying *Lugar* as Plaintiff suggests, and considering the totality of the circumstances, this Court is not persuaded that Fondren was acting under color of state law.  First, it is undisputed that Fondren is a federal employee and that the Federal Government has certified that he was acting within his discretionary authority as a federal agent during his role in Operation Grinch.  Second, it is undisputed that Fondren's participation in the operation was permitted through his federal investigative authority under 19 U.S.C § 1589a(4).  Third, HSI agents, including Fondren, did not investigate or obtain the state arrest warrants on McLeod and did not orchestrate the plan for executing the warrants; in other words, they were not jointly participating with the state in any investigation or planning of the operation. Next, Fondren continued to report to his federal superiors at all relevant times, he was not sworn – in any fashion – to act under state law, and no agreements existed between HSI and the MSCO (or any other state agency) from which Fondren's participation could arguably be said to stem from state authority.   In sum, the totality of the circumstances and undisputed facts established by the record reveal that Fondren was present during the events of December 19, 2019, as a federal agent under the authority of federal law and his support role was not so intertwined with the state actors that he could be found to be acting under color of authority of state law.  As such, Plaintiff's claims brought pursuant to § 1983 must be dismissed.[8]

---

F.Supp. 2d 512, at 534-535 M.D. N.C. May 30, 2008); *Adams v. Springmayer*, 2012 WL 1865736, at *5-6 (W.D. Pa. May 22, 2012) *cf. Wilkinson v. Hallsten*, 2006 WL 2224293, at *8 n.7 (W.D.N.C Aug. 2, 2006), *aff'd*, 225 Fed. Appx. 127 (4th Cir. 2007); *Macaluso v. Dane Cty.*, 537 N.W.2d 148, *3-4 (Wis. Ct. App. 1995) (internal citations omitted)).
[8] Of note, Plaintiff's final argument seems to suggest that as long as the Complaint pleads alternative theories of recovery, then dismissal is not warranted.  (*See* Doc. 356 at 44-45.)  While this may be true for purposes of a Rule 12(b)(6) motion for failure to state a claim, it is not true for a summary judgment motion.

**B.** *Bivens*

In addition to asserting that Fondren violated Plaintiff's constitutional rights under § 1983, Plaintiff alternatively asserts that Fondren violated her constitutional rights pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971) (Counts I and VI).  (Doc. 122).

Fondren argues that Plaintiff's *Bivens* claims should be dismissed because this case is meaningfully different from *Bivens* and to allow her *Bivens* claims to proceed would be an improper extension of *Bivens*.  (Doc. 239 at 13-34; Doc. 375 at 14-19).  In response, Plaintiff argues that Plaintiff's *Bivens* claims are cognizable because they are similar to the facts and context of *Bivens*, such that Counts I and VI are "applications of *Bivens*, not an extension of it." (Doc. 356 at 30).

In *Bivens*, the Supreme Court created a damages remedy against federal officials "acting under color of [their] authority" for violation of constitutional rights. *Bivens*, 403 U.S. at 389. Specifically, the Supreme Court provided a remedy to a plaintiff who alleged a violation of his Fourth Amendment right to be free from unreasonable search and seizure.  *Id*.  In the decade that followed, the "*Bivens* remedy" was extended twice.  In *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), the Supreme Court permitted a *Bivens* claim for a violation of the plaintiff's Fifth Amendment rights under the Due Process Clause for gender discrimination. And in *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), the Supreme Court permitted a *Bivens* claim for violation of a plaintiff's Eighth Amendment right to be free from cruel and unusual punishment for failure to provide adequate medical treatment. "These three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved

of an implied damages remedy under the Constitution itself." *Ziglar v. Abbasi*, 582 U.S. 120, 131, 137 S.Ct. 1843, 1855, 198 L.Ed2d 290 (2017).

In 2017, the Supreme Court recognized that *Bivens* is well-settled law in its own context, but "expanding the *Bivens* remedy is now considered a 'disfavored' judicial activity." *Id*. at 1857 citing *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 129 S.Ct. 1937, 173 L.Ed.2d 868. As such, in *Ziglar*, the Court set forth a two-pronged test to determine whether a *Bivens* claim may proceed. *Id.* at 1859-60. The first prong requires courts to ascertain whether the claim is presenting *Bivens* in a "new context". *Id*. If the case differs "in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court, then the context is new." *Id.* at 1859. If the case presents a new context, courts should evaluate whether "special factors" militate against extending *Bivens*. *Id*. at 1860. The pertinent question is whether Congress or the courts are more suited to determine whether a damages action can proceed. *Id*. at 1857 (citation omitted).

Following *Ziglar*, the Supreme Court in 2022, further analyzed the viability of two *Bivens* claims – a First Amendment excessive force claim and a First Amendment retaliation claim. *See Egbert v. Boule*, 596 U.S. 482, 142 S. Ct. 1793, 213 L.Ed.2d 54 (2022). Although the Court's analysis indicates that it was choosing not to "dispense with *Bivens* altogether" it again emphasized that "recognizing a cause of action under *Bivens* is a 'disfavored judicial activity.'" *Egbert*, 142 S. Ct. 1803 (quoting *Ziglar*, 137 S. Ct. at 1856–57). The Court directed lower courts to look to the two-step test set forth in *Ziglar* when determining whether to imply a *Bivens* extension, but noted, "those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* If "there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize

a *Bivens* remedy." *Id.* (internal quotation marks and citation omitted). Additionally, the *Egbert* Court noted that "a court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, 'an alternative remedial structure.'" *Id*. at 1804 (quoting *Ziglar*, 137 S. Ct. at 1858).

Although *Egbert* set out a single question inquiry, the Court did not expressly overrule *Bivens* or the cases employing the two-part test set forth in *Ziglar*.  As such, this Court will address Plaintiff's *Bivens* claims using *Ziglar*'s two-step *Bivens* analysis and then the *Egbert* Court's single step analysis.

### 1.    New *Bivens* Context

To determine whether this action presents a new *Bivens* context, this Court must first consider if this case is different in a meaningful way from previous *Bivens* cases.  *Ziglar* at 1859-60. In *Ziglar*, the Court provided a non-exhaustive list of differences meaningful enough to give rise to a new context as follows:

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id*. at 1859-60.

Considering the relevant inquiry, this Court finds that the current case is meaningfully different than the previous *Bivens* cases.[9]  In *Bivens,* a plaintiff brought suit alleging that agents from the Federal Bureau of Narcotics entered his home, arrested him, handcuffed him in front of

---

[9] There is no argument from the parties that this action is not distinguishable from *Davis* or *Carlson*.

his wife and children, and searched the home before subjecting him to a strip search—all without a warrant.  *See Bivens*, 403 U.S. at 389, 91 S.Ct. 1999*.*  Here, Plaintiff has brought suit against state and federal officers alleging the officers unlawfully entered her home and exercised deadly force when they shot her while attempting to execute a thought-to-be-valid, but actually-previously-executed arrest warrant of an individual who did not reside at the home.

Since *Bivens*, as pointed out by Plaintiff, Courts have recognized causes of action pursuant to *Bivens* as a remedy for injuries like those alleged by Plaintiff in this action.  (*See* Doc. 356 at n. 37).  However, the Supreme Court's more recent decisions, including the decision in *Egbert*, has altered that landscape.   Namely, since *Egbert* and given the broad application of the term "new context", courts have determined that facts such as the existence of an arrest warrant is sufficient to distinguish an action from *Bivens*.  *See, e.g., Senatus v. Lopez*, 2022 WL 16964153, *4 (S.D. Fla. October 12, 2022) (citing to *Cienciva v. Brozowski*, No. 3:20-CV-2045, 2022 WL 2791752, at *9 (M.D. Pa. July 15, 2022) (collecting cases and noting the case, which involved excessive force claims against U.S. Marshals arresting a fugitive, presented a "new context" because the defendants had acted pursuant to a valid warrant, and numerous post-*Ziglar* cases have held "that the presence of a warrant is a crucial difference in the *Bivens* new-context analysis because the legal mandate under which defendants were operating differs from the warrantless narcotics-investigation circumstances in *Bivens*").   Courts have also determined meaningful differences exist because the claims are asserted against a different class of defendant.  *See id*. (citing *Cienciva*, 2022 WL 2791752, at *9–10) (refusing to extend *Bivens* to a Fourth Amendment excessive force case involving U.S. Marshals executing an arrest warrant); *K.O. by & through E.O. v. Sessions*, 2022 WL 3023645, at *3 (D.C. Cir. July 29, 2022) (declining to extend *Bivens* to class

of defendants because the plaintiff's claims implicated a new defendants); *see also Francois v. United States*, 2023 WL 2715822, *10 (S.D. Fla. February 17, 2023) (finding a "new context" where agency at issue was USDA OIG, not Federal Bureau of Narcotics).   Finally, courts have found meaningful differences when the conduct at issue is something other than the warrantless search of a person.  *See Robinson v. Heinze*, 655 F.Supp.3d 1276, *1281-82 (N.D. Ga. Feb. 3, 2023) relying on *Bivens v. Rodriguez*, 2020 WL 134115, at *4 (E.D. Cal. Jan. 13, 2020) (stating in the context of finding a new *Bivens* context that "*Bivens* is primarily, and very particularly, concerned with the warrantless search of a person.  Plaintiff's complaint, by contrast, concerns the reasonableness of a seizure of a person by use of deadly force."), report and recommendation adopted, 2020 WL 2193259 (E.D. Cal. May 6, 2020).

The Court notes the similarities between this case and *Bivens*.  Namely, both cases involve federal law enforcement officers and an alleged violation of the Fourth Amendment.  As Plaintiff characterizes these cases, "Webster Bivens and Ann McLeod were both injured in their homes when police officers unlawfully entered in violation of the Fourth Amendment."  (Doc. 356 at 31). The Court also recognizes there exists a circuit split as to whether some factual distinctions, such as the existence of a warrant is "meaningfully different" *Bivens* context.  *See, e.g. Logsdon v. United States Marshall Service*, 91 F.4th 1352 (10th Cir. 2024) (concluding the existence of a warrant and the location of the arrest have no legal significance in the "new context" analysis of an excessive-force case, while noting "substantial of authority to the contrary" exists) (citing, *e.g.*, *Annappareddy v. Pascale*, 996 F.3d 120, 135 (4th Cir. 2021) (Fourth Amendment claims created a new *Bivens* context when search was conducted with a warrant); *Cantú v. Moody*, 933 F.3d 414,

423 (5th Cir. 2019) (similar); *Cain v. Rinehart*, No. 2023 WL 6439438, at *3 (6th Cir. July 25, 2023) (unpublished) (similar)).

Nevertheless, the Court is satisfied that the similarities relied on by Plaintiff are not enough and the undisputed facts meaningfully distinguish this case from *Bivens*. *See Egbert*, at 495 ("While *Bivens* and this case do involve similar allegations of excessive force and thus arguably present "almost parallel circumstances" or a similar "mechanism of injury," *Ziglar*, 582 U. S., at [139], 137 S.Ct., at 1859, these superficial similarities are not enough to support the judicial creation of a cause of action."). Namely, in this action, Fondren was an HSI Officer (not a Federal Bureau of Narcotics Officer), present on Plaintiff's property subject to an arrest warrant (as opposed to no warrant)[10], and was involved in the use of deadly force (not just excessive force or a warrantless search). Individually or collectively, these differences are meaningful.

Finally, even if all the facts addressed above do not establish this case presents a "new context," *Ziglar's* non-exhaustive list of differences meaningful enough to give rise to a new context includes a consideration of "potential special factors that previous *Bivens* cases did not consider." *Ziglar* at 1859-60. Although this Court will address the "special factors" as part of the second *Ziglar* test below, these same special factors support the conclusion that this case represents a new context at step one.

---

[10] The Court notes Plaintiff's argument that a previously executed arrest warrant, which was at issue in this action, is equivalent to no warrant at all. But this argument does not save Plaintiff's *Bivens* claims. Instead, the fact that Fondren was present on the Property to arrest an individual subject to a warrant that he did not know was no longer valid, is still factually different than entering a home and searching an individual with knowledge that no warrant was obtained. Moreover, even crediting Plaintiff's position that this action is equivalent to one where no warrant was obtained, there remain other meaningful differences which establish a new context as set forth above. *See Ziglar*, 137 S. Ct. at 1857. ("[E]ven a modest extension [of *Bivens*] is still an extension.")

### 2.    Special Factors

If the case is meaningfully different from *Bivens*, *Davis*, and *Carlson*, a court must ask whether any "special factors counsel [ ] hesitation in the absence of affirmative action by Congress." *Id.* at 1857 (quoting *Carlson*, 446 U.S. at 18). The Supreme Court has not defined the "special factors," but has stated that "the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id*. at 1857–58. The Court noted that such special factors may include whether there is "an alternative remedial structure present in a certain case" because "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Id.* at 1857, 1863.

In seeking summary dismissal, Fondren contends that the conclusion that this action is a "new context" is a special factor dissuading a *Bivens* remedy. (Doc. 239 at 18-20).  Fondren additionally argues because there exist an alternative remedial structure present, Plaintiff's *Bivens* claims must be dismissed.  (*Id*.).  Finally, Fondren contends that Congress, and not the Judiciary is better equipped to authorize a damages remedy based on the potential systemwide consequences for recognizing a *Bivens* remedy against, not just Fondren, but HSI agents, generally.  (*Id*.)  Plaintiff does not offer any argument as to the "special factors" analysis, and instead relies solely on her position that this case is not a "new context."  As explained above, Plaintiff's position is not compelling.

Moreover, the Court agrees with Fondren's "special factors" analysis.   First, the determination that this is a "new context" of *Bivens* action, compels dismissal.  *See Robinson*, 655 F.Supp.3d at 1282 (noting the *Egbert* Court's reliance on *Hernandez v. Mesa*, 885 F.3d 811, 818

(5th Cir. 2018) (en banc), aff'd, 589 U.S. 93, 140 S. Ct. 735, 206 L.Ed.2d 29 (2018), for the proposition that "[t]he newness of this 'new context' should alone require dismissal."). Moreover, as pointed out Fondren, in this action - as was the case in *Egbert* - 8 C.F.R. – 287.10(a)-(b) requires the Department of Homeland Security to investigate any "[a[lleged violations of the standards for enforcement activities." (Doc. 239 at 20).  If the Supreme Court found this exact remedy sufficient to foreclose a *Bivens* action in *Egbert*, there is no arguable reason for this Court to find otherwise in this action.  Finally, Fondren is clearly a different class of defendant as an employee of HSI, and this Court must consider as a special factor, the systemwide consequence of recognizing a *Bivens* action against, not just Fondren, but the HSI, generally. Congress is better equipped to do that.  Accordingly, Plaintiff's *Bivens* claims are due to be dismissed.

### 3.    *Egbert's* Single Question Inquiry

As discussed above, the Supreme Court has very recently indicated that the *Ziglar* two-part test, can accurately be described as "a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert,* at 1803*.*  In *Egbert*, the Court determined that the existence of an alternative remedial process answers that question in the affirmative.  As such, the existence of an alternative remedial process in this case, namely 8 C.F.R. -287.10(a)-(b) forecloses Plainitff's *Bivens* claims under the single inquiry set forth in *Egbert* for the same reasons that the remedial process forecloses her claims under the second part of Ziglar's two-part test as explained above.[11]  As a result, under either test, Plaintiff's claims cannot proceed.

---

[11] Of note, while the subject motions have been pending, the Eleventh Circuit issued an opinion in *Wimberley v. Selent*, 2024 WL 2845476 (11th Cir. June 5, 2024) which supports dismissal under *Egbert's* analysis.   In *Wimberley*,

C.      Qualified Immunity[12]

In this case, Plaintiff contends Fondren violated her Fourth Amendment Rights by his unlawful entry and use of excessive force.  (Doc. 356 at 20).  Fondren asserts that he is entitled to qualified immunity as to all claims brought by Plaintiff.  (Doc. 329).  A determination that Fondren is entitled to qualified immunity would defeat all of the claims asserted against him. *See Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (The defense of qualified immunity is available whether the Federal Defendants are sued under section 1983 or *Bivens*.).

The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal citation and quotation omitted). An official seeking qualified immunity must initially establish

---

a suit was brought against HSI officers for, among other things, a violation of the Fourth Amendment for excessive force pursuant to *Bivens*.  The District Court dismissed the *Bivens* claim after affirmatively answering Egbert's single inquiry because "HSI's tasks implicate separation-of-powers concerns and the Agents 'carried out HSI's mandate in the same manner that implicated national security in *Egbert* itself.'" *Id*. at *2.  On appeal, the Eleventh Circuit affirmed the dismissal stating that "HSI Agents serve as a branch within U.S. Immigration and Customs Enforcement. The agency's mission heavily emphasizes its 'global nature' in combatting crime from 'global threats.'" *Id*. at *4. The Court also noted there existed "alternative avenues for relief under the federal regulations". As such, the Eleventh Circuit found "these circumstances suggest a new context with special factors that preclude a *Bivens* claim—the Agents operate under a different mandate, with differing circumstances, both of which implicate national security at the particularized and agency-wide level." *Id*. (citing to *Egbert*, 142 S. Ct. at 1804–09).

[12] For the reasons detailed above, all of the claims asserted against Fondren are due to be dismissed.  However, to ensure a comprehensive analysis, this Court will address Fondren's qualified immunity arguments.

that he was acting within his discretionary authority. *Id*. If the official was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to show that immunity is not appropriate. *Id*.

To meet her burden, a plaintiff must first show that a defendant's conduct violated a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Second, a plaintiff must show that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id*. (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). "For an asserted right to be clearly established for purposes of qualified immunity, 'the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that "what he is doing" violates federal law.'" *Jackson v. Sauls*, 206 F.3d 1156, 1164-65 (11th Cir. 2000)(citations omitted). "Additionally, the standard for determining if an officer violated clearly established law is an objective one and does not include inquiry into the officer's subjective intent or beliefs. Thus, a police officer is entitled to qualified immunity if a reasonable police officer could have believed his or her actions were lawful in light of clearly established law and the information possessed by the officer at the time the conduct occurred." *Id*. (internal and external citations omitted).

There are three avenues by which Plaintiff can meet her burden to show that Fondren violated clearly established constitutional law. "First, the plaintiffs may show that a 'materially similar case has already been decided.' … Second, the plaintiffs can point to a 'broader, clearly established principle [that] should control the novel facts [of the situation].' … Finally, the conduct involved in the case may 'so obviously violate[] th[e] constitution that prior case law is

unnecessary.'" *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012) (internal citations omitted). When determining whether a right was clearly established, the Court "looks only to binding precedent—cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose—to determine whether the right in question was clearly established at the time of the violation." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011)(citation omitted).

Plaintiff does not appear to contest that Fondren was acting within the scope of his discretionary duties. Nevertheless, "a government official can prove he acted within the scope of his discretionary authority by showing 'objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.'" *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir.1988)). The Court is satisfied that Fondren was clearly acting in his discretionary authority during the relevant events of December 19, 2019. As a result, the Court will address Plaintiff's Fourth Amendment claims against Fondren.

### 1.    Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 569 U.S. 1, 6, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). "A warrantless and nonconsensual entry into a person's home, and any resulting search or seizure, violates the Fourth Amendment unless it is supported by both

probable cause and exigent circumstances." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1251 (11th Cir. 2013) (quoting *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)).  As such, it is well established that police may not enter a third parties' home to arrest a suspect without a search warrant or an exigency. *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68L.Ed.2d 38 (1981).  However, for Fourth Amendment purposes, an arrest warrant founded upon probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.  *Payton,* 445 U.S. at 603.

"The private property immediately adjacent to a home is entitled to the same protection against unreasonable search and seizure as the home itself." *United States v. Taylor*, 458 F.3d 1201, 1206 (11th Cir. 2006) (citing *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)).  "At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' . . . and therefore has been considered part of the home itself for Fourth Amendment purposes." *Id.*

According to Plaintiff, Fondren violated her "Fourth Amendment right to security in her home and person when [he] entered the curtilage of her home; and blinded and shot her."[13] (Doc. 356 at 21).  The Court will address whether Fondren is entitled to qualified immunity with respect to each of Plaintiff's alleged Fourth Amendment violations (unlaw entry and excessive force) separately.

---

[13] The Court evaluates Plaintiff's alleged Fourth Amendment violation stemming from Fondren shooting into the Property under Plaintiff's use of excessive force claim, discussed herein below.

### a.    Unlawful Entry

Fondren argues he is entitled to immunity on Plaintiff's unlawful entry claims because his entry did not violate the Fourth Amendment.  More specifically, Fondren contends he did not enter property protected by Fourth Amendment because it is "well settled that law enforcement officers can enter onto residential property, including portions that would be considered part of the curtilage for Fourth Amendment purposes, in order to carry out legitimate police business, including the execution of a facially valid arrest warrant"[14] and he was permitted to conduct a protective sweep of the property.  (Doc. 329 at 19-21) (quoting *Coffin*, 642 F.3d at 1012).  With respect to the limited license to enter a property to execute a valid arrest warrant, Fondren argues the arrest warrant "provided a reasonable belief that Nicholas McLeod resided and would be present at the Home in question, [. . .]" giving him authority to be present.  (Doc. 329 at 21) (citing *Sevostiyanova v. Cobb Cnty. of Ga.*, 484 F. App'x 355, 359 (11th Cir. 2012)). [15]

In response, Plaintiff argues that Fondren unlawfully entered Plaintiff's property first when he entered the curtilage and second when he shot through her door.  Acknowledging that under *Payton*, an arrest warrant can carry with it a limited authority to enter a home, Plaintiff argues, there are no facts to support that limited authority existed in this instance.  Rather, Plaintiff contends Fondren's action violated clearly established law as demonstrated through *County of Los Angeles, California, et al. v. Mendez*, 581 US 420, 137 S.Ct. 1539 (2017) and *Steagald*.  (Doc. 356 at 13-22).  Plaintiff also asserts that a broader, clearly established principle

---

[14] Fondren's argument with respect to his ability to enter the curtilage to conduct "police business" combines the analysis relating to an entry onto the open areas of curtilage where there is no expectation of privacy with his analysis relating to protected areas pursuant to the execution of a valid arrest warrant.  (Doc. 329 at 19-20).  The Court will address these issues separately.

[15] In *Sevostiyanova,* the Eleventh Circuit analyzed the limited license to enter a dwelling subject to an arrest warrant as set forth in *Payton*.

should control the novel facts of the situation and that the conduct involved in the case obviously violates the Constitution such that prior case law is unnecessary. (Doc. 356 at 21).  Finally, Plaintiff argues that the "reasonableness of [Fondren's] mistaken belief about Nicholas McLeod['s] residence and his whereabouts – is a fact specific inquiry which must be resolved by the trier of fact." (Doc. 356 at 2).

### 1.      Fondren's Entry to "Conduct Police Business"

As an initial matter, Fondren disclaims that he was on Plaintiffs' property to execute a warrant.  (*See* Doc. 329 at 19).  Nevertheless, considering the facts in a light most favorable to Plaintiff dictates that Fondren's presence be considered as part of a team present to execute an arrest warrant.[16]

Second, the Court is not convinced that Fondren did not "enter" the protected areas of Plaintiff's property implicated by the Fourth Amendment because he was conducting "legitimate police business."  Fondren states in a conclusory manner, that Plaintiff has no expectation of privacy in her carport.  (*Id*. at 19 and 22) (citing to *Coffin,* 642 F.3d at 1012 and *United States v. Ratcliff,* 202 F. Supp. 3d 1295, 1303 (N.D. Ala. 2016)).  Fondren's position, even if it were true, however wholly fails to address the undisputed facts surrounding Fondren's presence.  Namely, that Fondren entered the Property via the backyard, then used his flashlight to look into a window and a shed.  As such, the cases relied on by Fondren do not support his position. To be

---

[16] Fondren's argument is curious, because without the existence of the arrest warrant, it is unclear what "police business" Fondren would have needed to carry out.  Even more curiously, this assertion is inconsistent with Fondren's position that he had a license to enter the Property pursuant to *Payton*, discussed below.

sure, the well settled authority in this Circuit as set forth in *Coffin*[17], describes this "legitimate police business" restriction as follows:

> It is well-established that police officers can enter onto residential property, including portions that would be considered part of the curtilage, in order to carry out legitimate police business. 1 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(f) (4th ed. 2004) ("Thus, when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g. walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment.") (and the cases cited therein). "This is because a portion of the curtilage, being the normal route of access for anyone visiting the premises, is only a semi-private area." LaFave § 2.3(f) (quotations omitted).

642 F.3d at 1012.  In *Coffin*, the Court went on to cite to numerous instances where officers were permitted to enter onto a property to conduct police business. *See id.* (citing *Florida v. Detlefson*, 335 So.2d 371, 372 (Fla. 1st DCA 1976) ("It cannot be said [that] the defendant had a reasonable expectation of privacy in the front porch of his home where, presumably, delivery men and others were free to observe the plants thereon."); *Tracht v. Comm'r of Pub. Safety*, 592 N.W.2d 863, 865 (Minn.App. 1999) ("Police with legitimate business may enter the areas of curtilage which are impliedly open to use by the public."); *State v. Duhart*, 810 So.2d 972, 973–74 (Fla. 4th DCA 2002) (holding that there was no reasonable expectation of privacy in an attached carport (initially referred to as a garage) which is open and exposed to the public, comparing the situation to *Detlefson's* front porch where delivery men were free to go); *see also United States v. Taylor*, 458

---

[17] On this issue Fondren additionally cites an opinion from this Court in *United States v. Ratcliff*, 202 F. Supp. 3d 1295, 1303 (S.D. Ala. August 16, 2016).  However, *Ratcliff* is not helpful to Fondren because therein, this Court analyzed whether two officers violated the Fourth Amendment by conducting a "pre-knock observation" through windows of a closed garage in relation to a motion to suppress evidence.  *Id.* at 1302-03.  Though this Court ultimately concluded the alleged Fourth Amendment violation was irrelevant to the eventual outcome of the suppression motion, it stated "to a limited extent, the court agrees [that the observation violated the Fourth Amendment]".  Although, not addressed by Fondren, there is no dispute that while in Plaintiff's backyard, he looked through a window of her home with his flashlight.

F.3d 1201, 1204 (11th Cir. 2006) ("The Fourth Amendment, which prohibits unreasonable searches and seizures by the government, is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises."); *id*. ("[O]fficers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just an [sic] any private citizen may.") (citation and quotations omitted) (mistake in *Taylor*)).  The Supreme Court has likewise recognized an implied right to "knock and announce" without a warrant. *Jardines*, 569 U.S. at 8, 133 S.Ct. 1409.  But the Court suggested that when an officer approaches the home without a warrant, he has no greater license to remain on the property than "Girl Scouts or a trick-or-treaters." *Id*.

In the instant action, Fondren's entry implicated the Fourth Amendment because he did not "restrict [his] movements to places visitors could be expected to go." *See Coffin*, *supra*. Rather, the facts establish that Fondren, dressed in uniform and carrying a M4, exited his vehicle in front of a neighbor's home, immediately traveled through the yard of a neighboring property, and entered Plaintiff's backyard. Fondren then used the light attached to his firearm to search inside a shed in the backyard and look through a window of Plaintiff's home before establishing a "perimeter."  These actions are not akin to the "normal route of access for anyone visiting the premises." *See Coffin*, *supra*.  As a result, the Court is satisfied that those portions of the property onto which Fondren entered (even excluding the carport) are curtilage protected under the Fourth Amendment.  *See Taylor*, 458 F.3d at 1206.  As such, Fondren's entry without a warrant

or exigent circumstances violated the Fourth Amendment, absent the existence of another permissible exception.[18]

### 2. Fondren Did Not Violate the Fourth Amendment Pursuant to *Payton*.

Fondren next argues that his presence on the Property was permitted because the facially valid arrest warrant for McLeod provided him with a reasonable belief that McLeod lived at the Property and was inside at the time he entered.  (Doc. 329 at 21-22).  For support, Fondren relies on *Sevostiyanova*, 484 F. App'x at 359, wherein Eleventh Circuit analyzed the limited license to enter a dwelling subject to an arrest warrant as set forth in *Payton*.  In response, Plaintiff argues that *Payton* does not apply because the arrest warrants were "third-party" warrants.  (Doc. 356 at 13-19).  As such, Plaintiff contends Fondren violated Plaintiff's clearly established rights under *Steagald.* (*Id*.)

The Court recognizes the parties' fundamental disagreement as to whether Fondren's actions are constitutional under *Payton* entitling him to qualified immunity or unconstitutional under *Steagald* defeating his claim of immunity.[19]  However, because Plaintiff has not pointed to any facts which support that Fondren knew the Property belonged to a third party at the time he entered, the Court agrees that it must consider whether, despite that fact that Plaintiff's home was the residence of a third party (Plaintiff), Fondren's actions were constitutionally permitted under *Payton*.  *See Hernandez v. Mesa*, 582 U.S. 548, 554, 137 S. Ct. 2003, 198 L. Ed. 2d 625 (2017)

---

[18] Because this Court finds that immunity is still warranted under *Payton* for the reasons stated herein below, it is not necessary to further analyze whether Fondren's violation was clearly established.

[19] The Court appreciates that a *Payton* license fundamentally requires the existence of a valid arrest warrant.  There is also, no dispute in this case that at the time of Fondren's entry the McLeod warrants were no longer valid.  However, there are no facts that indicate Fondren was aware that the warrants had been executed or had reason to believe they were invalid for any reason.  As such, the Court has analyzed these facts under *Payton*.  Without a *Payton* licenses however, any entry onto the Property is a violation of a clearly established right under *Steagald*.

("Facts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant.").

Although searches and seizures inside a home without a search warrant are presumptively unreasonable, in *Payton* the Supreme Court held that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Following *Payton*, the Eleventh Circuit held that *Payton* requires a two-part inquiry to determine if entry pursuant to an arrest warrant complies with the Fourth Amendment's proscription of unreasonable searches. *United States v. Bervaldi*, 226 F.3d 1256, 1262-63 (11th Cir. 2000) (citing *United States v. Magluta*, 44 F.3d 1530, 1533 (11th Cir. 1995)). More specifically, the Court has stated as follows:

> [F]irst, there must be a reasonable belief that the location to be searched is the suspect's dwelling, and second, the police must have 'reason to believe' that the suspect is within the dwelling. Elaborating on this inquiry, we have explained that 'for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry.' Furthermore, 'in evaluating this on the spot determination, as to the second *Payton* prong, courts must be sensitive to common sense factors indicating a resident's presence."  We believe such 'common sense factors' must also guide courts in evaluating the first *Payton* prong.

*Bervaldi,* 226 F.3d at 1263 (internal citations omitted).

For Plaintiff to meet her burden of establishing Fondren is not entitled to qualified immunity, Plaintiff must show that the evidence, viewed in a light most favorable to her,

establishes that Fondren violated a constitutional right, i.e. that he did not have "reason to believe" that McLeod resided at the home and that he was there at the time Fondren entered.[20]

For factual support that Fondren reasonably believed Plaintiff's address was the residence of McLeod, Fondren points to the arrest warrants and his reliance on the other officers. For legal support, Fondren points to a number of cases which suggest that an officer may rely on another officer's investigation. (Doc. 375 at 6-11). Conversely, Plaintiff argues that the McLeod arrest warrants, alone, cannot establish that Plaintiff's address was McLeod's residence, such that reliance on the warrants could satisfy the first *Payton* prong. (Doc. 356 at 13-14, 23). For factual support, Plaintiffs points to the undisputed fact that the Property was Plaintiff's residence, and not McLeod's. (Doc. 356 at 13). Moreover, Plaintiff contends that Fondren's reliance on the arrest warrant was knowingly false because (1) on December 19, 2019, the arrest warrant was not active, (2) McLeod had not resided at the Property since 2018, and (3) at the time of his entry McLeod was incarcerated. (Doc. 356 at 13-20, 23).

Whether or not Fondren had a *Payton* license to enter Plaintiff's home is admittedly a close call. First, with respect to the address on the warrant, it is well established that an arrest warrant need not contain an address, much less a resident address. *See e.g.* Rule 4(c)(1), Fed. R. Crim. P., "The warrant shall ... contain the name of the defendant or, if his name is unknown, any name or description by which he can be identified with reasonable certainty."). Moreover, if an address on a warrant alone was sufficient to establish residency, then *Payton*'s first factor would be significantly diminished as *Payton* spells out that an officer's authority to execute an arrest

---

[20] Of note, Plaintiff seems to appreciate that if Fondren was permitted to enter under *Payton*, no constitutional violation occurred. (*See* Doc. 356 at 24) ("To enter the curtilage, Fondren must have had a reasonable belief that Nicholas McLeod resided at and was present at the home. *Payton v. New York*, 445 U.S. 573, 603 (1980).").

warrant at a particular address *is limited* by a reasonable belief that the suspect resides at the address and may be found at the address at the time of execution.  It does not limit the execution of an arrest warrant to the address listed on a warrant nor negate the ability to execute an arrest warrant when no address is listed.  *See, e.g., United States v. Stinson*, 857 F. Supp. 1026, 1029-30 (D. Conn. 1994) (Fourth Amendment "does not require officers to establish probable cause for identifying information, such as the suspect's address, that is included on the arrest warrant but not material to the ultimate probable cause determination.").  As such, *Payton's* limiting analysis logically implies that regardless of whether a warrant contains an address or not, both factors must be met for an entry with an arrest warrant to not run afoul of the Fourth Amendment.  Further, the Eleventh Circuit has on numerous occasions analyzed *Payton's* first factor and this Court is aware of no instances when *Payton's* first prong has been satisfied based on an address on a warrant alone.  *See, e.g., Payton v. City of Florence*, Ala. 413 Fed. Appx. 126, 131-32 (11th Cir. 2011) (finding officers did not violate the Fourth Amendment because they had a reasonable basis for believing the subject of an arrest warrant lived at the property based on their review of three or four documents, including documents which came from the subject of the arrest himself); *United States v. Bellamy*, 456 F. App'x 863, 865 (11th Cir. 2012) (finding officers had reasonable belief of residency based on information from other police officers that was corroborated by other factors). Even in *Bervaldi*, the Eleventh Circuit placed little value on the address on a search warrant.  *Bervaldi*, 226 F.3d at 1263 ("Nor is it significant that the arrest warrant listed the 132nd Place address.") (citing *United States v. Lauter*, 57 F.3d 212, 214 (2d Cir. 1995) (rejecting argument that when police believe that the target of an arrest lives at an address

other than the one listed on the warrant, they must apply for a new warrant before arresting the suspect at the new residence)).[21]

However, in this case, Fondren did not solely rely on the existence of an address on an arrest warrant. Rather, the undisputed facts establish that Fondren was assigned to be a part of Operation the Grinch by his superiors. (Doc. 329 at 3). He attended a briefing on the morning of December 19, 2019, led by the MCSO and USMS. (*Id*.). He was aware that intel packets were prepared and that the warrants to be executed were obtained by MCSO Narcotics Unit Personnel (*Id*. at 6). Fondren was additionally informed of the address where the warrant was to be executed immediately before the execution took place by a fellow officer[22]. (Doc. 329 at 6-7). It was not unreasonable for Fondren to rely on the information he was provided to inform his beliefs. *See, e.g., Bellamy*, 456 F. App'x at 865 ("Without a doubt, the officers here were entitled to rely on the information they received from the St. Petersburg Police Department.") (citing *United States v. Bennett*, 555 F.3d 962, 965 (11th Cir. 2009) (officers held reasonable belief that apartment was suspect's residence where they received information from out-of-state law enforcement that suspect was living with his mother); *United States v. Kirk*, 781 F.2d 1498, 1504–05 (11th Cir. 1986) (distinguishing "an officer in the field," who is able to rely on information from other officers, from a magistrate who "must be presented with facts as to the source" of information for "probable cause" purposes)). While there is no evidence that Fondren was

---

[21] Of note, another district court within the Eleventh Circuit has reached a similar conclusion. *See R&R by and Through Rogers v. Eaton*, 2019 WL 1573207, *7 (N.D. Ala. April 11, 2019) ("The Eleventh Circuit has never held that an officer had a reasonable belief that an address was a suspect's residence when that officer relied solely upon one document.).

[22] Of note, although not specifically addressed by Fondren, the fellow officer informed Fondren of the address, at least in part, by showing him one page from the intel packet that identified McLeod's address. (Doc. 240-1 at 11-12). Thus, even aside from the warrant, Fondren relied on a second document relating to the investigation.

specifically informed that the address was McLeod's *residence*, "common sense factors" must guide this Court's evaluation of the first *Payton* prong.  *Bervaldi,* at 1263.  As a result, although it is a close call, the totality of the circumstances supports a reasonable, albeit mistaken, belief by Fondren that the Property was McLeod's residence.  *See, e.g., Brand v. Casal*, 2015 WL 9304036, *11 (N.D. Ga. December 21, 2015) (finding officer's belief that warrant suspect resided at property based on warrant packet that included arrest warrant and one jail booking sheet with an address to be reasonable entitling officer to immunity).[23]

　　　　The facts relied on by Plaintiff do not defeat this conclusion.  Although there is no dispute that Mcleod did not reside at the Property and that warrants were no longer active, there is likewise, no dispute that Fondren was unaware of these facts at the time he entered on the Property.   "The objective reasonableness of an officer's actions in conducting a search or seizure will often require an examination of the information possessed by the officer at the time of the search and seizure." *Shepard v. Hallandale Beach Police Dept*., 398 F. App'x. 480, 483 (11th Cir. 2010) (citing *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987)).  At the time of Fondren's entry onto Plaintiff's curtilage, he knew only that there was an arrest warrant for McLeod and an address where the warrant was to be executed according to another officer.  As such, the after-the-fact evidence presented by Plaintiff cannot disturb the objective reasonableness of Fondren's determination.

---

[23] Of note, in *Brand*, the district court granted immunity on the unlawful entry claim as to one officer (who is most analogous to Fondren in this action), but not a second officer.  On appeal, the Eleventh Circuit affirmed in part and reversed in part finding both officers were entitled to immunity.  *See Brand v. Casal*, 877 F.3d 1253 (11th Cir. 2017). However, that opinion was subsequently vacated and, therefore, is not relied on by this Court.

The second prong of the *Payton* test is, similarly, a close call.  To satisfy this prong, Fondren relies on the fact that it was 6 a.m. and *Bervaldi*, *supra*.  Under Eleventh Circuit precedent, "officers may presume that a person is at home at certain times of the day—a presumption which can be rebutted by contrary evidence regarding the suspect's known schedule." *Magluta,* 44 F.3d at 1535; *see also Bervaldi*, 226 F.3d at 1265–67 (finding second *Payton* prong when officers approached the suspect's house at 6:00 a.m.); *United States v. Beck*, 729 F.2d 1329, 1331–32 (11th Cir. 1984) (per curiam) (finding it "reasonable to believe that one would be at home at 7:30 a.m. and be sound asleep").  Plaintiff has offered no evidence regarding McLeod's known schedule that would rebut this presumption.[24]  However, it is undisputed that at the time of Fondren's entry, the intention of the task force was to "knock and announce". (Doc. 353 at 28-29).  Further, according to Fondren at the time he approached the carport (after his entry through the backyard) "[. . .] there was no probable cause to enter the home because the target had not been identified as being in the home, so there was going to be no entry made into the home, however because it was just an arrest warrant and probable cause had not been established, however yes, I would have expected someone to knock on the door and announce these police officers."  (Doc. 240-1 at 40-41).  These facts arguably diminish the reasonableness of an objective belief that the time day creates a presumption as set forth in *Bervaldi*.  Moreover, although *Bervaldi* supports the second factor in this instance, this Court is not aware of a precedential case where the second *Payton* factor has been satisfied based *solely* on the time of day.  *See, e.g., R&R by and Through Rogers*, at *8 (reviewing Eleventh Circuit opinions analyzing

---

[24] Plaintiff has presented evidence that McLeod was not at the home because he was in jail and had been for several months.  However, it is undisputed that Fondren did not know this information at the time of his entry.  As a result, it cannot rebut that presumption established by *Magluta*.

the second *Payton* factor and finding that in all of those cases, there has been "something more" than mere day of the week or time of day).  Nevertheless, because *Bervaldi* states a belief can be reasonable based on the time of day for purposes of the second *Payton* factor, Fondren was reasonable in his belief that McLeod was in the house at 6 a.m. on December 19, 2019, when he entered the curtilage.[25]

Viewing the facts in a light most favorable to Plaintiff, Fondren had "reason to believe" that McLeod resided at the Property and was there are 6 a.m. As a result, Fondren's entry was permitted under *Payton*, and therefore, did not violate the Fourth Amendment. *See Payton*, 445 U.S. at 603, 100 S.Ct. at 1388. As a result, Fondren is entitled to qualified immunity on Plaintiff's unlawful entry claim.

### 3.      Fondren Did Not Conduct a Protective Sweep[26]

Fondren's argument that he was permitted to be on Plaintiff's property to conduct a protective sweep is without merit.  In *Maryland v. Buie*, the Supreme Court held that a protective sweep may be lawfully undertaken pursuant to an in-house arrest where the officer "possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." 494 U.S. 325, 337, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.  It is narrowly confined

---

[25] While this Court finds that the holding in *Bervaldi* controls the determination as to the second *Payton* factor, the facts in this action frustrate that result since it is clear that the officers' presence at 6 a.m. was not planned in an effort to ensure McLeod was home.  Rather, the facts essentially confirm that the time of day was mere happenstance, based on the location of the Property in proximity to where the briefing took place.  As such, had the Property been further away causing the warrant to be executed later, immunity based on a *Payton* license would be defeated.  In that respect, it seems the Defendants are simply receiving the benefit of serendipitous circumstances.

[26] Again, the Court is addressing all of Defendant's immunity grounds for the sake of being comprehensive.

to a cursory visual inspection of those places in which a person might be hiding." *Id*.  Protective

sweeps have also been permitted in situations where a defendant is arrested outside a residence.

*United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir. 1983), superseded by statute on other

grounds, 18 U.S.C. § 921(a)(21)(C).  Fondren does not sufficiently articulate how his presence fits

within the confines of a "protective sweep."   Nevertheless, the Court is not persuaded that

Fondren could enter the Property to perform a protective sweep *prior to* an anticipated arrest

without any facts from which to glean a threat existed, especially when no arrest took place at

all.  Accordingly, Fondren's entry was not permitted to conduct a protective sweep.

### b.   Excessive Force

Fondren additionally contends he is entitled to qualified immunity on Plaintiff's excessive

force claims because the undisputed facts establish that he had probable cause to believe a

threat of serious harm existed.  (Doc. 329 at 23-29).  Plaintiff contends that because Fondren

violated the constitution by entering Plaintiff's property, any force he used was excessive.  (Doc.

356 at 27-30).

"[A]pprehension by the use of deadly force is a seizure . . .." *Tennessee v. Garner*, 471 U.S.

1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The Eleventh Circuit has set forth the considerations of

an excessive force claim as follows:

> "Any claim that a law enforcement officer used excessive
> force -- whether deadly or not -- during a seizure of a free citizen
> must be analyzed under the Fourth Amendment's 'reasonableness'
> standard." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir.
> 2009). This standard requires "balanc[ing] the nature and quality of
> the intrusion on the individual's Fourth Amendment interests
> against the importance of the governmental interests alleged to
> justify the intrusion." *Scott v. Harris*, 550 U.S. 372, 383 (2007)
> (quotations omitted).  "The government's interests include

protecting the safety of the police officers involved as well as the public at large." *Garczynksi*, 573 F.3d at 1166.

We analyze the particular facts of each case to determine whether the force used was "objectively reasonable" under the totality of the circumstances. *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989). We consider an officer's conduct "from the perspective of a reasonable officer on the scene, ... taking into account all of the attendant circumstances." *Kesinger v. Herrington*, 381 F.3d 1243, 1249 (11th Cir. 2004). These circumstances may include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The circumstances often may be "tense, uncertain and rapidly evolving, thereby requiring split-second judgments as to how much force is necessary." *Garczynski*, 573 F.3d at 1167 (quotations omitted). "Because an officer's perspective in the field differs from that of a judge sitting peacefully in chambers, we must resist the temptation to judge an officer's actions with the 20/20 vision of hindsight." *Id*. (quotations omitted).

*Howard v. Dekalb County*, 2024 WL 1174021, *3 (11th Cir. March 19, 2024). "In the deadly force context, the Eleventh Circuit has observed that a police officer may constitutionally use deadly force when the officer: (1) 'has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others' or 'that he has committed a crime involving the infliction or threatened infliction of serious physical harm'; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible." *Howe v. City of Enterprise,* 2018 WL 8545947, *23 (M.D. Ala., September 17, 2018) quoting *Young v. Borders*, 2014 WL 11444072, *14 (M.D. Fla. September 14, 2018).

The relevant undisputed facts establish that prior to the shooting Fondren was initially positioned at the southeast corner of the back of the Property, but moved to join two officers by the carport door.  (Doc. 353 at 36-37).  Before Fondren reached the officers, the carport door opened.  (*Id*. at 37-38).  When the door opened, Plaintiff was holding the gun aimed at the floor.[27] The officers yelled "Whoa, Whoa gun, gun" or "gun, gun".  (Doc. 353 at 3-4, 42; Doc. 239 at 6). Upon seeing the gun, Fondren moved away from the door and towards the far corner of the carport to exit Plaintiff's line of fire.  (*Id*.).

Fondren then observed and heard the first of several gunshots.  (*Id*. at 8).  In response, Fondren fired two (possibly three) rounds at Plaintiff.  The carport door then closed and the glass from the door fell outward which Fondren believed was an attempt to engage the officers on the carport by pushing through or shooting out the glass.  (*Id*.).  At that time, Fondren moved from his prior spot and fired two or three rounds high into/through the glass.  (*Id*.). Fondren continued to move to his left and out of the carport, ultimately taking position behind a nearby SUV.  (*Id*.).

The Court finds Fondren's use of force was objectively reasonable based on the facts viewed in a light most favorable to Plaintiff.  As set forth by the Eleventh Circuit, the Court "must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal." *Crosby v. Monroe Cnty*, 394 F.3d 1328, 1334 (11th Cir. 2004)(citation omitted).  Here, Fondren was faced with a situation where the door of the home opened for reasons unknown to Fondren and he saw Plaintiff holding a gun.  "[T]he

---

[27] Defendant disputes whether Plaintiff's gun was pointed at the floor or raised, but the Court will consider the facts in a light most favorable to Plaintiff.

law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Young*, at \*16 (quoting *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007); *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) ("Regardless of whether [the defendant] had drawn his gun, [the defendant's] gun was available for ready use, and [the officer] was not required to wait 'and hope[ ] for the best.'" (quoting *Scott v. Harris*, 550 U.S. 372, 385, 127 S.Ct. 1769))). Nevertheless, when faced with Plaintiff holding a gun, Fondren retreated and only fired his weapon after other shots rang out. It was reasonable for him to believe at the time he fired that he and his fellow officers were at risk of serious harm. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003) (holding that the Constitution permits the use of deadly force against a person who poses an imminent threat of danger to a police officer or others). Although Plaintiff contends that because Fondren's entry onto Plaintiff's property violated the Fourth Amendment, his resulting use of force is, likewise, excessive, the Eleventh Circuit has determined an officer's use of force to be reasonable in situations with similar factual scenarios. "[W]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, use of deadly force does not violate the Constitution." *Howard*, at \*3 (quoting *Penley v. Eslinger*, 605 F.3d 843, 851 (11th Cir. 2010) (quotations omitted); *Cantu v. City of Dothan*, 974 F.3d 1217, 1230 (11th Cir. 2020) (use of deadly force is reasonable if the officer "had probable cause to believe at the time [of the shooting] that [there was] a threat of serious physical harm or death to [him]" or fellow officers); *Hunter v. Leeds*, 941 F.3d 1265, 1279 (11th Cir. 2019) ("It is axiomatic that when an officer is threatened with deadly force, he may respond with deadly force to protect himself.")). The Eleventh Circuit has also determined that "where a suspect has a deadly weapon

'available for ready use,' [. . .] an officer is not "required to wait and hope for the best" before resorting to deadly force.  *Id*. (quoting *Jean-Baptiste*, 627 F.3d at 821 (alterations omitted) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." (quoting *Long,* 508 F.3d at 581))).

Viewing the facts in a light most favorable to Plaintiff, Fondren's use of force was reasonable, and therefore, did not violate the Fourth Amendment.  As a result, Fondren is entitled to qualified immunity.

### D. Second Motion for Summary Judgment

Because this Court has determined that Fondren is entitled to summary judgment for the reasons stated herein above, it is not necessary for the Court to address Fondren's Second Motion for Summary Judgment (Doc. 363).  Accordingly, the same is hereby **Moot**.

## IV. CONCLUSION

For the reasons discussed above, Defendant Scott Fondren's Motion for Summary Judgment (Doc. 233) is **GRANTED** and his second motion for summary judgment (Doc. 363) is **MOOT**.

**DONE and ORDERED** this 26th day of September, 2024.

/s/ JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE