IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ANN RYLEE MCLEOD,                    )
                                     )
          Plaintiff,                 )
                                     )
v.                                   )     CIVIL ACTION NO. 20-00595-JB-MU
                                     )
UNITED STATES OF AMERICA, et al.,    )
                                     )
          Defendants.                )

## ORDER

This action is before the Court on Defendants Austin Wade Welch'("Welch"), John Skipper ("Skipper"), and Beau Bartel's ("Bartel") Motions for Summary Judgment (Docs. 334, 338, and 340) and supporting briefs (Docs. 336, 339, and 341), Plaintiff's Response (Doc. 355), and Defendants' collective reply (Doc. 374).[1]  A hearing was held on March 11, 2024, and the Court has reviewed the motions, supporting briefs and the various exhibits filed in support of the motions.  For the reasons discussed below, the motions are **GRANTED.**

## I.   FACTUAL AND PROCEDURAL BACKGROUND[2]

The facts which resulted in this lawsuit are, for the most part, undisputed by the parties. In most instances, such a situation might streamline the Court's factual predicate to ruling on a dispositive motion.  However, in this case, given the number of Defendants, their employment

---

[1] Defendants' reply also contains a motion to strike Plaintiff's omnibus narrative (Doc. 353) which is denied. However, it is worth noting that the summary judgment materials submitted to this Court were riddled with "undisputed" facts which clearly were not and citations which were more than liberal.  As such, this Court's analysis of this action was hindered by the submitted materials and caused the Court to expended valuable time in an effort to properly state the facts and apply the law.

[2] This factual summary repeats, in large part, the factual and procedural backgrounds set forth in this Court's other Orders ruling on the motions for summary judgment filed by the other Defendants.

and roles with different state and federal organizations, and the relevant inquires that must be made with respect to the numerous claims, the Court finds the least complicated path, is to start at the beginning.

On December 11, 2020, Plaintiff filed her Complaint against six defendants, alleging twenty causes of action which can be described as follows: in Counts I-VI, Plaintiff asserts claims pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) for violation of her Fourth Amendment rights (hereinafter "*Bivens*" claims); in Counts VII-X, Plaintiff asserts claims under the Fourth Amendment and 42 U.S.C. § 1983 for use of excessive and deadly force, unlawful entry, and failure to knock and announce (hereinafter "§ 1983" ); in Counts XI-XIV, Plaintiff asserts claims brought pursuant to the Federal Tort Claims Act; 28 U.S.C. §1346(b) ("FTCA"); and in Counts XV-XX Plaintiff asserts claims brought pursuant to Alabama State Law.  (Doc. 1).  Plaintiff later amended her Complaint several times and the operative complaint is the Third Amended Complaint filed on January 12, 2022.  (Doc. 122). Counts I-VI remain *Bivens* claims; *C*ounts VII-XVI are § 1983 claims; Counts XVII-XX are claims brought pursuant to the Federal Tort Claims Act; 28 U.S.C. § 1346(b) for assault and battery, negligence, wantonness, and false imprisonment; and Counts XXI-XXVI are claims brought pursuant to Alabama State Law for assault and battery, intentional infliction of emotional distress, negligence, wantonness, invasion of privacy, and false imprisonment. (*Id*.)

The relevant counts are pled against the various Defendants as follows:

**Count I** (*Bivens* claim) Use of Deadly Force – against Austin Wade Welch ("Welch"), John Gregory Skipper("Skipper"), and Scott Ray Fondren ("Fondren");
**Count II** (*Bivens* claim) Use of Deadly Force – against Beau Bartel ("Bartel");
**Count III** (*Bivens* claim) Unlawful Entry – against Welch, Skipper, and Fondren;
**Count IV** (*Bivens* claim) Unlawful Entry – against Bartel;

**Count V** (*Bivens* claim) Failure to Knock and Announce - against Welch, Skipper, and Fondren;

**Count VI** (*Bivens* claim) Failure to Knock and Announce – against Bartel;

**Count VII** (1983 claim) Use of Excessive and Deadly Force - against Welch, Skipper, Rebecca P. Miller ("Miller"), and David Smith ("Smith");

**Count VIII** (1983 claim) Use of Excessive and Deadly Force – against Fondren;

**Count IX** (1983 claim) Use of Excessive and Deadly Force – against Bartel;

**Count X** (1983 claim) Unlawful Entry- against Welch, Skipper, Miller, and Smith;

**Count XI** (1983 claim) Unlawful Entry- against Fondren;

**Count XII** (1983 claim) Unlawful Entry- against Bartel;

**Count XIII** (1983 claim) Unlawful Entry- against Raylene Busby ("Busby");

**Count XIV** (1983 claim) Failure to Knock and Announce against Welch, Skipper, Miller, and Smith;

**Count XV** (1983 claim) Failure to Knock and Announce against Fondren;

**Count XVI** (1983 claim) Failure to Knock and Announce against Bartel;

**Count XVII** (FTCA claim) Assault and Battery against the United States of America ("USA");

**Count XVIII** (FTCA claim) Negligence against USA;

**Count XIX** (FTCA claim) Wantonness against USA;

**Count XX** (FTCA claim) False Imprisonment against USA;

**Count XXI** (state law claim) Assault and Battery against Skipper, Welch, Busby, Miller, and Smith;

**Count XXII** (state law claim) Intentional Infliction of Emotional Distress against Skipper, Welch, Busby, Miller, and Smith;

**Count XXIII** (state law claim) negligence against Skipper, Welch, Busby, Miller, and Smith;

**Count XXIV** (state law claim) wantonness against Skipper, Welch, Busby, Miller, and Smith;

**Count XXV** (state law claim) invasion of privacy against Skipper, Welch, Busby, Miller, and Smith;

**Count XXVI** (state law claim) false imprisonment against Skipper, Welch, Busby, Miller, and Smith.

Although Plaintiff's Complaint categorizes the relevant individual Defendants as acting under color of both state and federal authority, the Defendants are employed as follows:

> Bartel is a Deputy U.S. Marshal stationed in the Southern District of Alabama.
> Busby is a Mobile County Deputy Sheriff.
> Welch is a Baldwin County Deputy Sheriff.
> Skipper is an Alabama Department of Corrections Sergeant/Training Instructor.
> Fondren is a Department of Homeland Security HSI agent.

(Doc. 122 at 4-6; Doc 336 at 2; Doc. 339 at 2).  Additionally, relevant to the instant motions, on

December 19, 2019, both Welch and Skipper were detailed to the United States Marshal's Service

Gulf Coast Regional Task Force ("RFTF") as Special Deputy United States Marshals ("SpDUSM"). (Doc. 122 at 5-6; Doc. 336 at 2; Doc. 336-7; Doc. 339-1 at 22-23; Doc. 339-5).  Although Skipper was an Investigator with the Alabama Department of Corrections and Welch was a Baldwin County law enforcement officer, both men were assigned to the RFTF pursuant to a Memorandum of Understanding between their respective employers (ADOC and BCSO) and the and the United States Marshal Service ("USMS") authorizing their work as a SpDUSM. (Doc. 336 at 4; Doc. 336-1 at 6; Doc. 339 at 5).

Relevant to the instant motions are Counts I-VII, IX, X, XII, XIV, XVI all of which are made pursuant to § 1983 or *Bivens* and asserted against Welch, Skipper, or Bartel[3] and Counts XXI-XXVI all of which are made pursuant to state law asserted against Welch and Skipper.[4] A consideration of the relevant claims against Welch, Skipper, and Bartel requires a consideration of the facts relating to Nicholas McLeod, Operation Grinch, and the events of December 19, 2019.

### A.    Operation The Grinch

The Mobile County Sheriff's Office ("MCSO") narcotics and vice unit (NVU) conducts twice yearly arrest round-ups of drug suspects in cases accumulated during the year.  (Doc. 353 at 10). In late October/early November 2019, the MCSO began planning a December 2019 round-up of completed drug cases.  (*Id*.).  The round-up was referred to as "Operation the Grinch."   (*Id*.).

---

[3] After the subject motions were filed, the parties filed a "Stipulation for Dismissal" pursuant to Fed. R. Civ. P. (a)[1](A)(ii) to dismiss, among other claims, Counts II (use of deadly force pursuant to *Bivens*) and VI (failure to knock and announce pursuant to *Bivens*) against Bartel (Doc. 349) and the parties assume those claims have been dismissed.  Nevertheless, the notice did not comply with Fed. R. Civ. P. 41 as it attempted to dismiss some, but not all, claims against Bartel. *See Perry v. Schumacher Grp. of La.*, 891 F.3d 954, 958 (11th Cir. 2018). Regardless, because the Court finds that all claims pursuant to § 1983 and *Bivens* are due to be dismissed for the reasons set forth herein, Counts II and VI are due to be and are hereby dismissed.

[4] According to Plaintiff's response, Plaintiff's claims against Welch and Skipper for state law outrage (Counts XXII), negligence (XXIII), wantonness (XXIV), and invasion of privacy (XXVI) "will not be pursued and are not argued herein." (Doc. 355 at 58 n.53). Accordingly, they are dismissed.

Nicholas McLeod was identified as one of the subjects to be arrested along with fifty-four other individuals.  (*Id*. at 11, 14).

Round-up operations commander Lt. Patrick White ("White") instructed operations leader Sgt. David Smith ("Smith") ". . . to organize personnel for the teams, divide the teams, and assign them to certain areas and collect the intel packets when they were done, and also prepare the briefing, the ops plan."  (*Id*. at 15).  White told Smith the MCSO narcotics investigators (Deputies Busby, Alan O'Shea and Clint Law) would "take care of the rest." (*Id*.)

Early in the round-up planning, White invited Homeland Security Investigations (HSI) personnel to assist via Philip Lavoie ("Lavoie").  (*Id*.).  Additionally, Smith called U.S. Marshal Beau Bartel ("Bartel"), who was in charge of the Regional Fugitive Task Force's ("RFTF") Mobile Office and invited the RFTF to participate.  (*Id*. at 8, 15).  According to Smith, generally the RFTF's role was to assist with the round-up.  According to Bartel, the role of the RFTF was to provide a "tactical response" to assist in the arrests.  (*Id*. at 15).  Both Lavoie for HSI, and Bartel for the RFTF, agreed to participate.  (*Id*.).  Bartel and the RFTF assisted the MCSO pursuant to a Memorandum of Understanding ("MOU") between USMS/RFTF and the MCSO.  (Doc. 341 at 4).

Bartel knew when he agreed to RFTF participation that he would not learn the round-up targets' names, charges, or the personnel assigned to his arrest team.  (*Id*. at 15-16).  Instead RFTF personnel, including Welch and Skipper, were to show up at the 5 a.m. pre-operational briefing and then help make the arrest.  (*Id*. at 16).  Bartel did not prepare an operational plan and only skimmed over the MCSO operational plan.  (*Id*.).  Neither the USMS nor the RFTF adopted the MCSO warrants.  (Doc. 341 at 4).

A week before to the round-up Smith prepared the MCSO round-up Ops Plan, which called for four arrest teams. (Doc. 353 at 21). The plan's "Operational Assignments" designated Bartel a team leader and Busby was assigned to Bartel's team as narcotics investigator (*Id*. at 21-22). The Ops plan did not discuss tactics or identify the suspects or their charges. (*Id*.). According to Smith, team leaders were to make tactical decisions. (*Id*. at 22). Bartel did not know who assigned him as team leader, and Busby did not know Bartel was going to be on a team until Bartel arrived to the round-up. (*Id*.).

B.     **Nicholas McLeod**

Nicholas Mcleod ("McLeod") was put on the radar of Officer Busby, a Mobile County Deputy Sheriff, on June 27, 2019 following a drug "reverse" investigation which resulted in McCleod being detained. (Doc. 353 at 8). Busby questioned McLeod, but allowed him to leave without arrest. (*Id*. at 8, 11). On July 1, 2019, Busby printed Nicholas McLeod's arrest history from the Sheriff's Jail Management System (JMS) which indicated McLeod's residence address as 1377 McCullough Road, Atmore, Alabama. (*Id*.) The JMS history also indicated that the Mobile Circuit Court issued an alias warrant for McLeod's arrest on June 25, 2019, in a MCSO NVU case. (*Id*. at 11-12). McLeod was ultimately arrested on July 9, 2019, on alias warrants in the state law criminal case. (*Id*.)

Following his arrest, McLeod remained continuously in the Mobile County Sheriff's custody without bond, from July 9, 2019 through January 18, 2020. During that time, Judge Brooks, a state court judge, ordered the Sheriff to transport McLeod from the jail to a drug rehab facility to complete a 90-day in-patient drug rehab program then transport him back to the Metro jail upon completion pending a status hearing. (*Id*. at 12-13). The Mobile Metro Jail staff notified

6

Judge Brooks on December 16, 2019, that McLeod would finish the rehab program on December 18, 2019.  (*Id*. at 13).

On December 17, 2019, Busby signed criminal complaints initiating criminal cases against suspects she planned to include in the round-up (Operation the Grinch), including Nicholas McLeod.  (*Id*.).  Each of the complaints alleged violations of Alabama law.  (*Id*.).  A Mobile County Magistrate issued corresponding arrest warrants.  (*Id*.).  All of the warrants were delivered to the MCSO Warrants Division at about noon on December 18, 2019.  (*Id*.).

MCSO Transportation Officer Cleve Hudson collected Nicholas McLeod at the Mission of Hope on December 18, 2019 and returned him to Metro Jail as the judge ordered. (*Id*.). Back in jail, McLeod was then arrested at 3:36 p.m. on the warrants stemming from the "reverse." (*Id*.). Nicholas McLeod was re-booked into the Metro Jail on the warrants under his biographical information including his Atmore residence address.  (*Id*.).

MCSO Warrants Division clerk Deirdra Greene ("Greene") updated the JMS at 4:34 p.m. to show McLeod's arrest on the Busby warrants as an "added charge" and that he was in the Metro Jail.  (*Id*. at 14).  She followed this entry up at 4:55 p.m. by flagging the JMS entry with "RWA'd" (return without action) and noting "801 Round Up 12/19/2019" to caution that the McLeod warrants had been "included in the [next day's] round-up […]."  (*Id*.)

C.    **December 19, 2019**

At approximately 5:00 a.m. on the morning of December 19, 2019, Welch, Skipper, and Bartel attended a ten-minute pre-operation briefing which was conducted by both MCSO and USMS personnel. (Doc. 336 at 5; Doc. 339 at 5; Doc. 341 at 5; Doc. 353 at 22).  Individual suspects, locations to be hit, and tactical matters were not discussed at the briefing.  (Doc. 353 at 22).

However, at the close of the briefing, White "may have said in concluding the briefing be safe, make sure warrants are valid, all that good stuff." (*Id*. at 23). Additionally, according to Bartel, either White or Smith "[…] said all of these cases were verified. They're all good to go. […]." (Doc. 333 at 11; Doc. 388-1 at 33.)

Following the initial briefing, the larger group was divided into teams. (Doc. 336 at 5; Doc. 339 at 5; Doc. 341 at 6). Bartel, Welch, and Skipper were assigned to Team 3 along with Busby and others. (*Id*.). Team 3 then met and Busby, who had the operational arrests packets created by the MCSO, shared the packet with Bartel and the group collectively discussed the information and details regarding the arrest subjects in the packets with each other. (Doc. 336 at 5; Doc. 339 at 6; Doc. 341 at 6). Upon reviewing the arrest packet, Bartel recognized that the RFTF had arrested one of the targets, Gary Wayne Gurley, two weeks earlier. (Doc. 353 at 24). Bartel brought Busby's attention to Gurley, then called the MCSO Warrants Division to verify the warrants and was told that Gurley was in the Metro Jail. (*Id*. at 25). Bartel told Sgt. Smith and returned the Gurley warrants. (*Id*.)

Once the arrest teams were identified, Bartel told the RFTF members "this is not our operation. We're not doing our – we are going to get to the house. We're going to secure the house perimeter. We're going to knock and announce. We're not breaching. We're not making entry. We're going to call everybody out of the house. If their target is there, we will place them under arrest." (Doc. 353 at 28-29). Following this final instruction, Team 3, including Bartel, Welch, Skipper, and Busby departed to the locations identified in the arrest packets. (Doc. 336 at 5-6; Doc. 339 at 6; Doc. 341 at 6).

At 6:30 a.m. on December 19, 2019, seven vehicles approached 11223 Old Moffett Road (the "Property").  (Doc. 353 at 4, 31).  Upon arriving at Plaintiff's home, Skipper and Welch exited their respective vehicles and saw two males, later identified as Chris McLeod ("Chris") and Matthew Sullivan ("Sullivan") exiting the home via the side door in the carport. (Doc. 336-1 at 26; Doc. 339-1 at 79-80).  Skipper and Welch observed Bartel and Busby approach the males, but they continued walking toward the carport door.  (*Id*.)  Bartel and Busby learned the identity of the two males (Chris and Sullivan) and were informed that McLeod did not live at the home. (Doc. 353 at 32).  They were additionally told by Chris and Sullivan that McLeod was thought to be in jail.  (*Id*.).  Finally, the officers were told that Plaintiff was inside the home and there were guns in the home.  (*Id*. at 33).

As they walked by, Skipper heard one of the men say that a woman was inside the home. (Doc. 339 at 7).  Welch heard Chris tell Busby and Bartel that his "wife or girlfriend" was in the house and that Nicholas McLeod was not there.  (Doc. 353 at 35).  Welch also heard one of the men yell "hey the police are looking for your uncle." (Doc. 336-1 at 27.)   Although disputed by the parties, Welch contends that the carport door was partially open or ajar.  (*Id*. at 28). According to Welch, when he approached the door, his flashlight was pointed down which cast a shadow and he could see a silhouette of someone inside.  (*Id*. at 29-31).  Welch announced "U.S. Marshals" and when no response came, he pushed the door open.  (*Id*.).  According, to Skipper, when he was a few feet from the door, a woman (Plaintiff) "presented herself in the doorway", holding a gun pointed at Skipper and Welch.  (Doc. 339 at 7).  Skipper and Welch commanded Plaintiff to drop the gun, and when she did not, they discharged their weapons.  After hearing commands to "drop the gun," Bartel left Busby to advance towards the carport.  (Doc. 341 at 7;

Doc. 353 at 41).  However, he did not reach the carport before shots were fired and he never fired his weapon.  (Doc. 341 at 7).

According to Plaintiff, she was in bed when she saw a beam of light in the side yard.  (Doc. 353 at 1).  Believing a prowler was outside, she got out of bed, picked up her pistol, and walked through the house towards the kitchen to ensure the door was locked.  (*Id*.).  As she reached for the lock, the kitchen door flew open towards her and all she saw were bright lights.  (*Id*. at 2).  According to Plaintiff, when the door flew open, she was holding a gun aimed at the floor.  The officers yelled "Whoa, Whoa gun, gun" and Welch, Skipper and Fondren all opened fire.  (Doc. 353 at 3-4, 42).  The officers collectively fired sixteen to eighteen bullets into the house, hitting Plaintiff five times.[5]  (*Id*. at 3).

Following the shooting, a team of officers ultimately cleared the house of threats and gave medical aide to Plaintiff.  (Doc. 353 at 43).  Plaintiff was then transported to a hospital.  (*Id*.).

### D.    Post shooting

Several relevant facts are undisputed post-shooting.  The address listed on the warrant was not the last known address for McLeod or the address listed when he was previously arrested.  None of the officers present at the Property on December 19, 2019, investigated McLeod's address.  Although not directly relevant to this motion, the totality of the record indicates that Busby gave an investigative file to the Mobile County District Attorney's office where it was reviewed and later sent to the County Magistrate's office. (Doc. 331 at 5).[6]  The

---

[5] It is now undisputed that none of the shots fired by Fondren struck Plaintiff.

[6] Because of the number of officers and organizations involved, there are multiple motions for summary judgment pending in this action simultaneously.  Although these facts were not included in the factual summary specific to Fondren, they do not appear to be disputed by the parties.

Magistrates' office then prepared and issued the warrants, including the address. (*Id*. at 5-6). The record also reflects that prior to December 19, 2019, Busby sent Rebecca Miller ("Miller") (a civilian MCSO employee who is no longer a defendant) a list of round-up suspects. (Doc. 353 at 17). Smith then instructed Miller to run a search on the warrant subjects, that included three reports with identifying information, including addresses. (*Id*.; Doc. 331). Miller placed the reports in folders and gave them to Smith, but neither Miller nor Smith reviewed, researched, or investigated further. (*Id*. at 17-18; Doc. 331 at 7-8).[7] Additionally, on December 18, 2019, Miller re-ran all the warrant subjects through JMS (Jail Management Systems), DOC (Dept. of Corrections), and BOP (Bureau of Prisons) between 2p.m. and 2:50 p.m. and then notified Smith that five of the subjects (but not McLeod) had recently been arrested. (Doc. 331 at 9). There is no dispute that the address provided on the warrant was Plaintiff's residence. (Doc. 353 at 4). Moreover, the McLeod warrants were not active on December 19, 2019, because on that morning, McLeod was incarcerated.

## II.    SUMMARY JUDGMENT STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The mere existence of some

---

[7] Collectively it appears that Smith thought Miller was responsible for determining the last known address for the subjects and Miller believed she was simply running reports that Smith would use to determine last known addresses. The result is that neither Smith nor Miller determined last known addresses. Also, there is no dispute that the reports on McLeod contained more than one address, including Plaintiff's residence address and the more recent address listed from McLeod's last arrest.

evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' " *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Anderson*, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson*, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor.  *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 524 (11th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th

Cir. 1991).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial.." *Vega v. Invsco Group, Ltd.*, 432 F. App'x 867, 870 (11th Cir. June 24, 2011).  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).  "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

III.    **DISCUSSION**

A.    **42 U.S.C. § 1983**

Plaintiff alleges that Welch and Skipper, while acting under color of state law, violated her Fourth and Fourteenth Amendment rights for use of deadly and excessive force (Count VII), unlawful entry (Count X), and failure to knock and announce (Count XIV), and seeks redress under 42 U.S.C. § 1983 ("§ 1983") (*See* Doc. 122).  Similarly, Plaintiff contends that Bartel, while acting under color of state law, violated her Fourth and Fourteenth Amendment rights for use of deadly and excessive force (Count IX), unlawful entry (Count XII), and failure to knock and announce (Count XVI), and seeks redress under 42 U.S.C. § 1983 ("§ 1983") (*See Id.*).

Defendants contend that because they were acting within the scope and course of their employment as federal agents, Plaintiff's § 1983 claims are due to be dismissed.  (Doc. 336 at 35-

39; Doc. 339 at 36-40; Doc. 341 at 21-26).[8]  For support, Defendants argue that there is no dispute that on December 19, 2019, they were acting as employees or agents of the United States Marshal Service and members of the Gulf Coast Regional Fugitive Task Force ("RFTF"). [9]  (*Id*.). Accordingly, Defendants argue that their participation can only be classified as under color of federal authority, defeating Plaintiff's § 1983 claims.  (*Id*.).  For legal support, Defendants rely on the Presidential Threat Protection Act of 2000, 106 P.L. 544, 114 Stt. 2715 ("the Act"), under which the USMS established regional task forces and allows for the apprehension of fugitives by task force members[10] and 5. U.S.C § 3374 which specifies that when an officer is "on detail to a Federal agency", the officer "is deemed an employee of the agency".  *See also* 28 C.F.R. § 0.112(b) (providing USMS authority to deputize federal, state, and local law-enforcement officers.). Defendants also rely on a number of cases wherein § 1983 claims have been dismissed against officers acting as specially deputized federal agents, including *King v. United States*, 2017 WL 6508182 (W.D. Mich. 2017), *rev'd and remanded on other grounds*, 917 F.3d 409 (6th Cir. 2019), *rev'd sub nom. on other grounds*, *Brownback v. King*, 141 S. Ct. 740, 209 L. Ed. 2d 33 (2021).[11]

Plaintiff concedes that at the time of the incident, Welch, Skipper, and Bartel were employees of the Federal Government under the FTCA.  (Doc. 355 at 54).  Plaintiff additionally makes no responsive argument to Defendants' position that they participated in the operation pursuant to the Presidential Threat Protection Act of 2000.  However, Plaintiff maintains that

---

[8] Welch and Skipper are represented by the same counsel and their respective motions and briefs appear to be identical on this issue.
[9] Although not incorporated as part of their arguments on this issue, the United States District Attorney for the Northern District of Florida certified that Welch and Skipper were acting as specially deputized United States Marshals and acting within the scope of their federal duties on December 19, 2019.  (Doc. 339-6)
[10] *See* 34 U.S.C. § 41503(a).
[11] *See also Ramirez v. City of Trenton*, 2022 WL 1284737 (D. NJ. April 29, 2022).

"the unique nature of the facts of this case" show that their Constitutional violations were done pursuant to color of state law and are thus, redressable under § 1983. (*Id*.).   As such, Plaintiff argues Welch and Skipper[12] acted under color of state law because they were state officers with state law power to arrest Mcleod at the request of the Mobile County Sheriff, "regardless of their additional status as RFTF TFOs." (*Id*. at 54).   More specifically, they were "attempting to serve state warrants, for state crimes, on a state resident, at a[n] in-state location" while on state payroll under state agency policies. (*Id*.)   Moreover, Plaintiff argues that under the MOUs between Welch's and Skipper's employers and the USMS, "the parent agencies retained responsibility for the conduct of their personnel." (*Id*.).   Finally, Plaintiff characterizes Welch and Skipper's role as doing the sheriff's bidding and attempting to take advantage of their RFTF status for purposes of § 1983 while disclaiming their obligations under the USMS policy and procedures because they were merely assisting the sheriff.  (*Id*. at 54-55).

To determine whether Welch and Skipper were acting under color of state law, Plaintiff urges this Court to consider the "totality of the circumstances" (*see Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961)) and apply the test set forth in *Lugar v. Edmonson Oil Co*. 457 U.S. 922, 937 (1982) as "some circuits" and "a number of district courts" have done to determine whether officers were acting under color or state or federal law.  (Doc. 355 at 57).

Relying on *Lugar*, Plaintiff argues that a totality of the circumstances warrants a determination that Welch and Skipper were acting under color of state law.  Plaintiff also distinguishes *King* because in that case, the officers were attempting to make an arrest pursuant

---

[12] Although Plaintiff filed a collective response to the motions individually filed by Welch, Skipper, and Bartel, Plaintiff arguments on this issue refer to Welch and Skipper, not Bartel.  Given that Bartel was not a state officer and Plaintiff's silence on the issue, it is undisputed that Bartel was acting under color of federal authority.

to an FBI investigation and under the Federal Fugitive Felon Act.  In sum, Plaintiff contends that the facts of this action establish a complete lack of federal interest in arresting Nicolas McLeod.

The Fourteenth Amendment of the Constitution provides in part:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. Because the Amendment is directed at the States, it can be violated only by conduct that may be fairly characterized as 'state action.'"

*Lugar*, 457 U.S. at 923-24.

"Section 1983 creates no substantive rights; it merely provides a remedy for deprivations of federal statutory and constitutional rights."  *Almand v. DeKalb County*, 103 f.3d 1510, 1512 (11th Cir. 1997). (citations omitted).  No claim lies under § 1983, for actions taken under color of federal law. *District of Columbia v. Carter*, 409 U.S. 418, 424-25, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).  As such, "[a] successful section 1983 action requires that the plaintiff show she was deprived of a federal right by a person acting under color of state law."  *Almand,* at 1513 citing *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir.1992) (citing *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 155–56, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978)).  "A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state." *Id*. citing *Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir. 1995) (citing *West v. Atkins*, 487 U.S. 42, 48–50, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988)).

Whether conduct constitutes state action is no simple question of fact. *See Blum v. Yaretsky*, 457 U.S. 991, 996–98, 102 S.Ct. 2777, 2782, 73 L.Ed.2d 534 (1982) (describing the question of whether there is state action as question of law); *Cuyler v. Sullivan*, 446 U.S. 335, 342 n. 6, 100 S.Ct. 1708, 1715 n. 6, 64 L.Ed.2d 333 (1980) (determining if state action exists is resolution of question of law); *see also Duke v. Smith*, 13 F.3d 388, 392 (11th Cir.1994) (reviewing de novo, as a mixed

question of law and fact, district court's determination that private actor was not sufficiently intertwined with government entity to be engaged in state action).

*Id*. at 1513-14.

Pursuant to *Lugar,* the Plaintiffs must establish that the deprivation of constitutional rights alleged in her complaint "has resulted from the exercise of a right or privilege having its source in state authority," and that the Defendants "may be appropriately characterized as 'state actors'" under the facts of this case. *Lugar*, 457 U.S. at 939, 102 S.Ct. 2744.

As an initial mater, it is worth noting that none of the cases relied on by Plaintiff to establish Defendants were acting under color of state law are from the Eleventh Circuit, or district courts within the Eleventh Circuit.[13]  Moreover, this Court's review of those cases cited by Plaintiff confirm the existence of numerous factual distinctions.  Regardless, even applying *Lugar* as Plaintiff suggests, and considering the totality of the circumstances, this Court is not persuaded that Defendants were acting under color of state law.  First, it is undisputed that both Welch and Skipper were specially deputized United States Marshals and members of the RFTF.  Similarly, Bartel is undisputedly a Deputy U.S. Marshal.  Indeed, the Federal Government has certified that these Defendants were acting within their discretionary authority as federal agents during their role in Operation the Grinch.  Second, although Plaintiff contends that Welch and Skipper could have had the power to arrest McLeod as state officers, it is undisputed that their presence on December 19, 2019, was dictated by their assignment to the RFTF.  Plaintiff makes no argument that as members of the RFTF, Welch and Skipper could not act as federal agents to arrest McLeod

---

[13] *See* Doc. 355 at n. 51 and 52 (citing to *Couden v. Duffy*, 446 F.3d 483, 499 (3d Cir. 2006); *Askew v. Bloemker*, 548 F.2d 673, 677 (7th Cir. 1976); *Johnson v. Orr*, 780 F.2d 386, 393 (3d Cir. 1986); *Pettiford v. City of Greensboro*, 556 F.Supp. 2d 512, at 534-535 M.D. N.C. May 30, 2008); *Adams v. Springmayer*, 2012 WL 1865736, at *5-6 (W.D. Pa. May 22, 2012) *cf. Wilkinson v. Hallsten*, 2006 WL 2224293, at *8 n.7 (W.D.N.C Aug. 2, 2006), *aff'd*, 225 Fed. Appx. 127 (4th Cir. 2007); *Macaluso v. Dane Cty.*, 537 N.W.2d 148, *3-4 (Wis. Ct. App. 1995) (internal citations omitted)).

pursuant the Presidential Threat Protection Act of 2000.  Third, the USMS did not investigate or obtain the state arrest warrants on McLeod and did not orchestrate Operation the Grinch. Instead, the MCSO determined the round-up suspects, obtained the warrants, and asked the USMS to assist in the execution of the warrants.  In other words, the USMS were not jointly participating with the state in any investigation or planning of the operation.

Finally, Plaintiff's attempt to distinguish this action from *King* and others relied on by Defendants is unconvincing.  In *King*, the Sixth Circuit upheld a determination that claims for constitutional violations against a police officer who was working full-time on an FBI Task force, were *Bivens* claims, not § 1983 claims.  *King*, 917 F.3d at 434.  In reaching its determination, the Court noted that the officer was enforcing a state warrant, but stated "the nature and character of a cooperative federal-state program is determined by the source and implementation of authority for the *program*, not for the particular work that the agency chooses, in the exercise of its authority, to perform on a given day."  *Id*. at 433.  Plaintiff attempts to distinguish *King* because in that case, the officer was making an arrest pursuant to an open FBI investigation under the Federal Fugitive Act, implicating a federal nexus, where no such connection exists in this case. However, regardless of the acts performed by the RFTF on December 19, 2019, it is undisputed that the source of the RFTF's authority to execute the subject warrants did not stem from state law.  As such, considering the nature and character of the RFTF compels a determination that Welch and Skipper were acting under color of federal authority.

In sum, the totality of the circumstances and undisputed facts established by the record reveal that Defendants were present during the events of December 19, 2019, as federal agents under the authority of federal law and their support role was not so intertwined with the state

actors that the officers were acting under color of authority of state law.  As such, Plaintiff's claims brought pursuant to § 1983 must be dismissed.[14]

> **B.    *Bivens***

In addition to asserting that Welch, Skipper, and Bartel violated Plaintiff's constitutional rights under § 1983, Plaintiff alternatively asserts that those Defendants violated her constitutional rights pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971) (Counts I-VI).  (Doc. 122).

Defendants argue that Plaintiff's *Bivens* claims should be dismissed because this case is meaningfully different from *Bivens* and to allow her *Bivens* claims to proceed would be an improper extension of *Bivens*.  (Doc. 336 at 21- 35; Doc. 374 at 10-14; Doc. 341 at 26-41).  In response, Plaintiff argues that Plaintiff's *Bivens* claims are cognizable because they are similar to the facts and context of *Bivens*, such that Counts I through VI are "applications of *Bivens*, not [] extensions of it."  (Doc. 355 at 43-53).

In *Bivens*, the Supreme Court created a damages remedy against federal officials "acting under color of [their] authority" for violation of constitutional rights. *Bivens*, 403 U.S. at 389. Specifically, the Supreme Court provided a remedy to a plaintiff who alleged a violation of his Fourth Amendment right to be free from unreasonable search and seizure.  *Id*.  In the decade that followed, the "*Bivens* remedy" was extended twice.  In *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), the Supreme Court permitted a *Bivens* claim for a violation of the plaintiff's Fifth Amendment rights under the Due Process Clause for gender discrimination.

---

[14] Of note, Plaintiff's final argument seems to suggest that as long as the Complaint pleads alternative theories of recovery, then dismissal is not warranted.  (*See* Doc. 355 at 58).  While this may be true for purposes of a Rule 12(b)(6) motion for failure to state a claim, it is not true for a summary judgment motion.

And in *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), the Supreme Court permitted a *Bivens* claim for violation of a plaintiff's Eighth Amendment right to be free from cruel and unusual punishment for failure to provide adequate medical treatment. "These three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Ziglar v. Abbasi*, 582 U.S. 120, 131, 137 S.Ct. 1843, 1855, 198 L.Ed2d 290 (2017).

In 2017, the Supreme Court recognized that *Bivens* is well-settled law in its own context, but "expanding the *Bivens* remedy is now considered a 'disfavored' judicial activity." *Id*. at 1857 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 129 S.Ct. 1937, 173 L.Ed.2d 868). As such, in *Ziglar*, the Court set forth a two-pronged test to determine whether a *Bivens* claim may proceed. *Id.* at 1859-60. The first prong requires courts to ascertain whether the claim is presenting *Bivens* in a "new context." *Id*. If the case differs "in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court, then the context is new." *Id.* at 1859. If the case presents a new context, courts should evaluate whether "special factors" militate against extending *Bivens*. *Id*. at 1860. The pertinent question is whether Congress or the courts are more suited to determine whether a damages action can proceed. *Id*. at 1857 (citation omitted).

Following *Ziglar*, the Supreme Court in 2022, further analyzed the viability of two *Bivens* claims – a First Amendment excessive force claim and a First Amendment retaliation claim. *See Egbert v. Boule*, 596 U.S. 482, 142 S. Ct. 1793, 213 L.Ed.2d 54 (2022). Although the Court's analysis indicates that it was choosing not to "dispense with *Bivens* altogether" it again emphasized that "recognizing a cause of action under *Bivens* is a 'disfavored judicial activity.'" *Egbert*, 142 S. Ct. 1803 (quoting *Ziglar*, 137 S. Ct. at 1856–57). The Court directed lower courts to

look to the two-step test set forth in *Ziglar when determining whether to* imply a *Bivens* extension, but noted, "those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* If "there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy." *Id.* (internal quotation marks and citation omitted). Additionally, the *Egbert* Court noted that "a court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, 'an alternative remedial structure.'" *Id*. at 1804 (quoting *Ziglar*, 137 S. Ct. at 1858).

Although *Egbert* set out a single question inquiry, the Court did not expressly overrule *Bivens* or the cases employing the two-part test set forth in *Ziglar*. As such, this Court will address Plaintiff's *Bivens* claims using *Ziglar*'s two-step *Bivens* analysis and then the *Egbert* Court's single step analysis.

### 1.    New *Bivens* Context

To determine whether this action presents a new *Bivens* context, this Court must first consider if this case is different in a meaningful way from previous *Bivens* cases. *Ziglar* at 1859-60. In *Ziglar*, the Court provided a non-exhaustive list of differences meaningful enough to give rise to a new context as follows:

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id*. at 1859-60.

Considering the relevant inquiry, this Court finds that the current case is meaningfully different than the previous *Bivens* cases.[15]  In *Bivens,* a plaintiff brought suit alleging that agents from the Federal Bureau of Narcotics entered his home, arrested him, handcuffed him in front of his wife and children, and searched the home before subjecting him to a strip search—all without a warrant*.  See Bivens, 403 U.S. at 389, 91 S.Ct. 1999.*  Here, Plaintiff has brought suit against state and federal officers alleging the officers unlawfully entered her home, failed to knock and announce, and exercised deadly force when they shot her while attempting to execute a thought-to-be-valid, but actually-previously-executed arrest warrant of an individual who did not reside at the home.

Since *Bivens*, as pointed out by Plaintiff, Courts have recognized causes of action pursuant to *Bivens* as a remedy for injuries like those alleged by Plaintiff in this action.  (*See* Doc. 356 at n. 37).  Indeed, the Court notes the similarities between this case and *Bivens*.  Namely, both cases involve federal law enforcement officers and an alleged violation of the Fourth Amendment.  As Plaintiff characterizes these cases, "Webster Bivens and Ann McLeod were both injured in their homes when police officers unlawfully entered in violation of the Fourth Amendment."  (Doc. 356 at 31).  The Court also recognizes there exists a circuit split as to whether some factual distinctions, such as the existence of a warrant is "meaningfully different" in the *Bivens* context. *See, e.g. Logsdon v. United States Marshal Service*, 91 F.4th 1352 (10th Cir. 2024) (concluding the existence of a warrant and the location of the arrest have no legal significance in the "new context" analysis of an excessive-force case, while noting "substantial of authority to the contrary" exists) (citing, *e.g.*, *Annappareddy v. Pascale*, 996 F.3d 120, 135 (4th Cir. 2021) (Fourth

---

[15] There is no argument from the parties that this action is not distinguishable from *Davis* or *Carlson*.

Amendment claims created a new *Bivens* context when search was conducted with a warrant); *Cantú v. Moody*, 933 F.3d 414, 423 (5th Cir. 2019) (similar); *Cain v. Rinehart*, No. 2023 WL 6439438, at *3 (6th Cir. July 25, 2023) (unpublished) (similar)).

However, the Supreme Court's more recent decisions, including the decision in *Egbert*, has altered the *Bivens* landscape.[16]  As such, the Court is satisfied that the similarities relied on by Plaintiff are not enough and the undisputed facts meaningfully distinguish this case from *Bivens*.  *See Egbert* at 495 ("While *Bivens* and this case do involve similar allegations of excessive force and thus arguably present 'almost parallel circumstances' or a similar 'mechanism of injury,' *Ziglar*, 582 U. S., at [139], 137 S.Ct., at 1859, these superficial similarities are not enough to support the judicial creation of a cause of action.").  Namely, this action involves three alleged Fourth Amendment violations, not all of which were present in *Bivens*.  Further, regardless of the violation alleged, the officers involved here are a Deputy U.S. Marshal (Bartel) and SpDUSMS (Welch and Skipper) (not Federal Bureau of Narcotics Officers), who were working together on a joint regional task force, present on Plaintiff's property subject to an arrest warrant (as opposed to no warrant)[17], and were involved in the use of deadly force (not just excessive force or a warrantless search).  Individually or collectively, these differences are meaningful.

_____

[16] Namely, since *Egbert,* courts have determined that facts such as the existence of an arrest warrant is sufficient to distinguish an action from *Bivens*.  *See, e.g., Senatus v. Lopez*, 2022 WL 16964153, *4 (S.D. Fla. October 12, 2022) (citations omitted). Courts have also determined meaningful differences exist because the claims are asserted against a different class of defendant.  *See id*. (citations omitted). Finally, courts have found meaningful differences when the conduct at issue is something other than the warrantless search of a person*.  See Robinson v. Heinze*, 655 F.Supp.3d 1276, *1281-82 (N.D. Ga. Feb. 3, 2023) (citations omitted).

[17] The Court notes Plaintiff's argument that a previously executed arrest warrant, which was at issue in this action, is equivalent to no warrant at all. But this argument does not save Plaintiff's *Bivens* claims.  Instead, the fact that Welch and Skipper were present on the Property to arrest an individual subject to a warrant that they did not know was no longer valid, is still factually different than entering a home and searching an individual with knowledge that no warrant was obtained.  Moreover, even crediting Plaintiff's position that this action is equivalent to one where no warrant was obtained, there remain other meaningful differences which establish a new context as set forth above.  *See Ziglar*, 137 S. Ct. at 1857.   ("[E]ven a modest extension [of *Bivens*] is still an extension.").

Further, while the subject motions have been pending, the Eleventh Circuit issued an opinion in *Robinson v. Sauls*, 102 F.4th 1337 (11th Cir. 2024) which compels the outcome of the application of *Bivens* in this action.  More specifically, in *Robinson*, the mother of a fugitive who was fatally shot by deputy United States Marshals and local police officers working on a joint regional task force brought an action against the officers alleging Fourth Amendment excessive force claim pursuant to *Bivens*.   The district court dismissed Plaintiff's *Bivens* claim for excessive/deadly force pursuant to *Egbert*.   On appeal, the Eleventh Circuit affirmed for two reasons: "First, Congress is better positioned than the Judiciary to determine whether a cause of action is available in the new context of the USMS operating a joint state and federal task force to apprehend fugitives, particularly given that Congress has legislated in this area and has created no damages remedy. Second, the fact that Congress and the Executive Branch have created alternative procedures to review a claim that a task force member used excessive force forecloses a *Bivens* action here." (*Id*. at *5). The Court specifically stated that the case "present[ed] a new context because the Supreme Court has never recognized a cause of action for excessive force against officers operating as part of a USMS joint federal and state task force apprehending fugitives." *Id*.   Given that Plaintiff's *Bivens* claims in this action (regardless of whether they are for unlawful entry, failure to knock and announce, or use of deadly force) are asserted against Bartel, Welch, and Skipper as members of a joint task force, a new category of defendants, her claims arise in a new context.  (*See Id*. at *6) ("Given the distinct statutory scheme within which both state and federal officers operate when they participate in a USMS joint task force apprehending fugitives, we conclude that claims against such officers present a new context for *Bivens* purposes.")

### 2.    Special Factors

If the case is meaningfully different from *Bivens*, *Davis*, and *Carlson*, a court must ask whether any "special factors counsel [ ] hesitation in the absence of affirmative action by Congress." *Id.* at 1857 (quoting *Carlson*, 446 U.S. at 18). The Supreme Court has not defined the "special factors," but has stated that "the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id*. at 1857–58. The Court noted that such special factors may include whether there is "an alternative remedial structure present in a certain case" because "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Id.* at 1857, 1863.

In seeking summary dismissal, Welch, Skipper, and Bartel rely on a number of cases where *Bivens* claims were not permitted to proceed based on a consideration of "special factors" including, the "newness of the *Bivens* context", system-wide consequences of recognizing a *Bivens* action, and alternative remedial measures.  (Doc. 336 at 25-35; Doc. 339 at 26-35; Doc. 341 at 31-41).  Plaintiff does not offer any argument as to the "special factors" analysis, and instead relies solely on her position that this case is not a "new context."  As explained above, Plaintiff's position is not compelling in light of *Egbert*.

Moreover, the Court agrees that a consideration of the relevant "special factors" counsels against allowing Plaintiff's *Bivens* claims proceed. First, the determination that this is a "new context" of *Bivens* action, compels dismissal.  *See Robinson*, 655 F.Supp.3d at 1282 (noting the *Egbert* Court's reliance on *Hernandez v. Mesa*, 885 F.3d 811, 818 (5th Cir. 2018) (en banc), aff'd, 589 U.S. 93, 140 S. Ct. 735, 206 L.Ed.2d 29 (2018), for the proposition that "[t]he newness of this

'new context' should alone require dismissal."). Moreover, as discussed above, the Eleventh Circuit's recent decision in *Robinson* compels the conclusion that special factors exist to foreclose a *Bivens* remedy in this action.  More specifically, on facts significantly similar to those in this action, the Eleventh Court stated: "Because of the unique circumstances present when the USMS operates joint task forces to apprehend state and federal fugitives, including 'the impact of potential liability on cooperation among law-enforcement agencies,' we conclude '"that the Judiciary is not undoubtedly better positioned than Congress to authorize a damages action."'" *Id*. at *6 (quoting *Logsdon v. U.S. Marshal Serv.*, 91 F.4th 1352, 1358–59 (10th Cir. 2024) (quoting *Egbert*, 596 U.S. at 495, 142 S.Ct. 1793)).  Accordingly, Plaintiff's *Bivens* claims are due to be dismissed.

### 3.    *Egbert's* single question Inquiry

As discussed above, the Supreme Court has very recently indicated that the *Ziglar* two-part test, can accurately be described as "a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert, at 1803.  Egbert's* single question inquiry is answered in the affirmative in this action, for all of the same reasons the Eleventh Circuit discussed in determining special factors counseled against extending *Bivens* in *Robinson*, as discussed above.   As a result, under either test, Plaintiff's claims cannot proceed.

### C.    Qualified Immunity[18]

Skipper, Welch, and Bartel contend they are entitled to qualified immunity as to all of Plaintiff's claims against them.  (Docs. 336, 339, and 341).  More specifically, Welch and Skipper

---

[18] For the reasons detailed above, all of the *Bivens* claims asserted against Welch, Skipper, and Bartel are due to be dismissed.  However, to ensure a comprehensive analysis, this Court will address the Defendants' qualified immunity arguments.

assert that they did not violate Plaintiff's clearly established Constitutional rights when they entered Plaintiff's carport, failed to knock and announce, and used deadly force. (Doc. 336 at 10-20; Doc. 339 at 8-21). Likewise, Bartel asserts that he did not violate Plaintiff's constitutional rights by his unlawful entry.[19] (Doc. 341). Plaintiff argues Welch, Skipper, and Bartel are not entitled to qualified immunity on any claim. (Doc. 355 at 25-40)

A determination that defendants are entitled to qualified immunity would defeat all of the claims asserted against them. *See Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (The defense of qualified immunity is available whether the Federal Defendants are sued under section 1983 or *Bivens*.)

The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal citation and quotation omitted). An official seeking qualified immunity must initially establish that he was acting within his discretionary authority. *Id*. If the official was acting within the scope

_____

[19] Plaintiff has sought dismissal of her claims against Bartel for use of deadly force (Counts II and IX) and VI (failure to knock and announce pursuant to *Bivens*). *See* n.2.

of his discretionary authority, the burden shifts to the plaintiff to show that immunity is not appropriate. *Id*.

To meet her burden, a plaintiff must first show that a defendant's conduct violated a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Second, a plaintiff must show that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). "For an asserted right to be clearly established for purposes of qualified immunity, 'the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that "what he is doing" violates federal law.'" *Jackson v. Sauls*, 206 F.3d 1156, 1164-65 (11th Cir. 2000)(citations omitted). "Additionally, the standard for determining if an officer violated clearly established law is an objective one and does not include inquiry into the officer's subjective intent or beliefs. Thus, a police officer is entitled to qualified immunity if a reasonable police officer could have believed his or her actions were lawful in light of clearly established law and the information possessed by the officer at the time the conduct occurred." *Id*. (internal and external citations omitted).

There are three avenues by which Plaintiff can meet her burden to show that the officers violated clearly established constitutional law. "First, the plaintiffs may show that a 'materially similar case has already been decided.' . . . Second, the plaintiffs can point to a 'broader, clearly established principle [that] should control the novel facts [of the situation].' . . . Finally, the conduct involved in the case may 'so obviously violate[] th[e] constitution that prior case law is unnecessary.'" *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012) (internal citations omitted).

When determining whether a right was clearly established, the Court "looks only to binding precedent—cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose—to determine whether the right in question was clearly established at the time of the violation." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011)(citation omitted).

Plaintiff does not appear to contest that Defendants were acting within the scope of their discretionary duties. Nevertheless, "a government official can prove he acted within the scope of his discretionary authority by showing 'objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.'" *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir.1988)). The Court is satisfied that Welch, Skipper, and Bartel were clearly acting in their discretionary authority during the relevant events of December 19, 2019. As a result, the Court will address Plaintiff's Fourth Amendment claims.

### 1.     Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 569 U.S. 1, 6, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). "A warrantless and nonconsensual entry into a person's home, and any resulting search or seizure, violates the Fourth Amendment unless it is supported by both probable cause and exigent circumstances." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1251

(11th Cir. 2013) (quoting *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)).  As such, it is well established that police may not enter a third parties' home to arrest a suspect without a search warrant or an exigency. *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68L.Ed.2d 38 (1981).  However, for Fourth Amendment purposes, an arrest warrant founded upon probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.  *Payton,* 445 U.S. at 603.

"The private property immediately adjacent to a home is entitled to the same protection against unreasonable search and seizure as the home itself." *United States v. Taylor*, 458 F.3d 1201, 1206 (11th Cir. 2006) (citing *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)).  "At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' . . . and therefore has been considered part of the home itself for Fourth Amendment purposes." *Id.*

According to Plaintiff, Defendants violated her "Fourth Amendment right to security in her home and person when they entered the curtilage of her home without license; stacked outside her kitchen door without knocking and announcing their presence and authority; forcefully propelled the kitchen door back into the home; and blinded and shot Ann Rylee."  (Doc. 355 at 26).  The Court will address whether Defendants are entitled to qualified immunity with respect to each of Plaintiff's alleged Fourth Amendment violations (unlaw entry, failure to knock and announce, and excessive force) separately.

a.      **Unlawful Entry**

Defendants' position with respect to their entry is twofold.  First, they contend they had a license to enter the property pursuant to *Payton,* because they had a reasonable belief that McLeod lived at the Property and was present.  (Doc 336 at 15; Doc. 339 at 15; Doc. 341 at 16).  Next, they contend that once on the property, they could conduct a sweep of the curtilage.  (Doc. 336 at 13-20; Doc. 339 at 14-21; Doc. 341 at 14-21).[20]

In response, Plaintiff argues that Welch, Skipper, and Bartel unlawfully entered Plaintiff's property when they entered her curtilage via the carport door.[21]  (Doc. 355 at 28-34).  Acknowledging that under *Payton*, an arrest warrant can carry with it a limited authority to enter a home, Plaintiff argues, *Payton* does not apply because the arrest warrants were "third-party" warrants.  (Doc. 355 at 12-19).  Rather, Plaintiff contends Defendant's actions violated clearly established law as demonstrated through *County of Los Angeles, California, et al. v. Mendez*, 581 US 420, 137 S.Ct. 1539 (2017) and *Steagald*.  (Doc. 355 at 28-34).  Plaintiff also asserts that a broader, clearly established principle should control the novel facts of the situation and that the

---

[20] Although Welch and Skipper do not specifically argue their actions were permitted because they performed a "knock and talk", the briefs suggests that Plaintiff had no expectation of privacy in her carport.  As such, to the extent that Welch and Skipper posit that their entry into the carport was permissible to conduct a "knock and talk" this Court is not persuaded for the reasons set forth in its Order relating to Officer Fondren. (See Doc. 398).  More specifically, Welch and Skipper's approach to the Property was not indicative of the license to be present just as any other citizen may.  Instead, Welch and Skipper approached the Property in a tactical manner, in protective gear, with guns raised, and immediately "stacked" against the door.  As such, absent the existence of another permissible exception to enter, their entry into the curtilage violated the Fourth Amendment. *See United States v. Maxi*, 886 F.3d 1318, *1327 (11th Cir. 2018) ("Because [the officers'] actions did not qualify as a "knock and talk," the officers here did not have a license to enter the curtilage of the duplex.")

[21] It is undisputed that Bartel did not approach the carport and despite his plan to surround the home and call out the warrants, he ended up only conducting what can be classified as a permissible "knock and talk".  *See Coffin*, 642 F.3d at 1012.  Nevertheless, it is Plaintiff's position that it was Bartel who instructed Welch and Skipper to enter the curtilage and that his plan to execute the warrants was flawed from its inception.  As such, Plaintiff also contends Bartel is liable for the unlawful entry in his supervisory capacity.  The Court will address supervisory liability separately below.

conduct involved in the case obviously violates the Constitution such that prior case law is unnecessary. (Doc. 356 at 21).

### 1.   Defendants did not violate the Fourth Amendment pursuant to *Payton*.

The Court recognizes the parties' fundamental disagreement as to whether Defendants' actions are constitutional under *Payton* entitling them to qualified immunity or unconstitutional under *Steagald* defeating their claims of immunity.[22]  However, because Plaintiff has not pointed to any facts which support that Defendants knew the Property belonged to a third party[23] at the time they entered, the Court agrees that it must consider whether, despite that fact that Plaintiff's home was the residence of a third party (Plaintiff), Defendants' actions were constitutionally permitted under *Payton*.  *See Hernandez v. Mesa*, 582 U.S. 548, 554, 137 S. Ct. 2003, 198 L. Ed. 2d 625 (2017) ("Facts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant.").

Although searches and seizures inside a home without a search warrant are presumptively unreasonable, in *Payton* the Supreme Court held that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the

---

[22] The Court appreciates that a *Payton* license fundamentally requires the existence of a valid arrest warrant.  There is also, no dispute in this case that at the time of Welch and Skipper's entry the McLeod warrants were no longer valid.  However, there are no facts that indicate Welch and Skipper were aware that the warrants had been executed or had reason to believe they were invalid for any reason.  As such, the Court has analyzed these facts under *Payton*. Without a *Payton* license however, any entry onto the Property is a violation of a clearly established right under *Steagald*.

[23] Of note, Plaintiff points out that Welch and Skipper's motions for summary judgment specifically state that Busby obtained warrants for the arrest of McLeod "at the home of his grandmother."  (Doc. 355 at 13).  However, the record does not establish Welch or Skipper had knowledge of this characterization at the time of their entry.  Further, the fact that the Property may have been owned by McLeod's grandmother does not automatically establish that it could not also be the residence of McLeod.

suspect is within." Following *Payton*, the Eleventh Circuit held that *Payton* requires a two-part inquiry to determine if entry pursuant to an arrest warrant complies with the Fourth Amendment's proscription of unreasonable searches. *United States v. Bervaldi*, 226 F.3d 1256, 1262-63 (11th Cir. 2000) (citing *United States v. Magluta*, 44 F.3d 1530, 1533 (11th Cir. 1995)). More specifically, the Court has stated as follows:

> [F]irst, there must be a reasonable belief that the location to be searched is the suspect's dwelling, and second, the police must have 'reason to believe' that the suspect is within the dwelling. Elaborating on this inquiry, we have explained that 'for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry.' Furthermore, 'in evaluating this on the spot determination, as to the second *Payton* prong, courts must be sensitive to common sense factors indicating a resident's presence." We believe such 'common sense factors' must also guide courts in evaluating the first *Payton* prong.

*Bervaldi,* 226 F.3d at 1263 (internal citations omitted).

For Plaintiff to meet her burden of establishing Defendant is not entitled to qualified immunity, Plaintiff must show that the evidence, viewed in a light most favorable to her, establishes that Defendants did not have "reason to believe" that McLeod resided at the home *and* that he was there at the time they entered. In other words, Plaintiff must show that a constitutional violation occurred because the officers were not permitted to enter pursuant to *Payton*.

Defendants rely on the McLeod arrest warrants and the work of other officers to show that they had a *Payton* license. Moreover, Defendants assert that at best their actions were mistaken or negligent, but not a constitutional violation. Conversely, Plaintiff argues that the

McLeod arrest warrants, alone, cannot establish that Plaintiff's address was McLeod's residence, such that reliance on the warrants could satisfy the first *Payton* prong. (Doc. 355 at 29-31). For factual support, Plaintiff points to the undisputed fact that the Property was Plaintiff's residence, and not McLeod's. (Doc. 355 at 11). Moreover, Plaintiff contends that Defendants' reliance on the arrest warrant was knowingly false because (1) on December 19, 2019, the arrest warrant was not active, (2) McLeod had not resided at the Property since 2018, and (3) at the time of his entry McLeod was incarcerated. (Doc. 355 at 28-29).

Whether or not Defendants had a *Payton* license to enter Plaintiff's home is admittedly a close call. First, with respect to the address on the warrant, it is well established that an arrest warrant need not contain an address, much less a resident address. *See e.g.* Rule 4(c)(1), Fed. R. Crim. P. ("The warrant shall ... contain the name of the defendant or, if his name is unknown, any name or description by which he can be identified with reasonable certainty."). Moreover, if an address on a warrant alone was sufficient to establish residency, then *Payton*'s first factor would be significantly diminished as *Payton* spells out that an officer's authority to execute an arrest warrant at a particular address *is limited* by a reasonable belief that the suspect resides at the address and may be found at the address at the time of execution. It does not limit the execution of an arrest warrant to the address listed on a warrant nor negate the ability to execute an arrest warrant when no address is listed. *See, e.g., U.S. v. Stinson*, 857 F. Supp. 1026, 1029-30 (D. Conn. 1994) (Fourth Amendment "does not require officers to establish probable cause for identifying information, such as the suspect's address, that is included on the arrest warrant but not material to the ultimate probable cause determination."). As such, *Payton's* limiting analysis logically implies that regardless of whether a warrant contains an address or not, both factors must be

met for an entry with an arrest warrant to not run afoul of the Fourth Amendment.  Further, the Eleventh Circuit has on numerous occasions analyzed *Payton's* first factor and this Court is aware of no instances when *Payton's* first prong has been satisfied based on an address on a warrant alone.  *See, e.g., Payton v. City of Florence*, Ala. 413 Fed. Appx. 126, 131-32 (11th Cir. 2011) (finding officers did not violate the Fourth Amendment because they had a reasonable basis for believing the subject of an arrest warrant lived at the property based on their review of three or four documents, including documents which came from the subject of the arrest himself); *United States v. Bellamy*, 456 F. App'x 863, 865 (11th Cir. 2012) (finding officers had reasonable belief of residency based on information from other police officers that was corroborated by other factors). Even in *Bervaldi*, the Eleventh Circuit placed little value on the address on a search warrant.  *Bervaldi*, 226 F.3d at 1263 ("Nor is it significant that the arrest warrant listed the 132nd Place address.") (citing *United States v. Lauter*, 57 F.3d 212, 214 (2d Cir. 1995) (rejecting argument that when police believe that the target of an arrest lives at an address other than the one listed on the warrant, they must apply for a new warrant before arresting the suspect at the new residence)).[24]

However, in this case, Defendants did not solely rely on the existence of an address on an arrest warrant.  Rather, the undisputed facts establish that Welch, Skipper, and Bartel were asked to assist the MCSO with Operation the Grinch, which was the result of a MCSO investigation. (Doc. 353 at 15). They attended a briefing on the morning of December 19, 2019, where they

---

[24] Of note, another district court within the Eleventh Circuit has reached a similar conclusion.  *See R&R by and Through Rogers v. Eaton*, 2019 WL 1573207, *7 (N.D. Ala. April 11, 2019) ("The Eleventh Circuit has never held that an officer had a reasonable belief that an address was a suspect's residence when that officer relied solely upon one document.).

were assigned a team.  (Doc. 336 at 5; Doc. 339 at 5; Doc. 341 at 5; Doc. 353 at 22).  MCSO then

passed out intel packets that included the warrants to be executed which were obtained by

MCSO Narcotics Unit Personnel.  (*Id*.)  After the initial briefing, Bartel, Welch, and Skipper met

separately with Busby, who shared the intel packet with Bartel.  (Doc. 336 at 5; Doc. 339 at 6;

Doc. 341 at 6; Doc. 353 at 27).  Bartel then instructed Welch and Skipper of the plan for executing

the warrants, which essentially involved forming a perimeter and calling out the warrants, but

not entering any properties.  (Doc. 353 at 28-29).

It was not unreasonable for Defendants to rely on the information they were provided to

inform their beliefs.  *See, e.g., Bellamy*, 456 F. App'x at 865 ("Without a doubt, the officers here

were entitled to rely on the information they received from the St. Petersburg Police

Department.") (citing *United States v. Bennett*, 555 F.3d 962, 965 (11th Cir. 2009) (officers held

reasonable belief that apartment was suspect's residence where they received information from

out-of-state law enforcement that suspect was living with his mother); *United States v. Kirk*, 781

F.2d 1498, 1504–05 (11th Cir. 1986) (distinguishing "an officer in the field," who is able to rely on

information from other officers, from a magistrate who "must be presented with facts as to the

source" of information for "probable cause" purposes)).  While there is no evidence that

Defendants were specifically informed that the address was McLeod's *residence*, "common sense

factors" must guide this Court's evaluation of the first *Payton* prong.  *Bervaldi,* at 1263.  As a

result, although it is a close call, the totality of the circumstances supports a reasonable, albeit

mistaken, belief by Defendants that the Property was McLeod's residence.  *See, e.g., Brand v.

Casal*, 2015 WL 9304036, *11 (N.D. Ga. December 21, 2015) (finding officer's belief that warrant

suspect resided at property based on warrant packet that included arrest warrant and one jail booking sheet with an address to be reasonable entitling officer to immunity).[25]

The facts relied on by Plaintiff do not defeat this conclusion.  Although there is no dispute that Mcleod did not reside at the Property and that warrants were no longer active, there is likewise, no dispute that Defendants were unaware of these facts at the time they entered on the Property.   "The objective reasonableness of an officer's actions in conducting a search or seizure will often require an examination of the information possessed by the officer at the time of the search and seizure." *Shepard v. Hallandale Beach Police Dept.*, 398 F. App'x. 480, 483 (11th Cir. 2010) (citing *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987)).  At the time of Defendants' entry onto Plaintiff's curtilage, they knew that there was an arrest warrant for McLeod and an address where the warrant was to be executed based on a MCSO investigation.  As such, the after-the-fact evidence presented by Plaintiff cannot disturb the objective reasonableness of Defendants' belief.

The second prong of the *Payton* test is, similarly, a close call.  To satisfy this prong, Defendants rely on the fact that it was 6 a.m. and that there were cars parked at the home. *Bervaldi*, *supra*.  (Doc. 374 at 14-16).  Under Eleventh Circuit precedent, "officers may presume that a person is at home at certain times of the day—a presumption which can be rebutted by contrary evidence regarding the suspect's known schedule." *Magluta,* 44 F.3d at 1535; *see also Bervaldi*, 226 F.3d at 1265–67 (finding second *Payton* prong when officers approached the

---

[25] Of note, in *Brand*, the district court granted immunity on the unlawful entry claim as to one officer, but not a second officer.  On appeal, the Eleventh Circuit affirmed in part and reversed in part finding both officers were entitled to immunity.  *See Brand v. Casal*, 877 F.3d 1253 (11th Cir. 2017).  However, that opinion was subsequently vacated and, therefore, is not relied on by this Court.

suspect's house at 6:00 a.m.); *United States v. Beck*, 729 F.2d 1329, 1331–32 (11th Cir. 1984) (per

curiam) (finding it "reasonable to believe that one would be at home at 7:30 a.m. and be sound

asleep"). Plaintiff has offered no evidence regarding McLeod's known schedule that would rebut

this presumption. However, it is undisputed that at the time of Defendants' entry, the intention

of the task force was to "knock and announce," not enter. (Doc. 353 at 28-29). This fact arguably

diminishes the reasonableness of an objective belief that the time of day creates a presumption

as set forth in *Bervaldi*. Moreover, although *Bervaldi* supports the second factor in this instance,

this Court is not aware of a precedential case where the second *Payton* factor has been satisfied

based *solely* on the time of day. *See, e.g., R&R by and Through Rogers*, at *8 (reviewing Eleventh

Circuit opinions analyzing the second *Payton* factor and finding that in all of those cases, there

has been "something more" than mere day of the week or time of day). Nevertheless, because

*Bervaldi* states a belief can be reasonable based on the time of day for purposes of the second

*Payton* factor, Defendants were reasonable in their belief that McLeod was in the house at 6 a.m.

on December 19, 2019, when they entered the curtilage.[26]

Viewing the facts in a light most favorable to Plaintiff, Defendants had "reason to believe"

that McLeod resided at the Property and was there are 6 a.m. As a result, their entry was

permitted under *Payton*, and therefore, did not violate the Fourth Amendment. *See Payton*, 445

U.S. at 603, 100 S.Ct. at 1388. As a result, Welch and Skipper are entitled to qualified immunity

on Plaintiff's unlawful entry claim.

___

[26] While this Court finds that the holding in *Bervaldi* controls the determination as to the second *Payton* factor, the facts in this action frustrate that result since it is clear that the officers' presence at 6 a.m. was not planned in an effort to ensure McLeod was home. Rather, the facts essentially confirm that the time of day was mere happenstance, based on the location of the Property in proximity to where the briefing took place. As such, had the Property been further away causing the warrant to be executed later, immunity based on a *Payton* license would be defeated. In that respect, it seems the Defendants are simply receiving the benefit of serendipitous circumstances.

### 2.      Defendants Did Not Conduct a Protective Sweep[27]

Defendants' argument that they were permitted to be on Plaintiff's property to conduct a protective sweep is without merit.  In *Maryland v. Buie*, the Supreme Court held that a protective sweep may be lawfully undertaken pursuant to an in-house arrest where the officer "possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." 494 U.S. 325, 337, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* Protective sweeps have also been permitted in situations where a defendant is arrested outside a residence.  *United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir. 1983), superseded by statute on other grounds, 18 U.S.C. § 921(a)(21)(C).  Defendants do not sufficiently articulate how their presence fits within the confines of a "protective sweep."   Nevertheless, the Court is not persuaded that Defendants could enter the Property to perform a protective sweep *prior to* an anticipated arrest without any facts from which to glean a threat existed, especially when no arrest took place at all.  Accordingly, Defendants' entry was not permitted to conduct a protective sweep.

### 3.      Supervisor Liability

Plaintiff contends Bartel violated Plaintiff's Fourth Amendment Rights in his supervisory capacity by "failing to direct the operation in a Constitutional manner and failing to intercede in the Fourth Amendment violations of his subordinates."  (Doc. 355 at 40-43).  In response, Bartel

---

[27] Again, the Court is addressing all of Defendant's immunity grounds for the sake of being comprehensive.

posits that Plaintiff's supervisory claims "are couched in claims of 42 U.S.C. § 1983 violations" and because Bartel is a federal actor, Plaintiff's claims are due to be dismissed.  (Doc. 374 at 21-22).  Bartel's observations are correct. As such, to the extent that Plaintiff's theory of liability against Bartel rests on supervisory liability pursuant § 1983 Plaintiff's claims fail because this Court has determined that Bartel is a federal agent, not a state actor. However, Plaintiff's complaint also alleges a Fourth Amendment claim against Bartel pursuant to *Bivens* and supervisory liability under *Bivens* mirrors supervisory liability pursuant to § 1983.  "Supervisory liability [under *Bivens*] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation."). *Gonzalez v. Reno*, 325 F.3d 1228 (11th Cir. 2003) citing *Braddy* [*v. Florida Dep't of Labor & Employment Sec.,*] 133 F.3d [797,] 802 [(11th Cir. 1998).] (quoting *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990)).

Here, there is no dispute that when Bartel arrived at the Property, he approached two men in the front yard to have a conversation about McLeod.  His movements, then, were permissible as a "knock and talk."  (*See* n 20). To the extent that Plaintiff contends Bartel directed Welch, Skipper, and Fondren to unlawfully enter because he knew there was no lawful basis for the entry, the Court is not persuaded.

In *Cottone v. Jenne*, relied on by Plaintiff, the Eleventh Circuit stated a causal connection can be established when "the facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." 326 F.3d 1352, 1360 (11th Cir. 2003).  In this action a determination that Bartel directed Welch and Skipper "to act unlawfully" requires that Bartel knew that no

warrant existed or that he could not reasonably believe McLeod resided at the Property and was present at the time of the allegedly unlawful entry pursuant to *Payton*.  In an effort to establish the requisite knowledge on Bartel's part, Plaintiff points out that Bartel did no initial investigation.  Plaintiff also relies on the fact that after the pre-op meeting, Bartel noticed that he had recently been involved in arresting an individual (Gary Wayne Gurley) whose name was also on his list of warrant targets for the round-up which prompted him to verify that warrant and learn that it was no longer active.   Plaintiff contends this information put Bartel on notice that the MCSO warrants were not all active and therefore, Bartel's plan to execute the warrants by directing Welch, Bartel, and Skipper, to surround the house, was flawed.

This Court has already determined that it was reasonable for Fondren, Welch, and Skipper to rely on the information provided to them by MCSO to inform their beliefs as to the validity of the warrants.  For the same reasons, this Court is not persuaded that Bartel's belief that the warrant was valid was unreasonable or that his failure to investigate from the outset was unreasonable and Plaintiff has pointed to no case where an officer has been liable for a constitutional violation based on facts similar to those in this action, *i.e.* a failure to investigate. The Courts is also not persuaded that Bartel's knowledge with respect to the Gurley warrant renders his belief that the McLeod warrants were active unreasonable.  Instead, the record remains that Bartel relied on an investigation by the MCSO to inform his beliefs that the warrants were active, and he was given no subsequent information regarding the McLeod warrants from which to conclude the McLeod warrants were invalid.  As such, at the time he directed the other officers to enter Plaintiff's curtilage he had no actual knowledge that the McLeod warrants were not active that would render his direction to Welch and Skipper to be

unlawful.  As a result, Bartel is entitled to qualified immunity as to Plaintiff's claims[28] against him in his supervisory role.

        **b.**        **Knock and Announce**

      Welch and Skipper additionally assert they are entitled to qualified immunity on Plaintiff's claim for a violation of the Fourth Amendment for failure to knock and announce.   More specifically, they assert that they were permitted to dispense with the knock and announce requirement due to exigent circumstances, *i.e.* being faced with Plaintiff holding a gun.  (Doc. 336 at 14; Doc. 339 at 14-15).  Defendants also contend that because they had a *Payton* license to enter, they were not required to knock or announce[29] and that they did not break open Plaintiff's door.  (Doc. 374 at 17-19).  In response, Plaintiff argues no exigent circumstances warranted forcible entry without first knocking and announcing.  (Doc. 355 at 34-37).

      The Fourth Amendment "incorporates the important common law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry." *United States v. Segura-Baltazar*, 448 F.3d 1281, 1289 (11th Cir. 2006); *see also Santana v. Miami-Dade Cnty., 688 F. App'x 763, 768 (11th Cir. 2017) ("*Under most circumstances, the Fourth Amendment requires officers to "knock and announce" before forcibly entering a home to execute a search warrant. ") (citing Wilson v. Arkansas, 514*

---

[28] To the extent that Plaintiff seeks to hold Bartel responsible for Welch and Skipper's failure to knock and announce, the only remaining claim against Bartel for failure to knock and announce is made pursuant to § 1983 (Count XVI) which fails because Bartel is not a state actor as discussed herein above. Of note, Plaintiff's corresponding *Bivens* claim was voluntarily dismissed (Count VI) per Doc. 349. Regardless, the only facts presented establish that Bartel instructed Welch and Skipper not to make entry into the home and that he was unaware of their forcible entry until after if occurred.

[29] The Defendants do not cite to any authority that a *Payton* license to enter a property negates the need to "knock and announce" prior to *forcible* entry.  Further courts within this Circuit have certainly analyzed whether a Fourth Amendment violation for failure to knock and announce occurred when officers – who had a *Payton* license to enter – effectuated an arrest warrant.  *See e.g. United States v. Nevels*, 2014 WL 272309 (M.D. Ala. January 23, 2014); *United States v. Coleman*, 2010 WL 11507843 (N.D. Ga. February 24, 2010).

*U.S.* 927, 934, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995) (The constitutional reasonableness of a search or seizure in the home depends on, among other things, whether law enforcement officers have announced their presence and authority prior to entering.)).   The federal knock-and-announce statute, which applies to the execution of both arrest and search warrants, provides that if an officer gives notice of his authority and purpose and is refused admittance or must "liberate himself or a person aiding him in the execution of the warrant," the officer may break open any "outer or inner door or window of a house, or any part of a house, or anything therein," to execute the warrant. 18 U.S.C. § 3109.

However, not every entry must be proceeded by an announcement.  *Wilson*, 514 U.S. at 934.  Rather, officers may dispense with knocking and announcing if they have "reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997). The relevant inquiry is "whether the officer had 'arguable reasonable suspicion' that a sufficient exigency existed to justify a no-knock entry." *Santana*, 688 F. App'x at 768 (quoting *Whittier v. Kobayashi*, 581 F.3d 1304, 1308 (11th Cir. 2009)). Courts are to "analyze whether a reasonable officer could have had reasonable suspicion that exigent circumstances, such as a threat of violence and/or destruction of evidence, existed to justify a no-knock entry." *Kobayashi*, 581 F.3d at 1308. "[The] Court must examine the totality of the circumstances to determine whether an officer had a 'particularized and objective' basis to support his suspicion." *Whittier v. Bruna*, 343 F. App'x 505, 508 (11th Cir. 2009) (quoting *Brent v.*

43

*Ashley*, 247 F.3d 1294, 1304 (11th Cir. 2001)). Notably, the required showing on this point is "not high." *Richards*, 520 U.S. at 394, 117 S.Ct. 1416.

In the instant action, there is no dispute that neither Welch nor Skipper knocked on Plaintiff's door. It is disputed whether an announcement was made by Welch. Regardless, Defendants argue that Welch "was justified" in pushing open the door "when it was apparent to him that there was a person in close proximity to them, less than ten feet, who was armed with a gun and pointing it at them." (Doc. 336 at 15; Doc. 339 at 16).

In order to determine whether the officers violated Plaintiff's right by failing to knock and announce, the Court must look to "whether the facts and circumstances of [this] particular entry justified dispensing with the knock-and-announce requirement." *Richards*, 520 U.S. at 394, 117 S.Ct. 1416. The Eleventh Circuit has recognized sufficient exigent circumstances justifying a no-knock entry when the officers have *specific* knowledge that the suspect, or someone else inside of the home, has or is likely to have a weapon. *Smith on behalf of Estate of Smith v. Ford*, 488 F.Supp.3d 1314, 1325 (citing to *e.g., Santana*, 688 F. App'x at 768 (officer had been told that the suspect drug dealer had ready access to a gun); *Kobayashi*, 581 F.3d at 1306 (the SWAT team had knowledge that the suspect carried a concealed handgun and kept a shotgun in his bedroom).

The Court is not satisfied that exigent circumstances existed in this instance justifying a no-knock entry. Considering the facts in a light most favorable to Plaintiff, the Court must assume that the carport door was closed. Moreover, although Skipper vaguely asserts that as he approached the door, Plaintiff "presented herself in the doorway" holding a gun, the facts when considered in a light most favorable to Plaintiff establish that Plaintiff was not visible to Skipper and Welch until *after* Welch pushed open the door. Even if Welch saw Plaintiff's shadow before

opening the door, there is still no evidence that the "shadow" had a weapon.  Exigent circumstances warranting a no-knock entry cannot arise after the entry has been made.  As a result, the Court finds that Skipper and Welch lacked the required reasonable suspicion of exigent circumstances to justify a no-knock entry and therefore, they violated the Fourth Amendment. Moreover, because as discussed above, both Supreme Court and Eleventh Circuit precedent have clearly established that a no-knock entry absent exigent circumstances violates the Fourth Amendment, Defendants violated Plaintiff's clearly-established constitutional right by failing to knock and announce absent a showing of exigent circumstances.  *Richards*, 520 U.S. at 394, 117 S.Ct. 1416. As a result, Skipper and Welch are not entitled to qualified immunity based on Plaintiff's unlawful entry claim for failure to knock and announce (Counts V and Count XIV).

### c.     Excessive Force[30]

Defendants additionally contend they are entitled to qualified immunity on Plaintiff's excessive force claims because the undisputed facts establish that they had probable cause to believe a threat of serious harm existed.  (Doc. 336 at 10-13; Doc. 339 at 10-14; Doc. 341 at 11-14).  Plaintiff contends that because Defendants violated the Constitution by entering Plaintiff's property, any force they used was excessive.  (Doc. 355 at 37-40).[31]

"[A]pprehension by the use of deadly force is a seizure . . .." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The Eleventh Circuit has set forth the considerations of an excessive force claim as follows:

---

[30] There is no excessive force claim pending against Bartel. (*See* Doc. 349).
[31] To the extent Plaintiff contends Welch and Skipper's use of deadly force was unreasonable because their entry caused the need for the ultimate use of force, the Court is not persuaded. *See Mendez*, at 1547 ("[. . .] the objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional.")

"Any claim that a law enforcement officer used excessive force -- whether deadly or not -- during a seizure of a free citizen must be analyzed under the Fourth Amendment's 'reasonableness' standard." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009). This standard requires "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott v. Harris*, 550 U.S. 372, 383 (2007) (quotations omitted). "The government's interests include protecting the safety of the police officers involved as well as the public at large." *Garczynksi*, 573 F.3d at 1166.

We analyze the particular facts of each case to determine whether the force used was "objectively reasonable" under the totality of the circumstances. *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989). We consider an officer's conduct "from the perspective of a reasonable officer on the scene, ... taking into account all of the attendant circumstances." *Kesinger v. Herrington*, 381 F.3d 1243, 1249 (11th Cir. 2004). These circumstances may include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The circumstances often may be "tense, uncertain and rapidly evolving, thereby requiring split-second judgments as to how much force is necessary." *Garczynski*, 573 F.3d at 1167 (quotations omitted). "Because an officer's perspective in the field differs from that of a judge sitting peacefully in chambers, we must resist the temptation to judge an officer's actions with the 20/20 vision of hindsight." *Id.* (quotations omitted).

*Howard v. Dekalb County*, 2024 WL 1174021, *3 (11th Cir. March 19, 2024). "In the deadly force context, the Eleventh Circuit has observed that a police officer may constitutionally use deadly force when the officer: (1) 'has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others' or 'that he has committed a crime involving the infliction or threatened infliction of serious physical harm'; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible." *Howe v. City of Enterprise,* 2018 WL 8545947, *23 (M.D.

Ala., September 17, 2018) quoting *Young v. Borders*, 2014 WL 11444072, *14 (M.D. Fla. September 14, 2018).

Here the relevant inquiry is whether Welch and Skipper had probable cause to believe Plaintiff posed a serious threat. Considering the facts in a light most favorable to Plaintiff indicates that Welch and Skipper approached Plaintiff's door carport door from the outside just as Plaintiff was approaching the same door from the inside of the house. Welch pushed the door open at which point, Welch and Skipper were faced with Plaintiff who was holding the gun aimed at the floor. The officers yelled "Whoa, Whoa gun, gun" or "gun, gun." Shots were then fired by both Welch and Skipper.

The Court finds that precedent dictates that Welch and Skipper's use of force was objectively reasonable. As set forth by the Eleventh Circuit, the Court "must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal." *Crosby v. Monroe Cnty*, 394 F.3d 1328, 1334 (11th Cir. 2004) (citation omitted). Here, Welch and Skipper were faced with Plaintiff standing only a few feet away holding a gun. "While the 'mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit,' *Perez*, 809 F.3d at 1220, when a suspect's gun is 'available for ready use' — even when the suspect has not 'drawn his gun' — an officer is 'not required to wait and hope for the best,'" *Powell v. Snook*, 25 F. 4th 912, 922 (11th Cir. 2022) quoting *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (cleaned up); see also *Young*, at *16 (quoting *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses

a deadly weapon to act to stop the suspect."). As such, it was reasonable for Welch and Skipper to believe at the time they fired, Plaintiff presented a risk of serious harm to the officers. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003) (holding that the Constitution permits the use of deadly force against a person who poses an imminent threat of danger to a police officer or others). Moreover, even if Plaintiff established that Welch and Skipper violated Plaintiff's Fourth Amendment rights due to their use of deadly force, Plaintiff has presented no authority that such a right was clearly established at the time the shooting occurred. As such, Plaintiff has failed to establish that Welch and Skipper are not entitled to qualified immunity on Plainitff's excessive force claim.

### D.    State Law Claims

Plaintiff has also asserted state law claims of Assault and Battery and False Imprisonment[32] against Welch and Skipper. (*See* Doc. 122). Welch and Skipper seek dismissal of these claims based on absolute immunity under the Westfall Act, 28 U.S.C. Section 2679(b)(1). (Doc. 336 at 39-41; Doc. 339 at 40-41). Alternatively, Welch and Skipper argue that should the Westfall Act not require dismissal, Ala. Code § 36-1-12 and *Ex parte Cranman* 792 So.2d 392 (Ala. 2000) requires the same result. (*Id*).

In response, Plaintiff argues that because Welch and Skipper acted under color of state authority for purposes of § 1983, and "because the counts for assault & battery and false imprisonment grow out of the same operative facts and circumstances, they are brought as permissible pendent state law claims." (Doc. 355 at 59). Moreover, Plaintiff argues that stat-

---

[32] Plaintiff's claims against Welch and Skipper for state law outrage (Counts XXII), negligence (XXIII), wantonness (XXIV), and invasion of privacy (XXVI) "will not be pursued and are not argued herein." (Doc. 355 at 58 n.53). Accordingly, they are dismissed.

agent immunity as articulated in *Ex Parte Cranman*, does not substantiate Defendants' request for dismissal because they have failed to provide facts and argument to support their conclusion that Plaintiff cannot demonstrate "willful, malicious, or in bad faith conduct." (*Id*.). Finally, Plaintiff argues based on the facts that that a question of fact exists as to whether the officers acted willfully, maliciously, or in bad faith.  (*Id*. at 61)

The Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the Westfall Act, accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties. *See* 28 U.S.C. § 2679(b)(1). "When a federal employee is sued for a wrongful or negligent act, the [. . . the Westfall Act] empowers the Attorney General to certify that the employee 'was acting within the scope of [her] office or employment at the time of the incident out of which the claim arose.' " *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 419-20 (1995) (quoting 28 U.S.C. § 2679(d)(1)). "Upon certification, the employee is dismissed from the action and the United States is substituted as defendant. The case then falls under the governance of the [FTCA.]" *Id*. at 420.

For all the reasons previously discussed herein above, Plaintiff's position that Welch and Skipper acted under color of state law is unconvincing and the Court is satisfied that on December 19, 2019, Welch and Skipper were federal agents.[33]  Additionally, the United States Attorney for the Northern District of Florida of has certified that both Welch and Skipper were acting within the scope of their employment as specially deputized United States Marshals on December 19,

---

[33] Of note, this Court previously considered the arguments raised by the Defendants at the 12(b)(6) stage of litigation and denied those motions because, at that time, it was unclear whether Welch and Skipper were specially deputized prior to their involvement with the events of December 19, 2019, and because Plaintiff specifically contested the certification relating to each of these officers.  Significantly, neither of those issues remain at this stage.  As a result, it appears that case law compels the above determination that they were not acting as state actors on December 19, 2019.

2019.  (Doc. 336-9; Doc. 339-6).  Accordingly, Welch and Skipper are due to be dismissed and Plaintiff's state law claims should be considered under the FTCA.   As such, Plaintiff's state law claims against Welch and Skipper are due to be dismissed.

### E.      Provocation Theory

Welch and Skipper assert a final argument that to the extent that Plaintiff's claims are based on a Provocation Theory they are due to be dismissed.  (Doc. 336 at 42; Doc. 339 at 41).  However, Plaintiff expressly states that she has not asserted such a claim rendering Defendants' position moot.  (Doc. 355 at 37 n 40).  Accordingly, the Court need not address this issue.

## IV.    CONCLUSION

For the reasons discussed above, Defendants Austin Wade Welch, John Skipper, and Beau Bartel's Motions for Summary Judgment (Docs. 334, 338, and 340) are **GRANTED**.

**DONE and ORDERED** this 26th day of September, 2024.

/s/ JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE