## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

ANN RYLEE MCLEOD,                          )
                                           )
               Plaintiff,              )
                                           )
v.                                         )    CIVIL ACTION NO. 20-00595-JB-MU
                                           )
UNITED STATES OF AMERICA, et al.,          )
                                           )
               Defendants.             )

## ORDER

This action is before the Court on Defendant United States' Motion for Summary Judgment and supporting brief (Docs. 332 and 333), Plaintiff's Response (Doc. 357), and Defendant's reply (Doc. 372). A hearing was held on March 11, 2024, and the Court has reviewed the motion, supporting briefs and the various exhibits filed in support of the motion. For the reasons discussed below, the motion is **GRANTED in part** and **DENIED in part.**

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

On December 11, 2020, Plaintiff filed her Complaint against six defendants, alleging twenty causes of action which can be described as follows: in Counts I-VI, Plaintiff asserts claims pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) for violation of her Fourth Amendment rights (hereinafter "*Bivens*" claims); in Counts VII-X, Plaintiff asserts claims under the Fourth Amendment and 42 U.S.C. § 1983 for use of excessive

---

[1] This factual summary repeats, in large part, the factual and procedural backgrounds set forth in this Court's other Orders ruling on the motions for summary judgment filed by the other Defendants.

and deadly force, unlawful entry, and failure to knock and announce (hereinafter "§ 1983"); in Counts XI-XIV, Plaintiff asserts claims brought pursuant to the Federal Tort Claims Act; 28 U.S.C. §1346(b) ("FTCA"); and in Counts XV-XX Plaintiff asserts claims brought pursuant to Alabama State Law. (Doc. 1). Plaintiff later amended her Complaint several times and the operative complaint is the Third Amended Complaint filed on January 12, 2022. (Doc. 122). Counts I-VI remain *Bivens* claims; Counts VII-XVI are § 1983 claims; Counts XVII-XX are claims brought pursuant to the Federal Tort Claims Act; 28 U.S.C. § 1346(b) for assault and battery, negligence, wantonness, and false imprisonment; and Counts XXI-XXVI are claims brought pursuant to Alabama State Law for assault and battery, intentional infliction of emotional distress, negligence, wantonness, invasion of privacy, and false imprisonment. (*Id*.)

The relevant counts are pled against the various Defendants as follows:

**Count I** (*Bivens* claim) Use of Deadly Force – against Austin Wade Welch ("Welch"), John Gregory Skipper("Skipper"), and Scott Ray Fondren ("Fondren");
**Count II** (*Bivens* claim) Use of Deadly Force – against Beau Bartel ("Bartel");
**Count III** (*Bivens* claim) Unlawful Entry – against Welch, Skipper, and Fondren;
**Count IV** (*Bivens* claim) Unlawful Entry – against Bartel;
**Count V** (*Bivens* claim) Failure to Knock and Announce - against Welch, Skipper, and Fondren;
**Count VI** (*Bivens* claim) Failure to Knock and Announce – against Bartel;
**Count VII** (1983 claim) Use of Excessive and Deadly Force - against Welch, Skipper, Rebecca P. Miller ("Miller"), and David Smith ("Smith");
**Count VIII** (1983 claim) Use of Excessive and Deadly Force – against Fondren;
**Count IX** (1983 claim) Use of Excessive and Deadly Force – against Bartel;
**Count X** (1983 claim) Unlawful Entry- against Welch, Skipper, Miller, and Smith;
**Count XI** (1983 claim) Unlawful Entry- against Fondren;
**Count XII** (1983 claim) Unlawful Entry- against Bartel;
**Count XIII** (1983 claim) Unlawful Entry- against Raylene Busby ("Busby");
**Count XIV** (1983 claim) Failure to Knock and Announce against Welch, Skipper, Miller, and Smith;
**Count XV** (1983 claim) Failure to Knock and Announce against Fondren;
**Count XVI** (1983 claim) Failure to Knock and Announce against Bartel;
**Count XVII** (FTCA claim) Assault and Battery against the United States of America ("USA");
**Count XVIII** (FTCA claim) Negligence against USA;

**Count XIX** (FTCA claim) Wantonness against USA;
**Count XX** (FTCA claim) False Imprisonment against USA;
**Count XXI** (state law claim) Assault and Battery against Skipper, Welch, Busby, Miller, and Smith;
**Count XXII** (state law claim) Intentional Infliction of Emotional Distress against Skipper, Welch, Busby, Miller, and Smith;
**Count XXIII** (state law claim) negligence against Skipper, Welch, Busby, Miller, and Smith;
**Count XXIV** (state law claim) wantonness against Skipper, Welch, Busby, Miller, and Smith;
**Count XXV** (state law claim) invasion of privacy against Skipper, Welch, Busby, Miller, and Smith;
**Count XXVI** (state law claim) false imprisonment against Skipper, Welch, Busby, Miller, and Smith.

Although Plaintiff's Complaint categorizes the relevant individual Defendants as acting under color of both state and federal authority, the Defendants are employed as follows:

> Bartel is a Deputy U.S. Marshal stationed in the Southern District of Alabama.
> Busby is a Mobile County Deputy Sheriff.
> Welch is a Baldwin County Deputy Sheriff.
> Skipper is an Alabama Department of Corrections Sergeant/Training Instructor.
> Fondren is a Department of Homeland Security HSI agent.

(Doc. 122 at 4-6).    Relevant to the instant motion Count XVIII (negligence), Count XIX (wantonness), Count XVII (assault and battery), and Count XX (false imprisonment) asserted against the United States.    A consideration of the relevant claims against the United States requires a consideration of the facts relating to Nicholas McLeod, Operation Grinch, and the events of December 19, 2019.

### A.    Operation The Grinch

The Mobile County Sheriff's Office ("MCSO") narcotics and vice unit (NVU) conducts twice yearly arrest round-ups of drug suspects in cases accumulated during the year.  (Doc. 353 at 10).  In late October/early November 2019, the MCSO began planning a December 2019 round-up of completed drug cases.  (*Id*.).  The round-up was referred to as "Operation the Grinch."   (*Id*.).

Nicholas McLeod was identified as one of the subjects to be arrested along with fifty-four other individuals.  (*Id*. at 11, 14).

Round-up operations commander Lt. Patrick White ("White") instructed operations leader Sgt. David Smith ("Smith") "...to organize personnel for the teams, divide the teams, and assign them to certain areas and collect the intel packets when they were done, and also prepare the briefing, the ops plan." (*Id*. at 15).  White told Smith the MCSO narcotics investigators (Deputies Busby, Alan O'Shea and Clint Law) would "take care of the rest." (*Id*.)

Early in the round-up planning, White invited Homeland Security Investigations (HSI) personnel to assist via Philip Lavoie ("Lavoie").  (*Id*.).  Additionally, Smith called U.S. Marshal Beau Bartel ("Bartel"), who was in charge of the Regional Fugitive Task Force's ("RFTF") Mobile Office and invited the RFTF to participate.  (*Id*. at 8, 15).  According to Smith, generally the RFTF's role was to assist with the round-up.  According to Bartel, the role of the RFTF was to provide a "tactical response" to assist in the arrests.  (*Id*. at 15).   Both Lavoie for HSI, and Bartel for the RFTF, agreed to participate. (*Id*.).

Bartel knew when he agreed to RFTF participation that he would not learn the round-up targets' names, charges, or the personnel assigned to his arrest team.  (*Id*. at 15-16).  Instead RFTF personnel were to show up at the 5 a.m. pre-operational briefing and then help make the arrest.  (*Id*. at 16).  Bartel did not prepare an operational plan and only skimmed over the MCSO operational plan.  (*Id*.). The MCSO office warrants were not adopted by the USMS and none the of RFTF members investigated, prepared, or confirmed the warrants. (Doc. 388-1 at 26, 29).

HSI's role in this operation was to assist the MCSO and the U.S. Marshal Service ("USMS") by helping secure the perimeter of the locations where the arrest warrants were to be executed.

(Doc. 239 at 2).  If, while executing the warrants, MCSO/USMS personnel discovered evidence of subsequent drug-related violations which met the federal threshold, HSI personnel would seize and catalog the evidence in a federal evidence database and initiate a federal prosecution based on the newly discovered federal violation. (*Id*.).

Marine Interdiction Agent ("MAI") James Mark Spruill ("Spruill") a Task Force Officer on HSI's Border Enforcement Security Task Force ("BEST") acted as BEST Team Leader for the operation for HSI.  (*Id*. at 3; Doc. 353 at 16).  As Team Leader, Spruill was responsible for preparing the paperwork for HSI's involvement in the operation, including the HSI Enforcement Operation Plan. (Doc. 239 at 3).  He was also responsible for assigning HSI Special Agents, one of whom was Special Agent Fondren ("Fondren") to participate in the operation.  (*Id*.).  Prior to the operation, Smith provided Spruill with the names and personally identifiable information for each subject, which Spruill then forwarded to an HSI Intelligence Research Specialist who ran each individual through the federal SAFETNet database for deconfliction with other federal agencies. (*Id*.) Upon completion of the HSI Ops Plan, Spruill submitted the plan for approval which was subsequently approved by Lavoie on December 17, 2019.  (*Id*.).

A week before to the round-up Smith prepared the MCSO round-up Ops Plan, which called for four arrest teams.  (Doc. 353 at 21).  The plan's "Operational Assignments" designated Bartel a team leader and Busby was assigned to Bartel's team as narcotics investigator. (*Id*. at 21-22). The Ops plan did not discuss tactics or identify the suspects or their charges.  (*Id*.).  According to Smith, team leaders were to make tactical decisions. (*Id*. at 22).  Bartel did not know who assigned him as team leader, and Busby did not know Bartel was going to be on a team until Bartel arrived to the round-up.  (*Id*.).

### B.    Nicholas McLeod

Nicholas Mcleod ("McLeod") was put on the radar of Officer Busby, a Mobile County Deputy Sheriff, on June 27, 2019 following a drug "reverse" investigation which resulted in McCleod being detained.  (Doc. 353 at 8).  Busby questioned McLeod, but allowed him to leave without arrest.  (*Id*. at 8, 11).  On July 1, 2019, Busby printed Nicholas McLeod's arrest history from the Sheriff's Jail Management System (JMS) which indicated McLeod's residence address as 1377 McCullough Road, Atmore, Alabama.  (*Id*.) The JMS history also indicated that the Mobile Circuit Court issued an alias warrant for McLeod's arrest on June 25, 2019, in a MCSO NVU case.  (*Id*. at 11-12). McLeod was ultimately arrested on July 9, 2019, on alias warrants in the state law criminal case. (*Id*.)

Following his arrest, McLeod remained continuously in the Mobile County Sheriff's custody without bond, from July 9, 2019 through January 18, 2020.  During that time, Judge Brooks, a state court judge, ordered the Sheriff to transport McLeod from the jail to a drug rehab facility to complete a 90-day in-patient drug rehab program then transport him back to the Metro jail upon completion pending a status hearing.  (*Id*. at 12-13).  The Mobile Metro Jail staff notified Judge Brooks on December 16, 2019, that McLeod would finish the rehab program on December 18, 2019.  (*Id*. at 13).

On December 17, 2019, Busby signed criminal complaints initiating criminal cases against suspects she planned to include in the round-up (Operation the Grinch), including Nicholas McLeod.  (*Id*.).  Each of the complaints alleged violations of Alabama law.  (*Id*.).  A Mobile County Magistrate issued corresponding arrest warrants.  (*Id*.).  All of the warrants were delivered to the MCSO Warrants Division at about noon on December 18, 2019.  (*Id*.).

MCSO Transportation Officer Cleve Hudson collected Nicholas McLeod at the Mission of Hope on December 18, 2019 and returned him to Metro Jail as the judge ordered. (*Id*.). Back in jail, McLeod was then arrested at 3:36 p.m. on the warrants stemming from the "reverse." (*Id*.). Nicholas McLeod was re-booked into the Metro Jail on the warrants under his biographical information including his Atmore residence address. (*Id*.).

MCSO Warrants Division clerk Deirdra Greene ("Greene") updated the JMS at 4:34 p.m. to show McLeod's arrest on the Busby warrants as an "added charge" and that he was in the Metro Jail. (*Id*. at 14). She followed this entry up at 4:55 p.m. by flagging the JMS entry with "RWA'd" (return without action) and noting "801 Round Up 12/19/2019" to caution that the McLeod warrants had been "included in the [next day's] round-up […]." (*Id*.)

### C.    December 19, 2019

At approximately 5:00 a.m. on the morning of December 19, 2019, Fondren, Welch, Skipper, and Bartel attended a ten-minute pre-operation briefing which was conducted by both MCSO and USMS personnel. (Doc. 333 at 10; Doc. 353 at 22). MCSO and USMS team leaders were provided with intel packets for the subject of each arrest. (Doc. 333 at 10). These packets were not provided to Fondren or his fellow HSI agents. (Doc. 239 at 4). During the briefing, the final team assignments for MCSO, USMS, and HSI personnel were determined, and respective team members grouped together before departing for the various locations identified by MCSO to execute each warrant. (Doc. 333 at 11). Individual suspects, locations to be hit, and tactical matters were not discussed at the briefing. (Doc. 353 at 22). However, at the close of the briefing, White "may have said in concluding the briefing be safe, make sure warrants are valid, all that

good stuff." (*Id*. at 23).  Additionally, according to Bartel, either White or Smith "[…] said all of these cases were verified. They're all good to go. […]." (Doc. 333 at 11; Doc. 388-1 at 33.)

Once the arrest teams were identified, Bartel told the RFTF members "this is not our operation. We're not doing our – we are going to get to the house.  We're going to secure the house perimeter. We're going to knock and announce. We're not breaching. We're not making entry. We're going to call everybody out of the house.  If their target is there, we will place them under arrest."  (Doc. 353 at 28-29).  Following this final instruction, Team 3, including Bartel, Welch, Skipper, Fondren, and Busby departed to the locations identified in the arrest packets. (Doc. 239 at 4;Doc. 336 at 5-6; Doc. 339 at 6; Doc. 341 at 6).

At 6:30 a.m. on December 19, 2019, seven vehicles approached 11223 Old Moffett Road (the "Property").   (Doc. 353 at 4, 31).  Fondren, carrying a M4 rifle, went immediately through the neighbor's yard and into the side and back yard of the Property while checking the windows in order create a perimeter before the RFTF officers knocked on the door.  (*Id*.).  Upon arriving at Plaintiff's home, Skipper and Welch exited their respective vehicles and saw two males, later identified as Chris McLeod ("Chris") and Matthew Sullivan ("Sullivan") exiting the home via the side door in the carport. (Doc. 336-1 at 26; Doc. 339-1 at 79-80).  Skipper and Welch observed Bartel and Busby approach the males, but they continued walking toward the carport door.  (*Id*.) Bartel and Busby learned the identity of the two males (Chris and Sullivan) and were informed that McLeod did not live at the home.  (Doc. 353 at 32).  They were additionally told by Chris and Sullivan that McLeod was thought to be in jail.  (*Id*.).  Finally, the officers were told that Plaintiff was inside the home and there were guns in the home.  (*Id*. at 33). Skipper overheard one of the men say that a woman was inside the home.  (Doc. 339 at 7; Doc. 339-1 at 87-88).  Welch heard

Chris tell Busby and Bartel that his "wife or girlfriend" was in the house and that Nicholas McLeod was not there. (Doc. 353 at 35). Welch also heard one of the men yell "hey the police are looking for your uncle." (Doc. 336-1 at 27).

Although disputed by the parties, Welch contends that the carport door was partially open or ajar. (*Id*. at 28). According to Welch, when he approached the door, his flashlight was pointed down which cast a shadow and he could see a silhouette of someone inside. (*Id*. at 29-31). Welch announced "U.S. Marshals" and when no response came, he pushed the door open. (*Id*.). According, to Skipper, when he was a few feet from the door, a woman (Plaintiff) "presented herself in the doorway," holding a gun pointed at Skipper and Welch. (Doc. 339 at 7). Skipper and Welch commanded Plaintiff to drop the gun, and when she did not, they discharged their weapons. According to Fondren, who attempted to join Welch and Skipper at the carport door, the door was opened before he could join the officers and he was faced with Plaintiff holding a gun. (Doc. 239 at 6-7). Fondren heard Welch and Skipper identify themselves as officers and commanded Plaintiff to drop her gun, but she refused. (*Id*. at 6-8.). After Fondren observed and heard the first of several gunshots, he fired two (possibly three) rounds at Plaintiff. (*Id*.).

According to Plaintiff, she was in bed when she saw a beam of light in the side yard. (Doc. 353 at 1). Believing a prowler was outside, she got out of bed, picked up her pistol, and walked through the house towards the kitchen to ensure the door was locked. (*Id*.). As she reached for the lock, the kitchen door flew open towards her and all she saw were bright lights. (*Id*. at 2). According to Plaintiff, when the door flew open, she was holding a gun aimed at the floor. The officers yelled "Whoa, Whoa gun, gun" and Welch, Skipper and Fondren all opened fire. (Doc.

353 at 3-4, 42).  The officers collectively fired sixteen to eighteen bullets into the house, hitting Plaintiff five times.[2]  (*Id*. at 3).

Following the shooting, Plaintiff was ordered to exit the house, but informed the officers she had been shot and could not move.  (Doc. 239 at 8-9).  A team of officers ultimately cleared the house of threats and gave medical aide to Plaintiff.  (*Id*.).  Plaintiff was then transported to a hospital.  (*Id*.).

### D.    Post shooting

Several relevant facts are undisputed post-shooting.  The address listed on the warrant was not the last known address for McLeod or the address listed when he was previously arrested.  None of the officers present at the Property on December 19, 2019, investigated McLeod's address.  Although not directly relevant to this motion, the totality of the record indicates that Busby gave an investigative file to the Mobile County District Attorney's office where it was reviewed and later sent to the County Magistrate's office. (Doc. 331 at 5).[3]  The Magistrates' office then prepared and issued the warrants, including the address. (*Id*. at 5-6).  The record also reflects that prior to December 19, 2019, Busby sent Rebecca Miller ("Miller") (a civilian MCSO employee who is no longer a defendant) a list of round-up suspects.  (Doc. 353 at 17).  Smith then instructed Miller to run a search on the warrant subjects, that included three reports with identifying information, including addresses.  (*Id*.; Doc. 331).  Miller placed the reports in folders and gave them to Smith, but neither Miller nor Smith reviewed, researched, or investigated further.  (*Id*. at

---

[2] It is now undisputed that none of the shots fired by Fondren struck Plaintiff.

[3] Because of the number of officers and organizations involved, there are multiple motions for summary judgment pending in this action simultaneously.  Although these facts were not included in the factual summary specific to the United States, they do not appear to be disputed by the parties.

17-18; Doc. 331 at 7-8).[4]  Additionally, on December 18, 2019, Miller re-ran all the warrant subjects through JMS (Jail Management Systems), DOC (Dept. of Corrections), and BOP (Bureau of Prisons) between 2p.m. and 2:50 p.m. and then notified Smith that five of the subjects (but not McLeod) had recently been arrested.  (Doc. 331 at 9).  There is no dispute that the address provided on the warrant was Plaintiff's residence.  (Doc. 353 at 4).  Moreover, the McLeod warrants were not active on December 19, 2019, because on that morning, McLeod was incarcerated.

## II.    SUMMARY JUDGMENT STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' " *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Anderson*, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250. (internal citations omitted).

---

[4] Collectively it appears that Smith thought Miller was responsible for determining the last known address for the subjects and Miller believed she was simply running reports that Smith would use to determine last known addresses. The result is that neither Smith nor Miller determined last known addresses. Also, there is no dispute that the reports on McLeod contained more than one address, including Plaintiff's residence address and the more recent address listed from McLeod's last arrest.

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson*, 477 U.S. at 251-252.  The moving party bears the burden of proving that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 524 (11th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial." *Vega v. Invsco Group, Ltd.*, 432 F. App'x 867, 870 (11th Cir. June 24, 2011).  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)

(citation omitted).  "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

## III.    DISCUSSION

Plaintiff has asserted four counts of violations of Alabama law by federal employees: (1) negligence (Count XVIII), (2) wantonness (Count XIX), (3) assault and battery (Count XVII), and (4) false imprisonment (XX). The Government seeks dismissal of all claims. (Doc. 332).

### A.    The Federal Tort Claims Act and the Discretionary Function Exception

The Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), generally authorizes suits against the United States for damages:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*Berkovitz v. United States*, 486 U.S. 531, 536, 108 S. Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988)).

"The FTCA does not create a substantive cause of action against the United States, but rather provides a mechanism by which a plaintiff may bring a state law tort action against the federal government, in federal court." *Anderson v. United States*, 2024 WL 1923227, *1 (11th Cir. 2024) citing to *Stone v. United States*, 373 F.3d 1129, 1130 (11th Cir. 2004).  "Under the FTCA, the United States is subject to liability in a tort action in the same manner, and to the same extent, that a private individual would be under the law of the place where the tort occurred." *Id*.  citing to 28

U.S.C. § 1346(b)(1)).   However, the Act includes various exceptions to the waiver of sovereign immunity and when an exception applies, a court lacks subject matter jurisdiction.  *See Ochran v. United States*, 273 F.3d 1315, 1317 (11th Cir. 2001) ("unless the facts support liability under state law, the district court lacks subject matter jurisdiction to decide an FTCA claim.") (citation omitted).

Relevant to this action is the "discretionary function exception" ("DFE"), raised by the Government. The exception provides:

> [a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).  In *United States v. Gaubert,* 499 U.S. 315, 322-23, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), the Supreme Court instructed courts to implement a two-prong test to determine whether the challenged conduct involves a "discretionary function or duty" for purposes of § 2680(a)'s exception.  *Gaubert*, 499 U.S. at 322-23, 111 S.Ct. at 1273 (quoting § 28 U.S.C. 2680(a)). In the first part of the test, a court must determine whether the challenged acts "involve[e] an element of judgment or choice." *Gaubert*, 499 U.S. at 322-23.  "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has not rightful option but to adhere to the directive.'" *Gaubert*, 499 U.S. at 322.  If the challenged conduct is discretionary, the second part of the test requires a court to determine whether the conduct is "of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23.  "[T]he purpose of the discretionary function exception, is 'to prevent judicial "second-guessing" of

legislative and administrative decisions grounded in social, economic, and political policy.'" *Id*. quoting *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

### 1.    Negligence and Wantonness

According to Defendant, this Court lacks jurisdiction over the negligence and wantonness claims against the United States pursuant to the Discretionary Function Exception ("DFE") to the Federal Tort Claims Act ("FTCA") because the conduct of the federal officers (Welch, Skipper, Bartel, and Fondren) related to the McLeod warrants and Plaintiff's shooting was discretionary. (Doc. 333 at 16-23).  For support, Defendant relies on *Mesa v. United States*, 837 F.Supp. 1210, 1213 (S.D. Fla. 1983) (*affirmed by* 123 F.3d 1435 (11th Cir. 1997) and a number of other cases for the position that "the overwhelming consensus of federal law establishes that criminal law enforcement decisions – investigative and prosecutorial alike – are discretionary in nature, and, therefore, by Congressional mandate, immune from judicial review."  (*Id*.).

In response, Plaintiff contends that the acts of the federal officers were not discretionary and were not influenced by public policy considerations, and instead their "negligence was no more than overt carelessness," and breaches of federal statutes and the Constitution.  (Doc. 357 at 8).  More specifically, Plaintiff argues that conduct of the officers was not discretionary because it was mandated by (1) Title 18 U.S.C. § 3109 and Ala. Code 15-10-2, or (2) the United States Marshal's Service Policy Directives/ Standard Operating Procedures (SOPs), (3) was the result of carelessness, and (4) was a violation of the Constitution.  (*Id*. at 10-25).  Plaintiff attempts to distinguish *Mesa* arguing the Court's conclusion was limited to "narrow questions" and not the more general proposition on which the United States relies.  (*Id*. at 9). Plaintiff additionally argues that the Defendant failed to address the specific conduct of each federal officer under the

*Gaubert* test and therefore, failed to carry its burden to establish the discretionary function exception.  (*Id*. at 9-10).

### a. Challenged Conduct

As an initial matter, Defendant generally categorizes all the conduct of the federal officers as investigative, in line with the agents' duty to enforce the law, or as part of executing an arrest warrant.  As a result, Defendant argues that the Eleventh Circuit, in *Mesa*, has already determined that this conduct is subject to the DFE.   On the other hand, Plaintiff takes issue with Defendants' characterization and argues each separate act or decision of each federal officer must meet the *Gaubert* two-part test.  (Doc. 357 at 9-10).  In that regard, Plaintiff has classified the conduct as: (1) the decision of Welch and Skipper to stack the door and enter the house, (2) the federal agents' failure to investigate and their entry into the home, (3) Bartel's decision not to verify the warrants, and (4) the federal officers' decision to violate the constitution.  (*Id*. at 10-25).

In *Mesa*, the Eleventh Circuit affirmed the dismissal of a claim for negligence or recklessness against the Unites States under the FTCA based on the DFE.  *Mesa v. United States*, 123 F. 3d 1435 (11th 1997).  In so doing, the Court applied the two-part *Gaubert* test to the following conduct: (1) failure to properly ascertain the identity a residence prior to service of the arrest warrant, and (2) failure to cease detaining and questioning once the agents were inside the residence and allegedly should have known they detained the wrong individual.  (*Id*. at 1438).  The Eleventh Circuit then "readily conclude[d] that the decisions regarding how to locate and identify the subject of an arrest warrant and regarding whether the person apprehended is in fact the person named in the warrant are discretionary in nature and involve an element of judgment

or choice." *Id*.  As to the second *Gaubert* factor, the Court concluded that the conduct was

susceptible to public policy and stated as follows:

> For example, in deciding how extensively to investigate the location and identity of the subject, agents may weigh the urgency of apprehending the subject in light of such factors as the potential threat the subject poses to public safety and the likelihood that the subject may destroy evidence. A desire to keep the investigation secret—for tactical reasons, to protect confidential sources, to protect the agents involved, or for other reasons—may also factor into the decision as to how to locate and identify the subject of a warrant. In addition, agents may consider their available resources and decide how to allocate those resources among the many investigations for which they are responsible. All of these factors indicate that the decision regarding how to locate and identify the subject of an arrest warrant is fundamentally rooted in policy considerations, and that judicial second-guessing of this decision thus is not appropriate. We therefore conclude that the investigation of the whereabouts and identity of the subject of an arrest warrant prior to service of the arrest warrant is conduct that falls within the discretionary function exception.

*Id*. at 1438.  Notably, however, with respect to the first *Gaubert* factor, the Court noted "the

allegations in Count II do not sweep so broadly as to encompass all actions which might be taken

in deciding when and how to execute the arrest warrant."  As such, the Court answered only "the

narrower question of whether the process of locating and identifying the subject of an arrest

warrant is within the discretionary function exception."  *Id*. at n.3.

Later in *Williams v. U.S.*, 314 Fed. Appx. 253 (11th Cir. 2009), the Eleventh Circuit

recognized that "in general, because it is the mandatory duty of law enforcement agents to

enforce the law, decisions as to how to best fulfill that duty are protected by the discretionary

function exception" but instructed that "courts should not accept this general rule without

analyzing the specific facts of each case." *Williams*, 314 Fed. Appx. at 257.  It then considered the

facts and determined that the conduct of "how to prevent escape of a fleeing suspect or how to

carry out an arrest" was discretionary and subject to policy analysis satisfying the *Gaubert* two-part test. *Id*.

The Court agrees with Plaintiff that it must consider the challenged conduct separately under *Gaubert's* two-part test. However, to the extent that the challenged conduct in this action is the same as the conduct which the Eleventh Circuit has already determined is discretionary, precedent dictates this Court has no jurisdiction over those claims subject to the DFE of the FTCA. A comparison of the challenged conduct in this action to the conduct at issue in *Mesa* and *Williams*, compels this Court to conclude that Plaintiff's claims of negligence relating to the actions of the federal officers with respect to locating and identifying the subject of an arrest warrant or how to carry out an arrest warrant, are subject to the DFE. More specifically, the Court is satisfied that the conduct in this action as described by Plaintiff as (1) failing to investigate or verify the warrants (locating the subject of the arrest warrant) is discretionary pursuant to *Mesa* and (2) stacking Plaintiff's door (in carrying out the execution of an arrest warrant) is discretionary pursuant to *Williams* because they require the officers to use judgment and are subject to policy considerations. This Court then, will consider whether the remaining challenged conduct of Welch's and Skipper's entry into Plaintiff's home is "discretionary in nature"—that is, whether it involved "an element of judgment or choice" and if so, whether it is "of the kind that the discretionary function exception was designed to shield." *See Gaubert*, at 322, 111 S. Ct. at 1273 (quotation marks omitted). As to the entry, Plaintiff has set forth four grounds to determine the conduct is not discretionary. The Court will address each one in turn.

**b.  18 U.S.C. § 3109 and Alabama Code (1975) 15-10-2**

Plaintiff contends that Welch and Skipper's decision to enter the house was not discretionary because the conduct was mandated by Title 18 U.S.C. § 3109 and Ala. Code 15-10-2.[5]  (Doc. 357 at 10-12).   Title 18 U.S.C. § 3109 entitled "Breaking doors or windows for entry or exit" states as follows:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

Similarly, Alabama Code (1975) 15-10-2 entitled "When an officer may execute a warrant; authority of officer to break and enter dwelling house", states:

> An officer may execute a warrant of arrest on any day and at any time; but in doing so, he must inform the defendant of his authority and, if required, must show the warrant. If an officer executing an arrest warrant is refused admittance after notice of his authority and purpose, he may break an outer or inner door or window of a dwelling house in order to make the arrest.

As the Court understands Plaintiff's position, because the federal/state statutes dictate the manner in which the officers are required to perform an entry while executing a warrant, the officer is divested of discretion, rendering the actions of Welch and Skipper not within the discretionary function exception.[6]  This Court is not persuaded.

---

[5] Although Plaintiff argues these statues were violated by Welch and Skipper when they decided to "stack" the door, as well, the statutes contain no language with respect to such conduct and Plaintiff offers no other "federal statute, regulation or policy" mandating such conduct.  *See Gaubert*, 499 U.S. at 322.  Moreover, as stated above, the Court has determined that "stacking the door" is discretionary pursuit to *Williams* because it is part of an officer's determination on how to carry out an arrest.

[6] Of note, *Gaubert* does not indicate that a state statute can prescribe the conduct that a federal officer must follow.

First, Plaintiff has not cited to any case where a Court has applied § 3109 or Ala. Code 15-10-2 in this context to defeat the DFE.  Moreover, the language of § 3109 and Ala. Code 15-10-2 does not support the establishment of a mandatory duty without discretion.  "[I]f a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' " there is no judgment or choice involved. *Gaubert,* 499 U.S. at 322, 111 S.Ct. 1267; *see also Phillips v. United States*, 956 F.2d 1071, 1076 (11th Cir. 1992) ("Where there exists a mandatory responsibility, there is no room for a policy choice."). The inquiry focuses on "whether the controlling statute or regulation mandates that a government agent perform his or her function in a specific manner." *Hughes v. United States*, 110 F.3d 765, 768; *see also Autery v. United States*, 992 F.2d 1523, 1529 (11th Cir. 1993) (observing that an unspecific statutory or regulatory guideline implies that discretion was intended). Rather, the statutes - by their language- still require the exercise of discretion.  More specifically, § 3109 makes no mention of how an officer "must" enter the curtilage or what positions officers should take to announce themselves.  Rather, it only dictates when an officer "may" break open an outer door or window.  This language lends support that the officer's actions with respect to § 3109 still requires discretion.  The conditions by which an officer "may" enter a home likewise requires judgment as to what constitutes refusal or what is necessary for to liberate oneself or others.  The same is true for Ala. Code 15-10-2 which instructs that an officer "must inform a defendant of his authority" before he "may" enter a house. Compliance with the language provided necessarily requires an officer to use discretion to determine the type of notice and explanation to provide and even then, whether he will enter.  Thus, the language of § 3109 and Ala. Code 15-10-2 does not dictate a specific "mandatory

responsibility" as Plaintiff suggests and instead involve a permissible exercise of judgment.  *See Phillips, supra*.   As such, *Gaubert's* first factor is met.

Having determined the conduct involved an element of judgment, this Court must next determine "whether that judgment [or choice] is of the kind that the discretionary function exception was designed to shield." *Id*. at 322–23, 111 S. Ct. at 1273 (quotation marks omitted).  In *Mesa* in determing whether officers' actions satisfied the second *Gaubert* factor, the Eleventh Circuit considered (1) the urgency of apprehending the subject in light of such factors as the potential threat the subject poses to public safety and the likelihood that the subject may destroy evidence, (2) a desire to keep the investigation secret—for tactical reasons, to protect confidential sources, to protect the agents involved, or for other reasons (3) available resources and how to allocate those resources among the many investigations for which they are responsible.  Similarly, in *Williams* the Court considered an officer's training, the need to restrain, the concern for the individual's and the public's safety, available resources, and the information at hand in determining the proper course of action.  *Williams*, at 258.  These considerations persuade this Court that whether and how to enter a home to execute an arrest warrant are grounded in public policy considerations.  As a result, the Court is satisfied that the second *Gaubert* factor has been met. Consequently, the Court is not satisfied that § 3109 or Ala. Code 15-10-2 renders the conduct of the federal officers outside of the DFE.

### c.  USMS Directives/Standard Operating Procedures

Plaintiff alternatively argues that the USMS Policy Directives/Standard Operating Procedures ("SOPs") dictate the manner in which officers should conduct themselves, removing discretion and negating the application of the DFE.  (Doc. 357 at 12-21).  Defendant, however,

contends that the SOPs are only applicable to the warrants that have been adopted by the USMS and because no adoption took place with the McLeod warrant, the SOP provisions regarding warrants are immaterial to this action. (Doc. 333 at 21; Doc. 372 at 7-9). Moreover, Defendant contends that even if the SOPs applied, sovereign immunity is still not waived because the SOPs do not create an independent state law tort.[7] (*Id*. at 21-23).

The Court is not persuaded by Plaintiff's position. Assuming arguendo that Directives and SOPs applied to the conduct of the federal officers, they leave room for the exercise of judgment or discretion. For example, the SOPs indicate that "Team Leaders are responsible for making critical tactical decisions on the street for each arrest and ensuring the Enforcement Operations standard operating procedures, policies, and regulations are adhered to by all team members." (Doc. 357 at 13; Doc. 387-1 at 5). This language supports that agents have discretion in "making critical tactical decisions." With regard to "Executing Search Warrants and Arrests Warrants" the SOPs, acknowledging safety concerns, set forth procedures to follow for the execution of warrants which are prefaced with phrases such as "[t]ime permitting" or indicate that warrants "should" be confirmed. (Doc. 387-1 at 10-12). Policy Directive 8.9 entitled "Arrests" under the subsection "Entry into a private dwelling", relied on by Plaintiff, states:

> . . . when the investigation develops information that a fugitive is located in a specific private premises, entry into the premise may be accomplished in any of the following ways:
> [. . .]
> d. with an arrest warrant, if the residence is that of the fugitive and the deputy has a reasonable belief that the subject is inside, forced entry may be used.

---

[7] Defendant misinterprets Plaintiff's argument. Plaintiff does not contend that a violation of the directives/SOPs create a cause of action. (*See* Doc. 357 at 18).

(Doc. 387-2 at 3). The language of this directive sets forth a number of ways in which entry may be accomplished, leaving it to an officer to exercise judgment as to whether varying criterion have been met. Further, in exercising that judgment, the directives do not require entry or use of force, but allow for it. Again, this language promotes the exercise of discretion rather that dictates mandatory conduct. Moreover, for the reasons stated above, the Court has determined that the conduct of whether and how to enter a home to execute an arrest warrant is grounded in public policy considerations. As a result, even if the Directives and SOPs apply to the conduct of the officers, without adoption of the warrant by the USMS, the Court is not persuaded, that their application removes the actions of the officers from the DFE.

### d. Careless Inattention

Third, Plaintiff asserts that Bartel's decision to not verify the warrant was not discretionary but was the result of careless inattention. (Doc. 357 at 21-23). Moreover, Plaintiff contends Bartel's failure to verify the warrant "was not the kind of discretionary decisions that the DFE was intended to shield from judicial second-guessing." (*Id*. at 21). In response, the government asserts that the cases relied on by Plaintiff are distinguishable and "inapplicable to the discretionary function analysis in light of *Mesa* and *Williams*." (Doc. 372 at 6). This Court agrees. First, the cases relied on by Plaintiff are distinguishable from this action and, therefore, do not compel the result Plaintiff seeks. Moreover, as set forth above, Bartel's failure to investigate the warrant or the identity of the subject of the warrant is discretionary conduct subject to policy consideration pursuant to *Mesa* and W*illiams*.

23

### e.  Constitutional Violations

Finally, Plaintiff contends the actions of the federal officers were not discretionary because they violated the Constitution.  (Doc. 357 at 23-25).  The Court appreciates Plaintiff's position that a majority of circuits permit FTCA claims against the Government when a Constitutional violation occurs.  However, as Plaintiff concedes, Eleventh Circuit precedent expressly defeats Plaintiff's argument with respect to the existence of a Constitutional violation.  (*See* Doc. 357 at 24-25 citing *Shivers v. United States*, 1 F.4th 924 (11th Cir. 2021)).  As a result, until the Eleventh Circuit determines otherwise, S*hivers* dictates this outcome, and Plaintiff's arguments cannot prevail.

### 2.    The FTCA and Intentional Torts

The Government seeks dismissal of Plaintiff's claims of assault and battery and false imprisonment asserted against the United States for the actions of Fondren, Welch, and Skipper. (Doc. 333 at 23-27).  According to the Government, Plaintiff's intentional tort claims "are premised on the shooting by federal law enforcement", but because the shooting was lawful pursuant to state-law immunities or Alabama's self-defense law, Plaintiff's claims cannot survive. (*Id*. at 24-27).  In response, Plaintiff contends her claims are not limited to the shooting but include the actions of the officers when they entered the curtilage of her home, stacked against her door with weapons raised, failed to knock and announce, opened her kitchen door, blinded her with tac lights, and then shot her.  (Doc. 357 at 26).  As such, Plaintiff argues the officer's entry and failure to knock and announce proximately caused her injuries, negating any claim of "lawfulness" related to her shooting.

The parties agree that the discretionary function exception does not apply to Plaintiff's intentional tort claims.  (Doc. 333 at 23; Doc. 357 at 2 (*see also* 28 U.S.C.A. § 2680(h)).  Likewise,

there is no dispute that the "intentional tort exception" of the FTCA does not provide immunity

to the United States in this instance because that immunity is waived with respect to claims

arising out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious

prosecution by federal investigative or law enforcement officers. *See* 28 U.S.C.A. § 2680(h).  As

such, this Court must determine whether the facts support summary dismissal of Plaintiff's claims

against each of the officers for assault and battery and false imprisonment under Alabama law.

*See Ochran v. United States*, 273 F.3d 1315, 1317 (11th Cir. 2001) (finding that FTCA claims are

governed by the law of the state where the alleged tortious activity occurred).

Although not distinguished by the parties, there is no dispute that Fondren's and Bartel's

participation in the events of December 19, 2019, differed from the actions of Welch and Skipper.

More specifically, there is no dispute that Fondren did not stack against Plaintiff's door and

Plaintiff has previously dismissed her originally alleged claim of a Fourth Amendment violation

against Fondren for his failure to knock and announce.  Moreover, Plaintiff has conceded that

none of the shots fired by Fondren struck Plaintiff.  Finally, this Court has addressed Plaintiff's

constitutional claims against Fondren and determined that he is entitled to qualified immunity

for Plaintiff's alleged violations of the Fourth Amendment based on unlawful entry and use of

deadly force.  For the same reasons, this Court finds that Plaintiff's state law intentional tort

claims based on Fondren's actions are subject to dismissal because Fondren's actions were

reasonable or lawful.  Similarly, Bartel did not stack against Plaintiff's door or fire his weapon and

this Court has determined that he is entitled to qualified immunity with respect to Plaintiff's

failure to knock and announce claim in his supervisory capacity because he did not instruct Welch

and Skipper to forcibly enter and was not aware that entry was made until after the fact.

Consequently, the Court finds that Plaintiff's state law intentional tort claims based on Bartel's actions are subject to dismissal because his actions were reasonable or lawful.

The claims against Welch and Skipper, however, are distinguishable. The Court appreciates the Government's position that Plaintiff's assault and battery claim is associated with Plaintiff's shooting. However, Plaintiff has adequately set forth facts that Plaintiff was assaulted by the actions of the officers prior to their use of force. Further, although this Court determined that Welch and Skipper's entry onto Plaintiff's curtilage and ultimate shooting was not unconstitutional, no such conclusion was reached with respect to Welch and Skipper's failure to knock and announce claim. (*See* Doc. 399).

As a result, this Court is not persuaded that Plaintiff's tort claims based on their actions taking place prior to the shooting, even if the shooting was reasonable, are necessarily subject to dismissal as well. As such, the Court will address the torts in turn.

### a.  Assault and Battery

The Alabama Supreme Court has defined "assault" as "an intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a wellfounded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented." *Wright v. Wright*, 654 So.2d 542, 544 (Ala. 1995) (citations omitted). "A successful assault becomes a battery, which consists of the touching of another in a hostile manner." *Id*. (citations omitted).

### 1.  Battery

The Government contends Plaintiff's assault and battery claims are subject to dismissal because the officers lawfully fired their weapons either pursuant to Alabama's state law

immunities provided by Ala. Code § 13A-3-27 or Alabama's self-defense law provided by at Ala. Code § 13A-3-23. (Doc. 333 at 24-25). For support, the Government relies on *Williams v. United States*, 314 F. App'x 253 (11th Cir. 2009) (finding a battery claim fails under the FTCA pursuant to a Georgia Law that permitted a "arrest by private person") and *Harris v. United States*, 2012 WL 13326289 (N.D. Ala., March 20, 2012) (finding battery claim fails under the FTCA upon application of Alabama's "arrest by private persons" statute). (*Id*.) In response, Plaintiff argues that (1) Alabama peace officer immunity (13A-3-27) does not apply to the actions of officers in an FTCA context, (2) even if state law immunities applied, Welch, Skipper, and Fondren would not be immune because they acted maliciously, willfully, or in bad faith, and (3) the sudden emergency doctrine, which provides justification for an assault and battery – cannot be invoked by the instigator of the event. (Doc. 357 at 28-29).

### a.  State Law Immunities

This Court recognizes that courts have used a variety of approaches in determining whether federal officers and ultimately the United States, are entitled to benefit from state law immunities or privileges afforded to law enforcement officers. *See Liggion v. United States*, 696 F.Supp.3d 1257 (N.D. Ga. Sept. 27, 2023) (analyzing the various approaches employed by multiple circuits on the issue of the "private person analog" in the FTCA context.). The Eleventh Circuit has not resolved this issue in a published decision. Nevertheless, in an unpublished decision, the Eleventh Circuit, when considering the liability of the United States under the FTCA for assault and battery based on the actions of federal officers, considered not whether state law immunity shielded the agents, but whether the actions were permitted by Georgia's citizen's arrest statute. *Williams*, at 259. However, the Eleventh Circuit has also affirmed a district court's dismissal of an

assault and battery claim under the FTCA based on the application of Florida Statute 776.05 entitled "Law enforcement officers; use of force in making an arrest." *See Darlymple v. United States*, 460 F.3d 1318 (11th Cir. 2006). Without explicit direction from the Eleventh Circuit, this Court is not persuaded that under the FTCA's private person analog, state law immunities apply to shield the actions of the officers and therefore, the United States of liability.[8]

### b. State Law Defenses or Privileges

Regardless of whether the federal officers can take advantage of the official immunities provided to state officers to defeat Plaintiff's FTCA claim for assault and battery based on the shooting, Plaintiff's claims can still be subject to dismissal based on available state law defenses. Here, the United States argues the actions of the officers were justified based on Alabama's self-defense statute which applies to private citizens. Under Ala. Code § 13A-3-23:

> (a) A person is justified in using physical force upon another person in order to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he or she may use a degree of force which he or she reasonably believes to be necessary for the purpose. A person may use deadly physical force, and is legally presumed to be justified in using deadly physical force in self-defense or the defense of another person pursuant to subdivision (5), if the person reasonably believes that another person is:
>
> (1) Using or about to use unlawful deadly physical force.

In *Duncan v. Ward*, 2021 WL 2000475, *5 (N.D. Ala. May 19, 2021), relied on by the Government, the plaintiff's state law assault and battery claims pursuant to the FTCA were summarily dismissed after the court found the officer's use of force was reasonable. The facts in

---

[8] Given the availability of the Alabama self-defense statute's application to the action of the officers, this Court need not address Plaintiff's alternative argument that the immunities would still be unavailable because the officers acted with actual malice, willfulness, or in bad faith.

*Duncan* established that an officer used deadly force following a car chase when, after the chase ceased, the occupant of the vehicle exited the car holding a firearm.  The court, after analyzing Duncan's Fourth Amendment use of force claim, determined that the officers acted reasonably in using deadly force.  Turning then to the plaintiff's state law claim for assault and battery, the court determined that the officers "reasonable belief immunizes him from assault-and-battery liability." (*Id*. at *5).

This Court has previously determined by separate order that Welch and Skipper's use of deadly force was reasonable. Namely, the undisputed facts establish that once Plaintiff's door was open, Welch and Skipper were faced with Plaintiff holding a handgun.  Accordingly, the Court similarly finds, Plaintiff's claim of battery based on the shooting fails.

### 2.  Assault

Even if Welch and Skipper's use of force was reasonable or lawful, there remain facts from which a factfinder could reasonably find that the failure of the officers to knock and announce which caused Plaintiff to be faced with multiple individuals with guns pointed at her, supports a claim for assault.  The Government has not argued or cited to any authority which would support summary dismissal based on privileges or immunities under Alabama law specific to Plaintiff's assault claim for any actions except the shooting. Instead, the Government relies on *Duncan v. Ward*, 2021 WL 2000475, (N.D. Ala. May 19, 2021) discussed herein above.  However, in *Duncan*, unlike here, there was no moment of time where the officers potentially acted unlawfully before the moment that necessitated the use of deadly force (Plaintiff brandishing a weapon).  As such, even if this Court applied the analysis in *Duncan*, the distinguishable facts do not support an

identical outcome with respect to an assault claim predicated on the actions of the officers prior to the shooting.

Instead, considering the facts as Plaintiff presents them, Welch and Skipper, armed with weapons, stacked against Plaintiff's door and without knocking or announcing their presence, pushed Plaintiff's door open, despite being told that no entry was to be made by Bartel. When the officers undertook these actions, Plaintiff's weapon was not visible to the officers. The Court is not satisfied that the facts considered in light most favorable to Plaintiff fail to support a claim for assault under Alabama Law and the Government has not specifically raised any argument with respect to state law claim of assault for actions of the officers prior to shooting, *i.e.* pushing open the door with guns raised. Accordingly, Defendant's motion with respect to Plaintiff's state law claim for assault survives.

### b.  False Imprisonment

The Unites States seeks dismissal of Plaintiff's state law claim for false imprisonment based on Plaintiff's shooting, arguing that because the shooting was lawful, her false imprisonment claims "premised on the deployment of lethal force" should also be dismissed. In response, Plaintiff asserts that because the federal agents provoked or instigated Plaintiff's need to defend herself in her home because of their unlawful entry, their actions were not justified or lawful and they are not subject to dismissal. (Doc. 357 at 27-31).

Alabama Code § 6–5–170 "defines false imprisonment as 'the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty'"). "And this 'includes directly restraining a person as well as threatening force to keep him in place or make him go where he does not wish to go.'" *Exford v. City of Montgomery*, 887 F.Supp.2d 1210,

1229 (M.D. Ala.  August 24, 2012) quoting *Yabba v. Ala. Christian Acad.*, 823 F.Supp.2d 1247, 1251 (M.D.Ala.2011) (Fuller, J.) (citing *Crown Central Petrol. Corp. v. Williams*, 679 So.2d 651, 653 (1996)); *see also Big B., Inc. v. Cottingham*, 634 So.2d 999, 1001 (Ala.1993).

To the extent that Plaintiff's claim for false imprisonment is based on the actions of the officers following her shooting, summary judgment is warranted.  More specifically, because this Court has determined that Welch, Skipper, and Fondren, acted reasonably in deploying deadly force rendering the shooting lawful, the Court is satisfied that their post shooting actions of "clearing" the home following the shooting is, likewise, lawful.  As such, those actions do not support a claim for false imprisonment under Alabama law.  However, to the extent that Plaintiff's false imprisonment claim is based on the actions of Welch and Skipper prior to the shooting, summary judgment is not warranted.  Much like how an unannounced, forceful entry can create an assault from the execution of a warrant, the unannounced forceful entry can deprive a person's freedom of movement through the threat of force.  Therefore, the Court is not convinced that the facts presented by Plaintiff fail to support a claim for false imprisonment under Alabama Law.

## IV.    CONCLUSION

For the reasons set forth herein above, the motion is **GRANTED in part** and **DENIED in part**.

**DONE and ORDERED** this 26th day of September, 2024.

/s/ JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE